HUESTON HENNIGAN LLP
Moez M. Kaba, State Bar No. 257456
mkaba@hueston.com
Cassidy M. O'Sullivan, State Bar No. 340492
cosulllivan@hueston.com
523 West 6th Street, Suite 400
Los Angeles, CA 90014
Telephone:     (213) 788-4340
Facsimile:     (888) 775-0898

Attorneys for Defendant
*SomaLogic, Inc.*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| FORMIC VENTURES, LLC., THE MICHAEL ANTONOV CHARITABLE FOUNDATION, INC., BEOFUND LLC. and METAPLANET HOLDINGS OU, <br><br> Plaintiffs, <br><br> v. <br><br> SOMALOGIC, INC. and DOES 1-10, <br><br> Defendants. | Case No. <br><br> **DEFENDANT SOMALOGIC, INC.'S NOTICE OF REMOVAL OF CIVIL ACTION** <br><br> Superior Court, San Francisco County <br> Case No.: CGC-23-605398 <br> State Court Complaint Filed: March 24, 2023 <br><br> *[Filed concurrently with Civil Cover Sheet, Declaration of Moez M. Kaba, and Corporate Disclosure Statement]* |

6411960

1  **TO THE CLERK OF THE UNITED STATES DISTRICT COURT FOR THE**

2  **NORTHERN DISTRICT OF CALIFORNIA AND PLAINTIFFS:**

3  **PLEASE TAKE NOTICE** that pursuant to 28 U.S.C. §§ 1332, 1441(b), and 1446 Defendant

4  SomaLogic, Inc. ("SomaLogic") hereby removes the above-captioned action from the Superior Court

5  of the State of California in and for the County of San Francisco (the "State Court") to the United

6  States District Court for the Northern District of California, San Francisco Division on the following

7  grounds:

8  ## PROCEDURAL HISTORY

9  1.     On March 24, 2023, Plaintiffs Formic Ventures, LLC, The Michael Antonov

10  Charitable Foundation, Inc., Beofund LLC, and Metaplanet Holdings OU ("Plaintiffs") commenced

11  this action against SomaLogic and Palamedrix, Inc. ("Palamedrix") in the State Court.

12  2.     Plaintiffs allege four claims under California law arising out of investments made by

13  the Plaintiffs in Palamedrix, a start-up which was acquired by SomaLogic in a merger that completed

14  in August 2022: (1) violation of California Penal Code Section 496(c); (2) breach of contract; (3)

15  fraudulent inducement; and (4) conversion. A true and correct copy of Plaintiffs' unverified

16  Complaint and its exhibits is attached hereto as **Exhibit A**.

17  3.     SomaLogic was served with a copy of the Summons and Complaint on March 30,

18  2023, through its agent for service of process. Plaintiffs filed a Proof of Service on or about April 4,

19  2023. A true and correct copy of Plaintiffs' filed Notice of Proof of Service which has been obtained

20  from the State Court docket is attached hereto as **Exhibit B**.

21  4.     On May 5, 2023, Plaintiffs filed a Request for Dismissal in the State Court requesting

22  dismissal of Defendant Palamedrix and served this Request on SomaLogic via email the same day.

23  A true and correct copy of the Plaintiffs' Request for Dismissal of Palamedrix is attached hereto as

24  **Exhibit C**.

25  5.     The State Court dismissed Palamedrix as a defendant the same day, leaving

26  SomaLogic as the only defendant. A true and correct copy of the State Court's order dismissing

27  Palamedrix as a defendant is attached hereto as **Exhibit D**.

28  6.     A true and correct copy of the complete State Court docket for this action is attached

2

6411960

1   hereto as **Exhibit E**.

2   <u>**BASIS FOR REMOVAL: DIVERSITY JURISDICTION**</u>

3   A notice of removal must simply contain a "short and plain statement of the grounds for

4   removal." 28 U.S.C. § 1446(a). This Court has original jurisdiction under 28 U.S.C. § 1332 pursuant

5   to 28 U.S.C. § 1441 because the amount in controversy exceeds $75,000, and because Plaintiffs and

6   SomaLogic (the only remaining non-fictitious defendant) are citizens of different states.[1]

7   **A.  <u>Complete Diversity Exists Between Plaintiffs and SomaLogic</u>**

8   Complete diversity exists between Plaintiffs and SomaLogic because they are citizens of

9   different states.

10   1.   <u>Plaintiffs' Citizenship</u>

11   7.   Plaintiff Formic Ventures, LLC ("Formic") is a Delaware limited liability company

12   ("LLC") with its principal place of business in San Francisco, California. Complaint, ¶ 6. The

13   Complaint states that "[a]t least one of Formic's members is a California resident." *Id.*

14   8.   For purposes of diversity jurisdiction, "an LLC is a citizen of every state of which its

15   owners/members are citizens." *Johnson v. Columbia Properties Anchorage, LP*, 437 F.3d 894, 899

16   (9th Cir. 2006).

17   9.   Despite a reasonably diligent search of public records and court filings, SomaLogic

18   is unable to conclusively determine the membership of Formic because the membership of Delaware

19   LLCs is not a matter of public record. Declaration of Moez M. Kaba ("Kaba Decl."), ¶¶ 2-3.

20   10.   On information and belief, Formic is not a citizen of Delaware or Colorado (the states

21   of SomaLogic's citizenship). *See* Kaba Decl., ¶ 2. This satisfies SomaLogic's pleading obligations.

22   *See Lincoln Ben. Life Co. v. AEI Life, LLC*, 800 F.3d 99, 107-10 (3d Cir. 2015) (noting that because

23   "[t]he membership of an LLC is often not a matter of public record . . . a plaintiff need not

24

25   _____

26   [1] Before Palamedrix was dismissed from this action, it was a non-diverse defendant because it was a citizen of California (like several of the Plaintiffs). Palamedrix was a citizen of Delaware and California because it was a Delaware corporation with its principal place of business in La Jolla, California. Complaint, ¶ 11. Once SomaLogic directed Plaintiffs to certified Delaware Secretary of State filings stating that Palamedrix was the non-surviving entity in the merger with SomaLogic in 2022, Plaintiffs moved to dismiss Palamedrix, and the Court promptly granted this request. *See* Ex. C and D.

27

28

3

6411960

1    affirmatively allege the citizenship of each member of a defendant LLC if it is unable to do so after

2    a reasonable investigation. If the plaintiff is able to allege in good faith that the LLC's members are

3    not citizens of its state of citizenship, its complaint will survive a facial challenge."); *accord Carolina*

4    *Cas. Ins. Co. v. Team Equip., Inc*., 741 F.3d 1082, 1087-888 (9th Cir. 2014). *See also Fiesta Mart,*

5    *LLC v. ACON Invs., LLC*, 2019 WL 3080911, *1-2 (S.D. Tex. Mar. 18, 2019) (finding that pleading

6    in notice of removal that defendant was unable to conclusively determine the membership of an LLC

7    despite a reasonably diligent search of public records and court filings, but that on information and

8    belief the LLC was not a citizen of the same states as any defendant, was sufficient to satisfy

9    defendant's obligations; and ordering both parties to file "verified proof indicating the identity and

10   citizenship of any and all members of both parties traced through each layer of each entity, however

11   many there may be.").

12       11.    Plaintiff The Michael Antonov Charitable Foundation, Inc. (the "Foundation") is a

13   California corporation with its principal place of business in San Francisco, California. Complaint, ¶

14   7. Pursuant to 28 U.S.C. § 1332(c), "a corporation shall be deemed to be a citizen of every State and

15   foreign state by which it has been incorporated and of the State or foreign state where it has its

16   principal place of business[.]" Because the Foundation was incorporated in California, and its

17   principal place of business is in San Francisco, California, the Foundation's citizenship for diversity

18   purposes is California. *Id.*

19       12.    Plaintiff Metaplanet Holdings OU ("Metaplanet") was incorporated in Tallinn,

20   Estonia. Complaint, ¶ 8. Pursuant to 28 U.S.C. § 1332(c), it shall be deemed to be a citizen of Estonia

21   as its place of incorporation. On information and belief, Estonia is also Metaplanet's principal place

22   of business (i.e., its "nerve center") because its headquarters, managing partner, and other employees

23   appear to be located in Tallinn, Estonia and Metaplanet has no physical presence in the United States.

24   *See* Kaba Decl., ¶¶ 4-7; *Hertz Corp. v. Friend*, 130 S. Ct. 1181, 1192 (2010) (a corporation's

25   "principal place of business" is "best read as referring to the place where a corporation's officers

26   direct, control, and coordinate the corporation's activities [i.e.,] the corporation's 'nerve center.'").

27   Therefore, Metaplanet's citizenship for diversity purposes is Estonia. Complaint, ¶ 8.

28       13.    Plaintiff Beofund LLC ("Beofund") is a New Mexico LLC with its principal place of

6411960

business in Danville, California. Complaint, ¶ 9. For purposes of diversity jurisdiction, "an LLC is a citizen of every state of which its owners/members are citizens." *Johnson*, 437 F.3d at 899. Records from the New Mexico Secretary of State website disclose that the sole member of Beofund is Hanna Concern Global LLC, another New Mexico LLC with its address in Danville, California. Kaba Decl., ¶¶ 8-10. The sole member of Hanna Concern Global LLC is Dmitriy Matthew Shlosberg, a natural person whose address is in Danville, California. *Id.,* ¶ 10.

14. The citizenship of a natural person is determined by his "state of domicile," namely his "permanent home, where [he] resides with the intention to remain or to which [he] intends to return." *Kanter v. Warner-Lambert Co.*, 265 F.3d 853, 857 (9th Cir. 2001); *D.C. v. Murphy*, 314 U.S. 441, 455 (1941) ("The place where a man lives is properly taken to be his domicile until facts adduced establish the contrary."); *Lopez v. Nationstar Mortgage LLC*, 2015 WL 6478263, *2 (C.D. Cal. Oct. 26, 2015) ("In the absence of evidence to the contrary, a party will be treated as a citizen of its state of residence for federal diversity purposes."). Mr. Shlosberg is Beofund's Manager. Complaint, Ex. 1. According to public records, Mr. Shlosberg's place of residence is Danville, California. Kaba Decl., ¶ 11. On information and belief, Mr. Shlosberg is therefore domiciled in California, and the citizenship of Beofund for diversity purposes is California. *See Johnson*, 437 F.3d at 899.

15. In summary, on information and belief, the Plaintiffs' citizenships for diversity purposes are California and Estonia.

2. <u>Defendants' Citizenship</u>

16. SomaLogic is a Delaware corporation with its principal place of business in Boulder, Colorado. Complaint, ¶ 10. Pursuant to 28 U.S.C. § 1332(c), SomaLogic is a citizen of Delaware and Colorado.

**17.** While Plaintiffs also named "Does 1-10" as fictitious defendants in this action (see Complaint, ¶ 12), only SomaLogic's citizenship is relevant for diversity jurisdiction. 8 U.S.C. § 1441(b) (for removal under diversity jurisdiction, "the citizenship of defendants sued under fictitious names shall be disregarded."); *Soliman v. Philip Morris Inc.*, 311 F.3d 966 (9th Cir. 2002)

6411960

1  ("The citizenship of fictitious defendants is disregarded for removal purposes").[2]

2     18.    In sum, complete diversity of citizenship exists here because Plaintiffs (California,

3  Estonia), have a different citizenship from Defendant SomaLogic (Delaware, Colorado), satisfying

4  28 U.S.C. §§ 1332(a) and 1441(b).

5     **B.    The Amount in Controversy Exceeds $75,000**

6     19.    The amount in controversy in this case plainly exceeds $75,000. 28 U.S.C. § 1332(a).

7  "[A] defendant's notice of removal need include only a plausible allegation that the amount in

8  controversy exceeds the jurisdictional threshold." *Dart Cherokee Basin Operating Co., LLC v.*

9  *Owens*, 574 U.S. 81, 89 (2014). When courts "assess the amount in controversy at the time of

10  removal, [they] must include all relief to which a plaintiff is entitled if the action succeeds." *Fritsch*

11  *v. Swift Trans. Co. of Arizona, LLC*, 899 F.3d 785, 794 (9th Cir. 2018).

12     20.    Accordingly, "[t]he amount in controversy includes all recoverable damages sought

13  by a plaintiff, including compensatory damages, punitive damages, statutory penalties, and attorney's

14  fees when authorized by statute." *Martin v. Container Store, Inc.*, 601 F. Supp. 3d 614, 616 (C.D.

15  Cal. 2022) (citing *Galt G/S v. JSS Scandinavia*, 142 F.3d 1150, 1155-56 (9th Cir. 1998)).

16     21.    Here, the Court can reasonably ascertain from Plaintiffs' Complaint that the amount

17  in controversy exceeds $75,000. For example:

18     • Plaintiffs assert they have suffered "material financial harm" in the following

19        amounts: Formic ($4,366,348.19); the Foundation ($168,779.84); Beofund

20        ($41,994.89); Metaplanet ($4,084,692.84). Complaint, ¶ 56.

21     • On its breach of contract claim, Plaintiffs assert they have suffered in excess of $8

22        million in damages. *Id.*, ¶ 67.

23  _____

24  [2] SomaLogic will later move to strike these fictitious defendants because federal courts do not permit the use of doe defendants. *See, e.g.*, *Lubin v. Sybedon Corp.*, 688 F. Supp. 1425, 1456-57 (S.D. Cal.

25  1988) (striking the doe defendants from the case after noting that "[t]he Ninth Circuit has repeatedly held that a suit naming Doe defendants may not be maintained in federal court.") (internal citations

26  omitted); *Molnar v. Nat'l Broad. Co.*, 231 F.2d 684, 687 (9th Cir. 1956) ("This attempt to join

27  fictitious defendants is said to be justified in California practice. However that may be, no one of the Rules of Civil Procedure under which federal courts operate gives warrant for the use of such a

28  device."); *Valdez v. Johnson & Johnson Consumer, Inc.*, 2021 WL 2982913, at *21 (S.D. Cal. July 15, 2021) (dismissing all Doe defendants with prejudice).

6411960

- Plaintiffs' Prayer for Relief seeks "treble damages of no less than $25,985,447.30" for their statutory claim. *Id.*, p. 14 ¶ 1.

22.   Plaintiffs also seek punitive and exemplary damages, as well as attorneys' fees. *Id.*, p. 14 ¶¶ 3-5. SomaLogic expressly denies that punitive/exemplary damages or attorneys' fees should be awarded here; however, for purposes of the amount in controversy requirement, this claimed relief should be considered. *See Martin*, 601 F. Supp. 3d at 616.

23.   SomaLogic denies any liability in connection with Plaintiffs' claims and does not concede that Plaintiffs are entitled to any damages. But given the number of liability theories pursued and the claimed damages, it is facially apparent that the amount in controversy exceeds $75,000.

24.   Therefore, because diversity of citizenship exists and the amount in controversy exceeds $75,000, this Court has original jurisdiction of the action pursuant to 28 U.S.C. §1332(a).

## THIS NOTICE OF REMOVAL IS TIMELY

25.   28 U.S.C. § 1446(b)(3) provides that where a case is not initially removable, "a notice of removal may be filed within 30 days after receipt by the defendant, through service or otherwise, of a copy of an amended pleading, motion, order or other paper from which it may first be ascertained that the case is one which is or has become removable." *Id.*

26.   Removal is timely because this Notice of Removal was filed within 30 days of May 5, 2023, the date upon which SomaLogic received a copy via email of Plaintiffs' request for dismissal of Palamedrix from the action (which was filed the same day). Kaba Decl., ¶ 12. At that time, SomaLogic was first able to ascertain that the case had become removable due to complete diversity of citizenship between the remaining parties. 28 U.S.C. § 1446(b); *Taguinod v. World Sav. Bank, FSB*, 2010 WL 11636502 (C.D. Cal. Dec. 2, 2010) (30-day period for removal began to run when defendant received notice of plaintiffs' voluntary dismissal of non-diverse defendant).

## VENUE IS PROPER IN THIS DISTRICT

27.   Venue lies in the Northern District of California, San Francisco Division under 28 U.S.C. §§ 1441(a) and 1446(a) because it is the district and division embracing the state court where this action was filed and is pending.

28.   Additionally, no party properly joined and served as defendants is a citizen of the

6411960

State in which such action is brought because SomaLogic is not a citizen of California and Palamedrix (which no longer exists) was dismissed. 28 U.S.C. § 1441(b)(2).

## COMPLIANCE WITH 28 U.S.C. §1446

29.     Pursuant to 28 U.S.C. § 1446(a), copies of all process, pleadings, and orders served on or filed by SomaLogic in the State Court are filed and attached with this Notice of Removal. *See* Exs. A-E.

30.     Pursuant to 28 U.S.C. § 1446(d), SomaLogic will promptly serve upon Plaintiffs' counsel of record and file with the State Court a true and correct copy of this Notice of Removal. Therefore, all procedural requirements under 28 U.S.C. § 1446 have been satisfied.

## NON-WAIVER OF DEFENSES

31.     By removing the action to this Court, SomaLogic expressly reserves and does not waive any rights or defenses available under federal or state law. SomaLogic expressly reserves the right to move for dismissal of the Complaint pursuant to Rule 12 of the Federal Rules of Civil Procedure. Nothing in this Notice of Removal should be taken as an admission that Plaintiffs' allegations are sufficient to state a claim or have any substantive merit.

**WHEREFORE**, SomaLogic hereby removes the above-entitled case to this Court, pursuant to 28 U.S.C. § 1441(a).

Dated: May 30, 2023                     HUESTON HENNIGAN LLP

By: _____
                     Moez M. Kaba
                     Cassidy M. O'Sullivan

                     *Attorneys For Defendant*
                     *SomaLogic, Inc.*

SOMALOGIC, INC'S NOTICE OF REMOVAL

6411960

# EXHIBIT A

ELLIS GEORGE CIPOLLONE
O'BRIEN ANNAGUEY LLP
Keith J. Wesley (State Bar No. 229276)
   kwesley@egcfirm.com
John V. Coghlan (*Pro Hac Vice*)
Application Forthcoming)
   jcoghlan@egcfirm.com
2121 Avenue of the Stars, 30th Floor
Los Angeles, California 90067
Telephone: (310) 274-7100
Facsimile: (310) 275-5697

George B. A. Laiolo (State Bar No. 329850)
   glaiolo@egcfirm.com
44 Montgomery Street, Suite 1280
San Francisco, CA 94104
Telephone: (415) 391-7100
Facsimile: (415) 391-7198

Attorneys for Plaintiffs Formic Ventures, LLC,
The Michael Antonov Charitable Foundation,
Inc., Beofund LLC, and Metaplanet Holdings OU

ELECTRONICALLY
**F I L E D**
*Superior Court of California,*
*County of San Francisco*

**03/24/2023**
**Clerk of the Court**
BY: JEFFREY FLORES
Deputy Clerk

**CGC-23-605398**

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF SAN FRANCISCO

| | |
|---|---|
| FORMIC VENTURES, LLC,<br>THE MICHAEL ANTONOV CHARITABLE<br>FOUNDATION, INC.,<br>BEOFUND LLC, and<br>METAPLANET HOLDINGS OU,<br><br>Plaintiffs,<br><br>vs.<br><br>SOMALOGIC, INC.,<br>PALAMEDRIX, INC., and<br>DOES 1–10,<br><br>Defendants. | Case No.<br><br>**COMPLAINT FOR:**<br><br>1. **VIOLATION OF PENAL CODE SECTION 496(C)**<br><br>2. **BREACH OF CONTRACT**<br><br>3. **FRAUDULENT INDUCEMENT**<br><br>4. **CONVERSION**<br><br>**<u>DEMAND FOR JURY TRIAL</u>** |

10

2200306.1

COMPLAINT

Plaintiffs Formic Ventures, LLC, The Michael Antonov Charitable Foundation, Inc., Beofund LLC, and Metaplanet Holdings OU (collectively, "Plaintiffs"), by and through their attorneys, brings this complaint against defendants SomaLogic, Inc., Palamedrix, Inc., and Does 1–10 (collectively "Defendants").

**INTRODUCTION**

1.     Plaintiffs are a group of early or "seed" investors in Palamedrix.  More than two years ago, Plaintiffs began investing (via SAFE Notes) millions of dollars in Palamedrix—money that Palamedrix literally needed to survive.  In exchange, Palamedrix guaranteed Plaintiffs a minimum return on their investment in the event, among other things, that Palamedrix were to be acquired.  At times, because it was desperate for funding, Palamedrix even promised to compensate Plaintiffs at 1.4 times their investment.

2.     Plaintiffs' investments indeed resulted in Palamedrix not just surviving, but thriving such that Palamedrix attracted a buyer—SomaLogic.

3.     In August of 2022, Palamedrix and SomaLogic closed the acquisition.  SomaLogic obtained a valuable business.  Palamedrix obtained substantial compensation.  Plaintiffs, however, were denied the compensation that was "due and payable . . . immediately prior to, or concurrent with" the acquisition, as set forth in their respective SAFE Notes.

4.     Instead, it was not until October of 2022 that Plaintiffs began to receive their compensation.  They first received a cash equivalent to less than half of the consideration that had been due over a month prior.  The latter part of the compensation, which SomaLogic and Palamedrix decided to provide in the form of SomaLogic stock, was not even offered to Plaintiffs until December.  As a result of Defendants' delay in providing compensation, the stock nosedived in value between when Plaintiffs should have been paid and the months in which Plaintiffs waited to acquire those shares.  Rather than make up the loss that is wholly attributable to Defendants' own delays and fraudulent representations and omissions, Defendants instead insist that Plaintiffs accept the deflated stock that would not even make Plaintiffs whole (let alone provide Plaintiffs with their contractually obligated return).

5.     In short, Palamedrix used Plaintiffs' funds to finance an operation that ultimately

11

was acquired and enriched both Palamedrix and SomaLogic.  Instead of honoring the pre-existing obligations, Defendants have engaged in a pattern of contractual breaches and tortious conduct to further enrich themselves at the expense of Plaintiffs.  Plaintiffs thus bring this action to recover the millions of dollars (and counting) owed to them by Defendants.

## PARTIES

6.     Plaintiff Formic Ventures, LLC ("Formic") is a family office that makes early stage investments in biotechnology startups focused on human longevity and in technology companies that make human lives more meaningful.  Formic is a Delaware Limited Liability Company with its principal place of business in San Francisco, California.  At least one of Formic's members is a California resident.

7.     Plaintiff Michael Antonov Charitable Foundation, Inc. is a charitable entity that supports people and entities focused on extending human lives and making them more meaningful.  To support its mission, it provides grants and gifts to 501(c)(3) organizations, collaborates with industry partners, and invests in companies that support its goals.  The Foundation is a California Corporation with its principal place of business in San Francisco, California.

8.     Plaintiff Metaplanet Holdings OU is an investment company that supports novel and evidence-based innovation.  Metaplanet is incorporated in Tallinn, Estonia.

9.     Plaintiff Beofund LLC is a New Mexico Limited Liability Company with its principal place of business in Danville, California.  At least one of Beofund's members is a California resident.

10.     Defendant SomaLogic, Inc. is a Delaware Corporation with its principal place of business in Boulder, Colorado.

11.     Defendant Palamedrix, Inc. is a Delaware Corporation with its principal place of business in La Jolla, California.

12.     The true names and capacities, whether individual, corporate or associate, or otherwise, of the Defendants named herein as DOES 1 through 10, inclusive, are unknown to Plaintiffs, who therefore sue said Defendants by such fictitious names pursuant to Code of Civil

1   Procedure § 474, and Plaintiffs will amend this complaint to show their true names and capacities

2   when the same have been ascertained.  Plaintiffs are informed and believe, and based upon such

3   information and belief, allege that all Defendants sued herein as DOES are in some manner

4   responsible for the acts herein alleged.

5                          **JURISDICTION AND VENUE**

6          13.     This Court has jurisdiction over this action pursuant to California Code of Civil

7   Procedure § 410.10. This is a civil action wherein the matter in controversy, exclusive of interest

8   and costs, exceeds this Court's jurisdictional minimum.

9          14.     Venue is proper in this Court pursuant to California Code of Civil

10  Procedure §§ 395(a) and 395.5 because this action involves contracts that were entered into and

11  required to be performed in this County.

12                          **FACTUAL BACKGROUND**

13      **A.    Plaintiffs Provide Startup Funds To Palamedrix In Exchange For A
            Guaranteed Return If Palamedrix's Ownership Changes.**
14

15         15.     Beginning in 2020, Plaintiffs Formic, Metaplanet, and the Michael Antonov

16  Charitable Foundation began providing funds to Defendant Palamedrix, a startup company.

17         16.     Plaintiffs supported Palamedrix's funding goals.  Plaintiffs also, however, invested

18  to make a financial return that could then be re-invested in further projects that supported their

19  respective businesses and goals.

20         17.     Startup companies generally do not yet have stock to offer to investors.  In

21  exchange for investing, Plaintiffs' returns were secured by a "Simple Agreement for Future

22  Equity" or "SAFE" note.  *See* Exs. A through I (Plaintiff SAFE Notes).  SAFE notes, like those

23  used in this matter, compensate investors by guaranteeing them the ability to buy stock at a later

24  date, typically with a guaranteed cap on how much the investor would pay per share.  *See* Exs. A

25  through I, § 1(a).

26         18.     Because the SAFE notes in this case anticipated a future Palamedrix stock offering,

27  they provided a contingent guarantee to investors if the company's ownership changed before such

28  an offering.  Specifically, if there was a "Liquidity Event," defined by the notes to include a

"Change of Control" of the company, Plaintiffs would be entitled to receive at least "the Purchase Price" of the SAFE note.  *See* Exs. A through I, § 1(b).

19.     Importantly, the compensation Plaintiffs were entitled to receive for a change of control was "due and payable to the Investor immediately prior to, or concurrent with, the consummation of such Liquidity Event."  *See* Exs. A through I, § 1(b).

20.     This contingent guarantee was important to Plaintiffs.  They were investing in Palamedrix and its leadership.  To the extent control of Palamedrix changed, the basis for Plaintiffs' investment changed.

21.     The contingent guarantee was also important because the amount of money Plaintiffs invested was significant and Plaintiffs depend on returns guaranteed by contract in order to sustain their businesses.  In 2020, Formic invested $2,200,000.  *See* Exs. A through C. Metaplanet invested $500,000.  *See* Ex. D.  And the Michael Antonov Foundation invested $300,000.  *See* Exs. E and F.

22.     Defendant Palamedrix knew that Plaintiffs were concerned about their investments. It took steps to address these concerns.  Specifically, "as a material inducement to [Formic's] investment," Palamedrix agreed to "invite one (1) representative from [Formic's affiliate] on behalf of the Investor … to attend all meetings of [Palamedrix's] Board of Directors in a nonvoting observer capacity."  *See* Ex. J, January 4, 2021 Letter from Palamedrix to Michael Antonov.

**B.     Palamedrix Requests Additional Funding To Help It Survive Until It Can Be Acquired By SomaLogic.**

23.     In June of 2021, Palamedrix approached Plaintiffs with a request for additional funding.  Palamedrix told Plaintiffs that it was in discussions with SomaLogic about a potential merger, but it needed additional money to survive until the merger could be finalized.

24.     Plaintiffs were reluctant to invest again.  They had previously invested in Palamedrix's leadership, which was subject to change.  Plaintiffs had expected to receive stock in the company, the value of which would largely be dependent upon that leadership.  In short, Plaintiffs would not have previously invested had they known Palamedrix would be under

1   different leadership.

2       25.      To alleviate Plaintiffs' concerns, Palamedrix promised to guarantee that, in

3   exchange for further investments, they would provide Plaintiffs with SAFE Notes guaranteeing

4   1.4 times the investment in the event there was a change in control of Palamedrix (such as an

5   acquisition by SomaLogic).  *See* Exs. G, H, I, § 1(b).  Because of this additional guaranteed return,

6   Plaintiffs Formic, Beofund, and MetaPlanet agreed to provide additional funding.

7       26.      The amount of money invested in this second round was significant.  Formic

8   Ventures invested $4,000,000 on June 29, 2021, *see* Ex. G. Metaplanet Holdings OU invested

9   $4,500,000 on June 22, 2021, *see* Ex. H.  And Beofund LLC invested $50,000 on June 22, 2021,

10  *see* Ex. I.

11      27.      Importantly, like the previously issued SAFE notes, the new notes guaranteed that

12  compensation for a change in Palamedrix control was "due and payable to the Investor

13  immediately prior to, or concurrent with, the consummation of such Liquidity Event."  Exs. G, H,

14  I, § 1(b).

15      **C.      Palamedrix Agrees To Be Acquired By SomaLogic Without Any Advance**
16      **Notice To Plaintiffs.**

17      28.      On July 25, 2022, Defendants SomaLogic and Palamedrix signed an agreement by

18  which SomaLogic would wholly acquire Palamedrix.

19      29.      Although Plaintiffs were aware that Palamedrix was discussing a potential merger

20  with SomaLogic, they did not know about any of the merger terms or that the merger agreement

21  was signed until after the fact.  Plaintiffs were not a party to the merger agreement, and no party to

22  the Agreement represented their interests.

23      30.      Although Palamedrix was obligated to invite an affiliate of Formic to all of its

24  Board of Director meetings, that affiliate was never invited to any meeting in which the terms of a

25  potential merger were discussed.  Indeed, Formic's affiliate was never invited to *any* Board of

26  Directors meetings.  Instead, as reflected in the merger agreement, Palamedrix consented to the

27  terms of the merger via written consent in lieu of a Board of Directors meeting.

28      31.      Plaintiffs only learned that the merger had occurred via an August 2, 2022 notice

Palamedrix sent to each SAFE note holder.  Those notices, which were largely verbatim, provided some details of the merger, informed Plaintiffs that it was expected to close in the third quarter of 2022, and informed Plaintiffs that Defendants intended to compensate Plaintiffs for their SAFE Notes via a combination of cash and SomaLogic common stock.  The notices gave no indication that there would be any delay in providing compensation following the merger's closing.

32.     Upon receipt of the August 2 Notices, a representative for Plaintiffs immediately requested a call with Palamedrix to understand the terms of the merger and learn how Defendants would be providing the SAFE Note compensation.

33.     On August 4, 2022, the representative for Plaintiffs spoke with a representative for Palamedrix.  Palamedrix's representative gave no indication to suggest that Plaintiffs would not be compensated fully in line with the terms of their SAFE Notes.

34.     Although they were frustrated that they were unaware of the merger agreement or its terms prior to it being signed, Plaintiffs nevertheless expected that they would be compensated in full according to the terms of their SAFE Notes.  Indeed, the guaranteed return promised by the SAFE notes on a change of control was the only reason Plaintiffs agreed to keep Palamedrix afloat through a second round of financing.

35.     On August 18, 2022, a Confidential Information Statement describing the merger was provided to Plaintiffs. For the first time, Plaintiffs were advised that the shares of SomaLogic common stock issued in connection with the merger agreement were considered to be "restricted securities" that would require registration with the SEC before they could be released.

36.     Until this statement, Plaintiffs had never been advised that the stock compensation would be "restricted," or that there was any other reason to expect a delay in receiving compensation.  Had Plaintiffs been made aware of these restrictions beforehand (such as at a Palamedrix Board meeting), they would have objected and explained that any such terms of the merger were inconsistent with the SAFE Notes' guarantee of payment "immediately prior to, or concurrent with" the merger.

37.     On August 30, 2022, the acquisition contemplated by the merger agreement closed and SomaLogic wholly acquired Palamedrix.

2200306.1

COMPLAINT

**D.      SomaLogic Fails To Timely Provide Compensation To Plaintiffs And Blames Its Chosen Form Of Compensation.**

38.      Despite its obligation to provide compensation "immediately prior to, or concurrent with" the merger, SomaLogic failed to timely provide the cash component of Plaintiffs' compensation.

39.      The Michael Antonov Charitable Foundation received the cash component of its compensation on October 7, 2022—more than a month after the acquisition was finalized on August 30.  On that day, the Foundation received $131,220.16 via wire transfer.

40.      Metaplanet received its cash on August 9, 2022.  On that day, a wire transfer provided Metaplanet with $2,757,376.65.

41.      Beofund had to wait even longer.  It did not receive its cash compensation until October 24, 2022—almost two months after the acquisition was finalized.  On that day, Beofund received a check for $28,005.11.

42.      Formic Ventures' payment was also delayed.  It received its cash compensation on October 25, 2022, when it received a check for $3,021,130.50.

43.      SomaLogic's initial delay in providing any compensation—cash or stock— damaged Plaintiffs by denying them access to funds they were due.  Plaintiffs were also deprived of the ability to use those funds to reinvest them immediately.  Had Plaintiffs known that the release of their compensation would be delayed, they would never have agreed to invest.

44.      The delay in providing the cash compensation, however, was only the beginning. To date, SomaLogic has yet to provide or offered to provide the stock component in an amount equal to that necessary to satisfy Plaintiffs' SAFE Notes.

45.      It was not until December 20, 2022—nearly four months after the acquisition was finalized and nearly five months after the merger agreement was signed—that SomaLogic even told Plaintiffs it was possible for them to receive the stock portion of their compensation.

46.      Between July 25, 2022 (when the merger agreement was signed and the point at which SomaLogic decided the number of shares each Plaintiff would receive) and December 20, 2022, the price of SomaLogic common stock fell over 50% from 4.8100 to 2.0500.  *See*

17

1   https://finance.yahoo.com/quote/SLGC/history?p=SLGC.[1]

2       47.     While SomaLogic finally agreed on December 20 to release the stock component of

3   Plaintiffs' compensation, it refused to account for the value of the stock falling by more than half.

4   In other words, because of Defendants' failure to provide compensation "immediately prior to, or

5   concurrent with" the merger, by the time Defendants told Plaintiffs it was possible to take

6   possession of the stock portion of their compensation, Defendants were unwilling to provide

7   Plaintiffs with the entire amount due.

8       48.     Plaintiffs have repeatedly attempted to work with Defendants to resolve this

9   situation.  As noted, on August 3, 2022, after receipt of Palamedrix's August 2 notice explaining

10  the details of the merger, a representative for Formic Ventures and Beofund contacted Palamedrix

11  and asked to discuss the situation.  Over the next few months, the same representative for

12  Plaintiffs continued to contact Palamedrix in an attempt to understand why Plaintiffs had not

13  received their compensation.  Only on December 20 was that representative told that the stock was

14  available to be released.

15      49.     On January 19, 2023, Plaintiffs' counsel discussed the matter with counsel for

16  SomaLogic.  Counsel for Plaintiffs explained that Plaintiffs had not been compensated according

17  to the terms of their SAFE Notes.  In response, SomaLogic committed to provide an explanation

18  as to why Plaintiffs had, in fact, been fully compensated.

19      50.     Nearly two weeks later, on February 3, 2023, SomaLogic's counsel finally

20  provided its explanation via e-mail.  Essentially, SomaLogic explained that its stock compensation

21  was set at a value that *would* have satisfied Plaintiffs SAFE Notes if the stock was provided at the

22  time of that valuation.  But, because the stock was "restricted" and needed SEC approval,

23  SomaLogic could not release it.  And SomaLogic did not believe it was responsible for the loss in

24  value caused by its decision to compensate Plaintiffs with "restricted stock."

25      51.     Of course, Plaintiffs, who were not parties to the merger agreement, never agreed to

26  receive "restricted" stock as satisfaction for their SAFE Notes.  Nor did they agree to receive

27  ─────────────────────
[1] A PDF copy of this webpage preserved on March 23, 2023 is attached as Ex. K.

28

1 | shares with a value set retroactively.

2 |     52.      Indeed, nothing in the SAFE Notes contemplated that the chosen form of

3 | compensation would dictate the value of Plaintiffs' ultimate return on their investments in

4 | Palamedrix.  And Plaintiffs did not otherwise waive the requirement in their notes that would

5 | require payment "immediately prior to, or concurrent with" the merger.

6 |     53.      Following Defendants' unsatisfactory explanation, on February 21, 2023, counsel

7 | for Plaintiffs sent a letter again reiterating that Plaintiffs had not been adequately compensated

8 | according to the terms of their SAFE Notes.  *See* Ex. L, Feb. 21, 2023 letter.  Counsel for

9 | Plaintiffs requested another conversation to address Plaintiffs' concerns.

10 |     54.      On February 24, 2023, counsel for Plaintiffs and for SomaLogic conferred again.

11 | Counsel for SomaLogic explained that Plaintiffs were not entitled to receive the compensation

12 | guaranteed by their SAFE Notes (contrary to the express language in those Notes).  In his view,

13 | SomaLogic was not obligated to compensate Plaintiffs for the loss in value of the stock from

14 | SomaLogic's delay in releasing it.

15 |     55.      To date, Plaintiffs have not accepted Defendants' offer to provide shares of

16 | SomaLogic stock that would not fully satisfy the guarantee in their SAFE Notes.

17 |     56.      As a result of Defendants' failure to provide the compensation due to Plaintiffs in

18 | their SAFE Notes, Plaintiffs have suffered material financial harm as follows:

19 |     (i)      Plaintiff Formic Ventures was entitled to receive $7,387,478.69 in guaranteed

20 |              compensation from its SAFE Notes following the merger.  Accounting for the

21 |              $3,021,130.50 Formic has already received in cash from Defendants, Formic has

22 |              suffered a loss of $4,366,348.19.

23 |     (ii)     The Michael Antonov Charitable Foundation was entitled to receive $300,000 in

24 |              guaranteed compensation from its SAFE Notes following the merger.  Accounting

25 |              for the $131,220.16 the Foundation has already received in cash from Defendants,

26 |              the Foundation has suffered a loss of $168,779.84.

27 |     (iii)    Beofund LLC was entitled to receive $70,000 in guaranteed compensation from its

28 |              SAFE Notes following the merger.  Accounting for the $28,005.11 Beofund has

1    already received in cash from Defendants, Beofund has suffered a loss of

2    $41,994.89.

3    (iv)    Metaplanet Holdings OU was entitled to receive $6,842,069.49 in guaranteed

4    compensation from its SAFE Notes following the merger.  Accounting for the

5    $2,757,376.65 Metaplanet has already received in cash from Defendants,

6    Metaplanet has suffered a loss of $4,084,692.84.

7    <u>**FIRST CAUSE OF ACTION**</u>

8    **(Violation of *Penal Code* Section 496(c) Against All Defendants)**

9    57.    Plaintiffs incorporate by reference the allegations set forth above as though set forth

10   fully herein.

11   58.    Plaintiffs were entitled to the full compensation guaranteed by their SAFE Notes

12   "immediately prior to, or concurrent with" Defendant SomaLogic's Acquisition of Defendant

13   Palamedrix.  Defendants refused to provide that compensation to Plaintiffs despite maintaining no

14   legal or equitable right to it.  In short, Defendants held onto funds that they knew were due and

15   owed to Plaintiffs.

16   59.    Defendants continue to possess compensation that does not belong to them while

17   knowing they maintain no legal, equitable, or beneficial right to the money.

18   60.    Subdivision (a) of section 496 specifies the criminal penalties for receiving,

19   concealing or withholding property obtained in "any manner constituting theft," and subdivision

20   (c) permits treble damages and an award of attorney's fees in a civil action brought by any party

21   injured by such a violation of subdivision (a).

22   61.    Defendants' actions constitute a violation of California Penal Code § 496(a).

23   62.    Accordingly, as a result of Defendants' violation of California Penal

24   Code § 496(a), Plaintiffs are entitled to statutory treble damages, the costs of suit, and reasonable

25   attorneys' fees pursuant to California Penal Code § 496(c).

26   <u>**SECOND CAUSE OF ACTION**</u>

27   **(Breach of Contract Against All Defendants)**

28   63.    Plaintiffs incorporates by reference and hereby realleges the preceding paragraphs

20

1    of this complaint as if fully set forth herein.

2        64.        The Palamedrix SAFE Notes are valid written contracts entered into by Plaintiff

3    and Defendant Palamedrix.  Upon information and belief, all Defendants owe Plaintiffs

4    contractual duties under the SAFE Notes.

5        65.        Defendants, without any legal excuse or justification, breached the terms of the

6    SAFE Notes by refusing to provide Plaintiffs the compensation guaranteed by the SAFE Notes—

7    timely or otherwise.  Specifically, by choosing a form of compensation—restricted company

8    common stock—that Defendants freely acknowledge could not have been released to Plaintiffs

9    "immediately prior to, or concurrent with, the consummation of" the merger agreement,

10   Defendants failed to abide by the terms of the SAFE Agreement.  Moreover, Defendants breached

11   the contracts by delaying cash payments.

12       66.        Plaintiffs never agreed to waive the terms of their SAFE Notes setting the amount

13   of compensation or that would receipt of that compensation "immediately prior to, or concurrent

14   with" the merger agreement.

15       67.        Defendants' breaches are a proximate and substantial cause of the harm Plaintiffs

16   has suffered, the amount of which exceeds $8,000,000.

17                              **THIRD CAUSE OF ACTION**

18                      **(Fraudulent Inducement Against All Defendants)**

19       68.        Plaintiffs incorporate by reference and hereby re-allege the preceding paragraphs of

20   this complaint as if fully set forth herein.

21       69.        Defendants represented and warranted that, in conjunction with SomaLogic's

22   acquisition of Palamedrix, they would compensate Plaintiffs based on the terms of their SAFE

23   Notes and, consistent with those terms, provide them with their contractually guaranteed

24   compensation "immediately prior to, or concurrent with" the merger.  Indeed, the promise of such

25   guaranteed compensation was used to induce Plaintiffs to invest in a second round of financing

26   that Palamedrix needed to survive.

27       70.        These representations were and continue to be false.  At the time of making these

28   representations, Defendants knew them to be false, given that Defendants had no intention of

providing Plaintiffs with either the cash or stock component of their compensation concurrent with the merger.  Defendants made these representations despite knowing them to be false and were well aware that Plaintiffs would rely on the same.  Defendants did not even make Plaintiffs aware of the merger agreement until after it was signed.

71.      Defendants also knew that Plaintiffs were interested in making sure Palamedrix honored their investments.  "As a material inducement to [Formic's] investment," Palamedrix agreed to permit a representative of Plaintiff Formic to attend all Palamedrix Board of Directors meetings.

72.      But Palamedrix never invited Formic's representative to a single Board of Directors meeting, including any meeting in which the terms of the merger agreement were discussed.

73.      Defendants intended for Plaintiffs to rely on these essential representations and, indeed, Plaintiff did so when they agreed to invest in Palamedrix.

74.      But for Defendants' representations that they would be compensated consistent with the terms of their SAFE Notes, Plaintiffs would not have agreed to invest in Palamedrix.

75.      The false and material representations are the direct and proximate cause of Plaintiffs' injuries.

76.      Defendants acted with willful, reckless and conscious disregard of Plaintiffs' rights and in doing the acts alleged in this complaint acted with oppression and malice.  Accordingly, Plaintiffs seek punitive and exemplary damages, in an amount according to the proof at trial.

## **FOURTH CAUSE OF ACTION**

### **(Conversion Against All Defendants)**

77.      Plaintiffs incorporate by reference the allegations set forth above as though set forth fully herein.

78.      Despite maintaining no legal or equitable right to the remainder of compensation due to Plaintiffs under the terms of their SAFE Notes, Defendants continue to possess that compensation and refuse to remit it to Plaintiffs.

79.      According to the terms of their SAFE Notes, in exchange for their investment, Plaintiffs were each entitled to a guaranteed amount of compensation following a change of

22

1   control of Defendant Palamedrix, which occurred following its acquisition by Defendant

2   SomaLogic.  Defendants have failed to and continue to refuse to provide the full amount of that

3   guaranteed compensation.

4        80.        Defendants have acted with willful, reckless and conscious disregard of Plaintiffs'

5   rights.  Defendants were aware that the SAFE Notes required them to provide Plaintiffs with their

6   guaranteed compensation "immediately prior to, or concurrent with" the merger.  When they

7   failed to do so, Plaintiffs reminded them of their obligation.  Defendants nevertheless continue to

8   withhold the guaranteed compensation due to Plaintiffs.  In all of these acts, and as described in

9   this complaint, Defendants have acted with oppression and malice.  Accordingly, Plaintiffs seek

10  punitive and exemplary damages, in an amount according to the proof at trial.

11                              **PRAYER FOR RELIEF**

12       WHEREFORE, Plaintiffs pray for judgment against Defendants, as follows:

13       1.        For treble damages of no less than $25,985,447.30;

14       2.        For general, compensatory, and consequential damages;

15       3.        For exemplary damages;

16       4.        For punitive damages, in an amount to be proven at trial;

17       5.        For attorney's fees;

18       6.        For costs of suit herein;

19       7.        For pre-judgment and post-judgment interest; and

20       For such further relief as the Court may deem just and proper.

21
22  DATED:  March 24, 2023              ELLIS GEORGE CIPOLLONE
                                       O'BRIEN ANNAGUEY LLP
23                                           Keith J. Wesley
                                             John V. Coghlan (*pro hac vice* application
24                                           forthcoming)
                                             George B. A. Laiolo
25
26                                     By:  _____
27                                              Keith J. Wesley
                                       Attorneys for Plaintiffs
28

# EXHIBIT A

**POST-MONEY VALUATION CAP**

THIS INSTRUMENT AND ANY SECURITIES ISSUABLE PURSUANT HERETO HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "**SECURITIES ACT**"), OR UNDER THE SECURITIES LAWS OF CERTAIN STATES.  THESE SECURITIES MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED, PLEDGED OR HYPOTHECATED EXCEPT AS PERMITTED IN THIS SAFE AND UNDER THE ACT AND APPLICABLE STATE SECURITIES LAWS PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT OR AN EXEMPTION THEREFROM.

## PALAMEDRIX, INC.

### SAFE
### (Simple Agreement for Future Equity)

THIS CERTIFIES THAT in exchange for the payment by Formic Ventures LLC (the "**Investor**") of $1,000,000.00 (the "**Purchase Amount**") on or about August 25, 2020, Palamedrix, Inc., a Delaware corporation (the "**Company**"), issues to the Investor the right to certain shares of the Company's Capital Stock, subject to the terms described below.

This Safe is one of the forms available at http://ycombinator.com/documents and the Company and the Investor agree that neither one has modified the form, except to fill in blanks and bracketed terms.

The "**Post-Money Valuation Cap**" is $20,000,000.  See **Section 2** for certain additional defined terms.

1.  *Events*

(a)  **Equity Financing**. If there is an Equity Financing before the termination of this Safe, on the initial closing of such Equity Financing, this Safe will automatically convert into the greater of: (1) the number of shares of Standard Preferred Stock equal to the Purchase Amount divided by the lowest price per share of the Standard Preferred Stock; or (2) the number of shares of Safe Preferred Stock equal to the Purchase Amount divided by the Safe Price.

In connection with the automatic conversion of this Safe into shares of Standard Preferred Stock or Safe Preferred Stock, the Investor will execute and deliver to the Company all of the transaction documents related to the Equity Financing; *provided,* that such documents (i) are the same documents to be entered into with the purchasers of Standard Preferred Stock, with appropriate variations for the Safe Preferred Stock if applicable, and (ii) have customary exceptions to any drag-along applicable to the Investor, including (without limitation) limited representations, warranties, liability and indemnification obligations for the Investor.

(b)  **Liquidity Event**.  If there is a Liquidity Event before the termination of this Safe, this Safe will automatically be entitled (subject to the liquidation priority set forth in Section 1(d) below) to receive a portion of Proceeds, due and payable to the Investor immediately prior to, or concurrent with, the consummation of such Liquidity Event, equal to the greater of (i) the Purchase Amount (the "**Cash-Out Amount**") or (ii) the amount payable on the number of shares of Common Stock equal to the Purchase Amount divided by the Liquidity Price (the "**Conversion Amount**").  If any of the Company's securityholders are given a choice as to the form and amount of Proceeds to be received in a Liquidity Event, the Investor will be given the same choice, *provided* that the Investor may not choose to receive a form of consideration that the Investor would be ineligible to receive as a result of the Investor's failure to satisfy any requirement or limitation generally applicable to the Company's securityholders, or under any applicable laws.

Notwithstanding the foregoing, in connection with a Change of Control intended to qualify as a tax-free reorganization, the Company may reduce the cash portion of Proceeds payable to the Investor by the amount determined by its board of directors in good faith for such Change of Control to qualify as a tax-free reorganization for U.S. federal income tax purposes, provided that such reduction (A) does not reduce the total Proceeds payable to such Investor and (B) is applied in the same manner and on a pro rata basis to all securityholders who have equal priority to the Investor under Section 1(d).

(c)  **Dissolution Event**. If there is a Dissolution Event before the termination of this Safe, the Investor will automatically be entitled (subject to the liquidation priority set forth in Section 1(d) below) to receive a portion of Proceeds equal to the Cash-Out Amount, due and payable to the Investor immediately prior to the consummation of the Dissolution Event.

(d) **Liquidation Priority**. In a Liquidity Event or Dissolution Event, this Safe is intended to operate like standard non-participating Preferred Stock. The Investor's right to receive its Cash-Out Amount is:

(i) Junior to payment of outstanding indebtedness and creditor claims, including contractual claims for payment and convertible promissory notes (to the extent such convertible promissory notes are not actually or notionally converted into Capital Stock);

(ii) On par with payments for other Safes and/or Preferred Stock, and if the applicable Proceeds are insufficient to permit full payments to the Investor and such other Safes and/or Preferred Stock, the applicable Proceeds will be distributed pro rata to the Investor and such other Safes and/or Preferred Stock in proportion to the full payments that would otherwise be due; and

(iii) Senior to payments for Common Stock.

The Investor's right to receive its Conversion Amount is (A) on par with payments for Common Stock and other Safes and/or Preferred Stock who are also receiving Conversion Amounts or Proceeds on a similar as-converted to Common Stock basis, and (B) junior to payments described in clauses (i) and (ii) above (in the latter case, to the extent such payments are Cash-Out Amounts or similar liquidation preferences).

(e) **Termination**. This Safe will automatically terminate (without relieving the Company of any obligations arising from a prior breach of or non-compliance with this Safe) immediately following the earliest to occur of: (i) the issuance of Capital Stock to the Investor pursuant to the automatic conversion of this Safe under Section 1(a); or (ii) the payment, or setting aside for payment, of amounts due the Investor pursuant to Section 1(b) or Section 1(c).

2. *Definitions*

"**Capital Stock**" means the capital stock of the Company, including, without limitation, the "**Common Stock**" and the "**Preferred Stock**."

"**Change of Control**" means (i) a transaction or series of related transactions in which any "person" or "group" (within the meaning of Section 13(d) and 14(d) of the Securities Exchange Act of 1934, as amended), becomes the "beneficial owner" (as defined in Rule 13d-3 under the Securities Exchange Act of 1934, as amended), directly or indirectly, of more than 50% of the outstanding voting securities of the Company having the right to vote for the election of members of the Company's board of directors, (ii) any reorganization, merger or consolidation of the Company, other than a transaction or series of related transactions in which the holders of the voting securities of the Company outstanding immediately prior to such transaction or series of related transactions retain, immediately after such transaction or series of related transactions, at least a majority of the total voting power represented by the outstanding voting securities of the Company or such other surviving or resulting entity or (iii) a sale, lease or other disposition of all or substantially all of the assets of the Company.

"**Company Capitalization**" is calculated as of immediately prior to the Equity Financing and (without double-counting, in each case calculated on an as-converted to Common Stock basis):

- Includes all shares of Capital Stock issued and outstanding;
- Includes all Converting Securities;
- Includes all (i) issued and outstanding Options and (ii) Promised Options; and
- Includes the Unissued Option Pool, except that any increase to the Unissued Option Pool in connection with the Equity Financing shall only be included to the extent that the number of Promised Options exceeds the Unissued Option Pool prior to such increase.

"**Converting Securities**" includes this Safe and other convertible securities issued by the Company, including but not limited to: (i) other Safes; (ii) convertible promissory notes and other convertible debt instruments; and (iii) convertible securities that have the right to convert into shares of Capital Stock.

"**Direct Listing**" means the Company's initial listing of its Common Stock (other than shares of Common Stock not eligible for resale under Rule 144 under the Securities Act) on a national securities exchange by means of an effective registration statement on Form S-1 filed by the Company with the SEC that registers shares of existing capital stock of the

26

Company for resale, as approved by the Company's board of directors. For the avoidance of doubt, a Direct Listing shall not be deemed to be an underwritten offering and shall not involve any underwriting services.

"**Dissolution Event**" means (i) a voluntary termination of operations, (ii) a general assignment for the benefit of the Company's creditors or (iii) any other liquidation, dissolution or winding up of the Company (**excluding** a Liquidity Event), whether voluntary or involuntary.

"**Dividend Amount**" means, with respect to any date on which the Company pays a dividend on its outstanding Common Stock, the amount of such dividend that is paid per share of Common Stock multiplied by (x) the Purchase Amount divided by (y) the Liquidity Price (treating the dividend date as a Liquidity Event solely for purposes of calculating such Liquidity Price).

"**Equity Financing**" means a bona fide transaction or series of transactions with the principal purpose of raising capital, pursuant to which the Company issues and sells Preferred Stock at a fixed valuation, including but not limited to, a pre-money or post-money valuation.

"**Initial Public Offering**" means the closing of the Company's first firm commitment underwritten initial public offering of Common Stock pursuant to a registration statement filed under the Securities Act.

"**Liquidity Capitalization**" is calculated as of immediately prior to the Liquidity Event, and (without double-counting, in each case calculated on an as-converted to Common Stock basis):

- Includes all shares of Capital Stock issued and outstanding;
- Includes all (i) issued and outstanding Options and (ii) to the extent receiving Proceeds, Promised Options;
- Includes all Converting Securities, **other than** any Safes and other convertible securities (including without limitation shares of Preferred Stock) where the holders of such securities are receiving Cash-Out Amounts or similar liquidation preference payments in lieu of Conversion Amounts or similar "as-converted" payments; and
- Excludes the Unissued Option Pool.

"**Liquidity Event**" means a Change of Control, a Direct Listing or an Initial Public Offering.

"**Liquidity Price**" means the price per share equal to the Post-Money Valuation Cap divided by the Liquidity Capitalization.

"**Options**" includes options, restricted stock awards or purchases, RSUs, SARs, warrants or similar securities, vested or unvested.

"**Proceeds**" means cash and other assets (including without limitation stock consideration) that are proceeds from the Liquidity Event or the Dissolution Event, as applicable, and legally available for distribution.

"**Promised Options**" means promised but ungranted Options that are the greater of those (i) promised pursuant to agreements or understandings made prior to the execution of, or in connection with, the term sheet or letter of intent for the Equity Financing or Liquidity Event, as applicable (or the initial closing of the Equity Financing or consummation of the Liquidity Event, if there is no term sheet or letter of intent), (ii) in the case of an Equity Financing, treated as outstanding Options in the calculation of the Standard Preferred Stock's price per share, or (iii) in the case of a Liquidity Event, treated as outstanding Options in the calculation of the distribution of the Proceeds.

"**Safe**" means an instrument containing a future right to shares of Capital Stock, similar in form and content to this instrument, purchased by investors for the purpose of funding the Company's business operations. References to "this Safe" mean this specific instrument.

"**Safe Preferred Stock**" means the shares of the series of Preferred Stock issued to the Investor in an Equity Financing, having the identical rights, privileges, preferences and restrictions as the shares of Standard Preferred Stock, other than with respect to: (i) the per share liquidation preference and the initial conversion price for purposes of price-based

anti-dilution protection, which will equal the Safe Price; and (ii) the basis for any dividend rights, which will be based on the Safe Price.

"**Safe Price**" means the price per share equal to the Post-Money Valuation Cap divided by the Company Capitalization.

"**Standard Preferred Stock**" means the shares of the series of Preferred Stock issued to the investors investing new money in the Company in connection with the initial closing of the Equity Financing.

"**Unissued Option Pool**" means all shares of Capital Stock that are reserved, available for future grant and not subject to any outstanding Options or Promised Options (but in the case of a Liquidity Event, only to the extent Proceeds are payable on such Promised Options) under any equity incentive or similar Company plan.

3.  *Company Representations*

(a)  The Company is a corporation duly organized, validly existing and in good standing under the laws of its state of incorporation, and has the power and authority to own, lease and operate its properties and carry on its business as now conducted.

(b)  The execution, delivery and performance by the Company of this Safe is within the power of the Company and has been duly authorized by all necessary actions on the part of the Company (subject to section 3(d)). This Safe constitutes a legal, valid and binding obligation of the Company, enforceable against the Company in accordance with its terms, except as limited by bankruptcy, insolvency or other laws of general application relating to or affecting the enforcement of creditors' rights generally and general principles of equity. To its knowledge, the Company is not in violation of (i) its current certificate of incorporation or bylaws, (ii) any material statute, rule or regulation applicable to the Company or (iii) any material debt or contract to which the Company is a party or by which it is bound, where, in each case, such violation or default, individually, or together with all such violations or defaults, could reasonably be expected to have a material adverse effect on the Company.

(c)  The performance and consummation of the transactions contemplated by this Safe do not and will not: (i) violate any material judgment, statute, rule or regulation applicable to the Company; (ii) result in the acceleration of any material debt or contract to which the Company is a party or by which it is bound; or (iii) result in the creation or imposition of any lien on any property, asset or revenue of the Company or the suspension, forfeiture, or nonrenewal of any material permit, license or authorization applicable to the Company, its business or operations.

(d)  No consents or approvals are required in connection with the performance of this Safe, other than: (i) the Company's corporate approvals; (ii) any qualifications or filings under applicable securities laws; and (iii) necessary corporate approvals for the authorization of Capital Stock issuable pursuant to Section 1.

(e)  To its knowledge, the Company owns or possesses (or can obtain on commercially reasonable terms) sufficient legal rights to all patents, trademarks, service marks, trade names, copyrights, trade secrets, licenses, information, processes and other intellectual property rights necessary for its business as now conducted and as currently proposed to be conducted, without any conflict with, or infringement of the rights of, others.

4.  *Investor Representations*

(a)  The Investor has full legal capacity, power and authority to execute and deliver this Safe and to perform its obligations hereunder. This Safe constitutes valid and binding obligation of the Investor, enforceable in accordance with its terms, except as limited by bankruptcy, insolvency or other laws of general application relating to or affecting the enforcement of creditors' rights generally and general principles of equity.

(b)  The Investor is an accredited investor as such term is defined in Rule 501 of Regulation D under the Securities Act, and acknowledges and agrees that if not an accredited investor at the time of an Equity Financing, the Company may void this Safe and return the Purchase Amount. The Investor has been advised that this Safe and the underlying securities have not been registered under the Securities Act, or any state securities laws and, therefore, cannot

DocuSign Envelope ID: 53426EF0-8EB0-45BF-A614-B82104049EFE

be resold unless they are registered under the Securities Act and applicable state securities laws or unless an exemption from such registration requirements is available. The Investor is purchasing this Safe and the securities to be acquired by the Investor hereunder for its own account for investment, not as a nominee or agent, and not with a view to, or for resale in connection with, the distribution thereof, and the Investor has no present intention of selling, granting any participation in, or otherwise distributing the same. The Investor has such knowledge and experience in financial and business matters that the Investor is capable of evaluating the merits and risks of such investment, is able to incur a complete loss of such investment without impairing the Investor's financial condition and is able to bear the economic risk of such investment for an indefinite period of time.

**5.** *Miscellaneous*

(a)  Any provision of this Safe may be amended, waived or modified by written consent of the Company and either (i) the Investor or (ii) the majority-in-interest of all then-outstanding Safes with the same "Post-Money Valuation Cap" and "Discount Rate" as this Safe (and Safes lacking one or both of such terms will be considered to be the same with respect to such term(s)), *provided that* with respect to clause (ii): (A) the Purchase Amount may not be amended, waived or modified in this manner, (B) the consent of the Investor and each holder of such Safes must be solicited (even if not obtained), and (C) such amendment, waiver or modification treats all such holders in the same manner. "Majority-in-interest" refers to the holders of the applicable group of Safes whose Safes have a total Purchase Amount greater than 50% of the total Purchase Amount of all of such applicable group of Safes.

(b)  Any notice required or permitted by this Safe will be deemed sufficient when delivered personally or by overnight courier or sent by email to the relevant address listed on the signature page, or 48 hours after being deposited in the U.S. mail as certified or registered mail with postage prepaid, addressed to the party to be notified at such party's address listed on the signature page, as subsequently modified by written notice.

(c)  The Investor is not entitled, as a holder of this Safe, to vote or be deemed a holder of Capital Stock for any purpose other than tax purposes, nor will anything in this Safe be construed to confer on the Investor, as such, any rights of a Company stockholder or rights to vote for the election of directors or on any matter submitted to Company stockholders, or to give or withhold consent to any corporate action or to receive notice of meetings, until shares have been issued on the terms described in Section 1.  However, if the Company pays a dividend on outstanding shares of Common Stock (that is not payable in shares of Common Stock) while this Safe is outstanding, the Company will pay the Dividend Amount to the Investor at the same time.

(d)  Neither this Safe nor the rights in this Safe are transferable or assignable, by operation of law or otherwise, by either party without the prior written consent of the other; *provided, however*, that this Safe and/or its rights may be assigned without the Company's consent by the Investor (i) to the Investor's estate, heirs, executors, administrators, guardians and/or successors in the event of Investor's death or disability, or (ii) to any other entity who directly or indirectly, controls, is controlled by or is under common control with the Investor, including, without limitation, any general partner, managing member, officer or director of the Investor, or any venture capital fund now or hereafter existing which is controlled by one or more general partners or managing members of, or shares the same management company with, the Investor; and *provided, further*, that the Company may assign this Safe in whole, without the consent of the Investor, in connection with a reincorporation to change the Company's domicile.

(e)  In the event any one or more of the provisions of this Safe is for any reason held to be invalid, illegal or unenforceable, in whole or in part or in any respect, or in the event that any one or more of the provisions of this Safe operate or would prospectively operate to invalidate this Safe, then and in any such event, such provision(s) only will be deemed null and void and will not affect any other provision of this Safe and the remaining provisions of this Safe will remain operative and in full force and effect and will not be affected, prejudiced, or disturbed thereby.

(f)  All rights and obligations hereunder will be governed by the laws of the State of California, without regard to the conflicts of law provisions of such jurisdiction.

(g)  The parties acknowledge and agree that for United States federal and state income tax purposes this Safe is, and at all times has been, intended to be characterized as stock, and more particularly as common stock for purposes of Sections 304, 305, 306, 354, 368, 1036 and 1202 of the Internal Revenue Code of 1986, as amended.  Accordingly, the

parties agree to treat this Safe consistent with the foregoing intent for all United States federal and state income tax purposes (including, without limitation, on their respective tax returns or other informational statements).

*(Signature page follows)*

30

IN WITNESS WHEREOF, the undersigned have caused this Safe to be duly executed and delivered.

**PALAMEDRIX, INC.**

By: _____
          3E89D869DAC1479

          Michael Shane Bowen
          Chief Executive Officer

             652 Jocelyn Way
Address: _____

          Encinitas, CA
_____

          shanebowen@palamedrix.com
Email: _____

**INVESTOR:**

**Formic Ventures LLC**

By: _____
          72F7C4DD33EF4B5...

          MICHAEL ANTONOV
Name: _____

          Manager
Title: _____

          977 North Broadway
Address: _____

          North Massapequa, NY 11758
_____

          michael@formic.vc
Email: _____

# EXHIBIT B

## POST-MONEY VALUATION CAP

THIS INSTRUMENT AND ANY SECURITIES ISSUABLE PURSUANT HERETO HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "**SECURITIES ACT**"), OR UNDER THE SECURITIES LAWS OF CERTAIN STATES.  THESE SECURITIES MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED, PLEDGED OR HYPOTHECATED EXCEPT AS PERMITTED IN THIS SAFE AND UNDER THE ACT AND APPLICABLE STATE SECURITIES LAWS PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT OR AN EXEMPTION THEREFROM.

## PALAMEDRIX, INC.

### SAFE
### (Simple Agreement for Future Equity)

THIS CERTIFIES THAT in exchange for the payment by **Formic Ventures LLC** (the "**Investor**") of **$350,000** (the "**Purchase Amount**") on or about **December 30, 2020**, Palamedrix, Inc., a Delaware corporation (the "**Company**"), issues to the Investor the right to certain shares of the Company's Capital Stock, subject to the terms described below.

This Safe is one of the forms available at http://ycombinator.com/documents and the Company and the Investor agree that neither one has modified the form, except to fill in blanks and bracketed terms.

The "**Post-Money Valuation Cap**" is **$30,000,000**.  See **Section 2** for certain additional defined terms.

1. *Events*

(a) **Equity Financing**. If there is an Equity Financing before the termination of this Safe, on the initial closing of such Equity Financing, this Safe will automatically convert into the greater of: (1) the number of shares of Standard Preferred Stock equal to the Purchase Amount divided by the lowest price per share of the Standard Preferred Stock; or (2) the number of shares of Safe Preferred Stock equal to the Purchase Amount divided by the Safe Price.

In connection with the automatic conversion of this Safe into shares of Standard Preferred Stock or Safe Preferred Stock, the Investor will execute and deliver to the Company all of the transaction documents related to the Equity Financing; *provided,* that such documents (i) are the same documents to be entered into with the purchasers of Standard Preferred Stock, with appropriate variations for the Safe Preferred Stock if applicable, and (ii) have customary exceptions to any drag-along applicable to the Investor, including (without limitation) limited representations, warranties, liability and indemnification obligations for the Investor.

(b) **Liquidity Event**.  If there is a Liquidity Event before the termination of this Safe, this Safe will automatically be entitled (subject to the liquidation priority set forth in Section 1(d) below) to receive a portion of Proceeds, due and payable to the Investor immediately prior to, or concurrent with, the consummation of such Liquidity Event, equal to the greater of (i) the Purchase Amount (the "**Cash-Out Amount**") or (ii) the amount payable on the number of shares of Common Stock equal to the Purchase Amount divided by the Liquidity Price (the "**Conversion Amount**").  If any of the Company's securityholders are given a choice as to the form and amount of Proceeds to be received in a Liquidity Event, the Investor will be given the same choice, *provided* that the Investor may not choose to receive a form of consideration that the Investor would be ineligible to receive as a result of the Investor's failure to satisfy any requirement or limitation generally applicable to the Company's securityholders, or under any applicable laws.

Notwithstanding the foregoing, in connection with a Change of Control intended to qualify as a tax-free reorganization, the Company may reduce the cash portion of Proceeds payable to the Investor by the amount determined by its board of directors in good faith for such Change of Control to qualify as a tax-free reorganization for U.S. federal income tax purposes, provided that such reduction (A) does not reduce the total Proceeds payable to such Investor and (B) is applied in the same manner and on a pro rata basis to all securityholders who have equal priority to the Investor under Section 1(d).

(c) **Dissolution Event**. If there is a Dissolution Event before the termination of this Safe, the Investor will automatically be entitled (subject to the liquidation priority set forth in Section 1(d) below) to receive a portion of Proceeds equal to the Cash-Out Amount, due and payable to the Investor immediately prior to the consummation of the Dissolution Event.

(d) **Liquidation Priority**.  In a Liquidity Event or Dissolution Event, this Safe is intended to operate like standard non-participating Preferred Stock.  The Investor's right to receive its Cash-Out Amount is:

(i)  Junior to payment of outstanding indebtedness and creditor claims, including contractual claims for payment and convertible promissory notes (to the extent such convertible promissory notes are not actually or notionally converted into Capital Stock);

(ii)  On par with payments for other Safes and/or Preferred Stock, and if the applicable Proceeds are insufficient to permit full payments to the Investor and such other Safes and/or Preferred Stock, the applicable Proceeds will be distributed pro rata to the Investor and such other Safes and/or Preferred Stock in proportion to the full payments that would otherwise be due; and

(iii)  Senior to payments for Common Stock.

The Investor's right to receive its Conversion Amount is (A) on par with payments for Common Stock and other Safes and/or Preferred Stock who are also receiving Conversion Amounts or Proceeds on a similar as-converted to Common Stock basis, and (B) junior to payments described in clauses (i) and (ii) above (in the latter case, to the extent such payments are Cash-Out Amounts or similar liquidation preferences).

(e) **Termination**.  This Safe will automatically terminate (without relieving the Company of any obligations arising from a prior breach of or non-compliance with this Safe) immediately following the earliest to occur of: (i) the issuance of Capital Stock to the Investor pursuant to the automatic conversion of this Safe under Section 1(a); or (ii) the payment, or setting aside for payment, of amounts due the Investor pursuant to Section 1(b) or Section 1(c).

2. *Definitions*

"**Capital Stock**" means the capital stock of the Company, including, without limitation, the "**Common Stock**" and the "**Preferred Stock**."

"**Change of Control**" means (i) a transaction or series of related transactions in which any "person" or "group" (within the meaning of Section 13(d) and 14(d) of the Securities Exchange Act of 1934, as amended), becomes the "beneficial owner" (as defined in Rule 13d-3 under the Securities Exchange Act of 1934, as amended), directly or indirectly, of more than 50% of the outstanding voting securities of the Company having the right to vote for the election of members of the Company's board of directors, (ii) any reorganization, merger or consolidation of the Company, other than a transaction or series of related transactions in which the holders of the voting securities of the Company outstanding immediately prior to such transaction or series of related transactions retain, immediately after such transaction or series of related transactions, at least a majority of the total voting power represented by the outstanding voting securities of the Company or such other surviving or resulting entity or (iii) a sale, lease or other disposition of all or substantially all of the assets of the Company.

"**Company Capitalization**" is calculated as of immediately prior to the Equity Financing and (without double-counting, in each case calculated on an as-converted to Common Stock basis):

- Includes all shares of Capital Stock issued and outstanding;
- Includes all Converting Securities;
- Includes all (i) issued and outstanding Options and (ii) Promised Options; and
- Includes the Unissued Option Pool, except that any increase to the Unissued Option Pool in connection with the Equity Financing shall only be included to the extent that the number of Promised Options exceeds the Unissued Option Pool prior to such increase.

"**Converting Securities**" includes this Safe and other convertible securities issued by the Company, including but not limited to: (i) other Safes; (ii) convertible promissory notes and other convertible debt instruments; and (iii) convertible securities that have the right to convert into shares of Capital Stock.

"**Direct Listing**" means the Company's initial listing of its Common Stock (other than shares of Common Stock not eligible for resale under Rule 144 under the Securities Act) on a national securities exchange by means of an effective registration statement on Form S-1 filed by the Company with the SEC that registers shares of existing capital stock of the

34

Company for resale, as approved by the Company's board of directors. For the avoidance of doubt, a Direct Listing shall not be deemed to be an underwritten offering and shall not involve any underwriting services.

"**Dissolution Event**" means (i) a voluntary termination of operations, (ii) a general assignment for the benefit of the Company's creditors or (iii) any other liquidation, dissolution or winding up of the Company (**excluding** a Liquidity Event), whether voluntary or involuntary.

"**Dividend Amount**" means, with respect to any date on which the Company pays a dividend on its outstanding Common Stock, the amount of such dividend that is paid per share of Common Stock multiplied by (x) the Purchase Amount divided by (y) the Liquidity Price (treating the dividend date as a Liquidity Event solely for purposes of calculating such Liquidity Price).

"**Equity Financing**" means a bona fide transaction or series of transactions with the principal purpose of raising capital, pursuant to which the Company issues and sells Preferred Stock at a fixed valuation, including but not limited to, a pre-money or post-money valuation.

"**Initial Public Offering**" means the closing of the Company's first firm commitment underwritten initial public offering of Common Stock pursuant to a registration statement filed under the Securities Act.

"**Liquidity Capitalization**" is calculated as of immediately prior to the Liquidity Event, and (without double-counting, in each case calculated on an as-converted to Common Stock basis):

- Includes all shares of Capital Stock issued and outstanding;
- Includes all (i) issued and outstanding Options and (ii) to the extent receiving Proceeds, Promised Options;
- Includes all Converting Securities, **other than** any Safes and other convertible securities (including without limitation shares of Preferred Stock) where the holders of such securities are receiving Cash-Out Amounts or similar liquidation preference payments in lieu of Conversion Amounts or similar "as-converted" payments; and
- Excludes the Unissued Option Pool.

"**Liquidity Event**" means a Change of Control, a Direct Listing or an Initial Public Offering.

"**Liquidity Price**" means the price per share equal to the Post-Money Valuation Cap divided by the Liquidity Capitalization.

"**Options**" includes options, restricted stock awards or purchases, RSUs, SARs, warrants or similar securities, vested or unvested.

"**Proceeds**" means cash and other assets (including without limitation stock consideration) that are proceeds from the Liquidity Event or the Dissolution Event, as applicable, and legally available for distribution.

"**Promised Options**" means promised but ungranted Options that are the greater of those (i) promised pursuant to agreements or understandings made prior to the execution of, or in connection with, the term sheet or letter of intent for the Equity Financing or Liquidity Event, as applicable (or the initial closing of the Equity Financing or consummation of the Liquidity Event, if there is no term sheet or letter of intent), (ii) in the case of an Equity Financing, treated as outstanding Options in the calculation of the Standard Preferred Stock's price per share, or (iii) in the case of a Liquidity Event, treated as outstanding Options in the calculation of the distribution of the Proceeds.

"**Safe**" means an instrument containing a future right to shares of Capital Stock, similar in form and content to this instrument, purchased by investors for the purpose of funding the Company's business operations. References to "this Safe" mean this specific instrument.

"**Safe Preferred Stock**" means the shares of the series of Preferred Stock issued to the Investor in an Equity Financing, having the identical rights, privileges, preferences and restrictions as the shares of Standard Preferred Stock, other than with respect to: (i) the per share liquidation preference and the initial conversion price for purposes of price-based

anti-dilution protection, which will equal the Safe Price; and (ii) the basis for any dividend rights, which will be based on the Safe Price.

**Safe Price**" means the price per share equal to the Post-Money Valuation Cap divided by the Company Capitalization.

**Standard Preferred Stock**" means the shares of the series of Preferred Stock issued to the investors investing new money in the Company in connection with the initial closing of the Equity Financing.

**Unissued Option Pool**" means all shares of Capital Stock that are reserved, available for future grant and not subject to any outstanding Options or Promised Options (but in the case of a Liquidity Event, only to the extent Proceeds are payable on such Promised Options) under any equity incentive or similar Company plan.

3. *Company Representations*

(a) The Company is a corporation duly organized, validly existing and in good standing under the laws of its state of incorporation, and has the power and authority to own, lease and operate its properties and carry on its business as now conducted.

(b) The execution, delivery and performance by the Company of this Safe is within the power of the Company and has been duly authorized by all necessary actions on the part of the Company (subject to section 3(d)). This Safe constitutes a legal, valid and binding obligation of the Company, enforceable against the Company in accordance with its terms, except as limited by bankruptcy, insolvency or other laws of general application relating to or affecting the enforcement of creditors' rights generally and general principles of equity. To its knowledge, the Company is not in violation of (i) its current certificate of incorporation or bylaws, (ii) any material statute, rule or regulation applicable to the Company or (iii) any material debt or contract to which the Company is a party or by which it is bound, where, in each case, such violation or default, individually, or together with all such violations or defaults, could reasonably be expected to have a material adverse effect on the Company.

(c) The performance and consummation of the transactions contemplated by this Safe do not and will not: (i) violate any material judgment, statute, rule or regulation applicable to the Company; (ii) result in the acceleration of any material debt or contract to which the Company is a party or by which it is bound; or (iii) result in the creation or imposition of any lien on any property, asset or revenue of the Company or the suspension, forfeiture, or nonrenewal of any material permit, license or authorization applicable to the Company, its business or operations.

(d) No consents or approvals are required in connection with the performance of this Safe, other than: (i) the Company's corporate approvals; (ii) any qualifications or filings under applicable securities laws; and (iii) necessary corporate approvals for the authorization of Capital Stock issuable pursuant to Section 1.

(e) To its knowledge, the Company owns or possesses (or can obtain on commercially reasonable terms) sufficient legal rights to all patents, trademarks, service marks, trade names, copyrights, trade secrets, licenses, information, processes and other intellectual property rights necessary for its business as now conducted and as currently proposed to be conducted, without any conflict with, or infringement of the rights of, others.

4. *Investor Representations*

(a) The Investor has full legal capacity, power and authority to execute and deliver this Safe and to perform its obligations hereunder. This Safe constitutes valid and binding obligation of the Investor, enforceable in accordance with its terms, except as limited by bankruptcy, insolvency or other laws of general application relating to or affecting the enforcement of creditors' rights generally and general principles of equity.

(b) The Investor is an accredited investor as such term is defined in Rule 501 of Regulation D under the Securities Act, and acknowledges and agrees that if not an accredited investor at the time of an Equity Financing, the Company may void this Safe and return the Purchase Amount. The Investor has been advised that this Safe and the underlying securities have not been registered under the Securities Act, or any state securities laws and, therefore, cannot

be resold unless they are registered under the Securities Act and applicable state securities laws or unless an exemption from such registration requirements is available. The Investor is purchasing this Safe and the securities to be acquired by the Investor hereunder for its own account for investment, not as a nominee or agent, and not with a view to, or for resale in connection with, the distribution thereof, and the Investor has no present intention of selling, granting any participation in, or otherwise distributing the same. The Investor has such knowledge and experience in financial and business matters that the Investor is capable of evaluating the merits and risks of such investment, is able to incur a complete loss of such investment without impairing the Investor's financial condition and is able to bear the economic risk of such investment for an indefinite period of time.

**5.** *Miscellaneous*

(a)  Any provision of this Safe may be amended, waived or modified by written consent of the Company and either (i) the Investor or (ii) the majority-in-interest of all then-outstanding Safes with the same "Post-Money Valuation Cap" and "Discount Rate" as this Safe (and Safes lacking one or both of such terms will be considered to be the same with respect to such term(s)), *provided that* with respect to clause (ii): (A) the Purchase Amount may not be amended, waived or modified in this manner, (B) the consent of the Investor and each holder of such Safes must be solicited (even if not obtained), and (C) such amendment, waiver or modification treats all such holders in the same manner. "Majority-in-interest" refers to the holders of the applicable group of Safes whose Safes have a total Purchase Amount greater than 50% of the total Purchase Amount of all of such applicable group of Safes.

(b)  Any notice required or permitted by this Safe will be deemed sufficient when delivered personally or by overnight courier or sent by email to the relevant address listed on the signature page, or 48 hours after being deposited in the U.S. mail as certified or registered mail with postage prepaid, addressed to the party to be notified at such party's address listed on the signature page, as subsequently modified by written notice.

(c)  The Investor is not entitled, as a holder of this Safe, to vote or be deemed a holder of Capital Stock for any purpose other than tax purposes, nor will anything in this Safe be construed to confer on the Investor, as such, any rights of a Company stockholder or rights to vote for the election of directors or on any matter submitted to Company stockholders, or to give or withhold consent to any corporate action or to receive notice of meetings, until shares have been issued on the terms described in Section 1.  However, if the Company pays a dividend on outstanding shares of Common Stock (that is not payable in shares of Common Stock) while this Safe is outstanding, the Company will pay the Dividend Amount to the Investor at the same time.

(d)  Neither this Safe nor the rights in this Safe are transferable or assignable, by operation of law or otherwise, by either party without the prior written consent of the other; *provided, however*, that this Safe and/or its rights may be assigned without the Company's consent by the Investor (i) to the Investor's estate, heirs, executors, administrators, guardians and/or successors in the event of Investor's death or disability, or (ii) to any other entity who directly or indirectly, controls, is controlled by or is under common control with the Investor, including, without limitation, any general partner, managing member, officer or director of the Investor, or any venture capital fund now or hereafter existing which is controlled by one or more general partners or managing members of, or shares the same management company with, the Investor; and *provided, further*, that the Company may assign this Safe in whole, without the consent of the Investor, in connection with a reincorporation to change the Company's domicile.

(e)  In the event any one or more of the provisions of this Safe is for any reason held to be invalid, illegal or unenforceable, in whole or in part or in any respect, or in the event that any one or more of the provisions of this Safe operate or would prospectively operate to invalidate this Safe, then and in any such event, such provision(s) only will be deemed null and void and will not affect any other provision of this Safe and the remaining provisions of this Safe will remain operative and in full force and effect and will not be affected, prejudiced, or disturbed thereby.

(f)  All rights and obligations hereunder will be governed by the laws of the State of [Governing Law Jurisdiction], without regard to the conflicts of law provisions of such jurisdiction.

(g)  The parties acknowledge and agree that for United States federal and state income tax purposes this Safe is, and at all times has been, intended to be characterized as stock, and more particularly as common stock for purposes of Sections 304, 305, 306, 354, 368, 1036 and 1202 of the Internal Revenue Code of 1986, as amended.  Accordingly, the

parties agree to treat this Safe consistent with the foregoing intent for all United States federal and state income tax purposes (including, without limitation, on their respective tax returns or other informational statements).

*(Signature page follows)*

38

IN WITNESS WHEREOF, the undersigned have caused this Safe to be duly executed and delivered.

**PALAMEDRIX, INC.**

By: _____

Name: Michael Shane Bowen

Chief Executive Officer

Address: 652 Jocelyn Way

North Encinitas, CA 92024

Email: sb@palamedrix.com

**INVESTOR: Formic Ventures LLC**

By: _____

Name: Michael Antonov

Title: Manager

Address: 977 North Broadway

North Massapequa, NY 11758

Email: michael@formic.vc

# EXHIBIT C

## POST-MONEY VALUATION CAP

THIS INSTRUMENT AND ANY SECURITIES ISSUABLE PURSUANT HERETO HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "**SECURITIES ACT**"), OR UNDER THE SECURITIES LAWS OF CERTAIN STATES.  THESE SECURITIES MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED, PLEDGED OR HYPOTHECATED EXCEPT AS PERMITTED IN THIS SAFE AND UNDER THE ACT AND APPLICABLE STATE SECURITIES LAWS PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT OR AN EXEMPTION THEREFROM.

### PALAMEDRIX, INC.

### SAFE
#### (Simple Agreement for Future Equity)

THIS CERTIFIES THAT in exchange for the payment by **Formic Ventures LLC** (the "**Investor**") of **$350,000** (the "**Purchase Amount**") on or about **December 30, 2020**, Palamedrix, Inc., a Delaware corporation (the "**Company**"), issues to the Investor the right to certain shares of the Company's Capital Stock, subject to the terms described below.

This Safe is one of the forms available at http://ycombinator.com/documents and the Company and the Investor agree that neither one has modified the form, except to fill in blanks and bracketed terms.

The "**Post-Money Valuation Cap**" is **$25,000,000**.  See **Section 2** for certain additional defined terms.

1.  *Events*

(a)  **Equity Financing**. If there is an Equity Financing before the termination of this Safe, on the initial closing of such Equity Financing, this Safe will automatically convert into the greater of: (1) the number of shares of Standard Preferred Stock equal to the Purchase Amount divided by the lowest price per share of the Standard Preferred Stock; or (2) the number of shares of Safe Preferred Stock equal to the Purchase Amount divided by the Safe Price.

In connection with the automatic conversion of this Safe into shares of Standard Preferred Stock or Safe Preferred Stock, the Investor will execute and deliver to the Company all of the transaction documents related to the Equity Financing; *provided,* that such documents (i) are the same documents to be entered into with the purchasers of Standard Preferred Stock, with appropriate variations for the Safe Preferred Stock if applicable, and (ii) have customary exceptions to any drag-along applicable to the Investor, including (without limitation) limited representations, warranties, liability and indemnification obligations for the Investor.

(b)  **Liquidity Event**.  If there is a Liquidity Event before the termination of this Safe, this Safe will automatically be entitled (subject to the liquidation priority set forth in Section 1(d) below) to receive a portion of Proceeds, due and payable to the Investor immediately prior to, or concurrent with, the consummation of such Liquidity Event, equal to the greater of (i) the Purchase Amount (the "**Cash-Out Amount**") or (ii) the amount payable on the number of shares of Common Stock equal to the Purchase Amount divided by the Liquidity Price (the "**Conversion Amount**").  If any of the Company's securityholders are given a choice as to the form and amount of Proceeds to be received in a Liquidity Event, the Investor will be given the same choice, *provided* that the Investor may not choose to receive a form of consideration that the Investor would be ineligible to receive as a result of the Investor's failure to satisfy any requirement or limitation generally applicable to the Company's securityholders, or under any applicable laws.

Notwithstanding the foregoing, in connection with a Change of Control intended to qualify as a tax-free reorganization, the Company may reduce the cash portion of Proceeds payable to the Investor by the amount determined by its board of directors in good faith for such Change of Control to qualify as a tax-free reorganization for U.S. federal income tax purposes, provided that such reduction (A) does not reduce the total Proceeds payable to such Investor and (B) is applied in the same manner and on a pro rata basis to all securityholders who have equal priority to the Investor under Section 1(d).

(c)  **Dissolution Event**. If there is a Dissolution Event before the termination of this Safe, the Investor will automatically be entitled (subject to the liquidation priority set forth in Section 1(d) below) to receive a portion of Proceeds equal to the Cash-Out Amount, due and payable to the Investor immediately prior to the consummation of the Dissolution Event.

(d) **Liquidation Priority**.  In a Liquidity Event or Dissolution Event, this Safe is intended to operate like standard non-participating Preferred Stock.  The Investor's right to receive its Cash-Out Amount is:

(i)  Junior to payment of outstanding indebtedness and creditor claims, including contractual claims for payment and convertible promissory notes (to the extent such convertible promissory notes are not actually or notionally converted into Capital Stock);

(ii)  On par with payments for other Safes and/or Preferred Stock, and if the applicable Proceeds are insufficient to permit full payments to the Investor and such other Safes and/or Preferred Stock, the applicable Proceeds will be distributed pro rata to the Investor and such other Safes and/or Preferred Stock in proportion to the full payments that would otherwise be due; and

(iii)  Senior to payments for Common Stock.

The Investor's right to receive its Conversion Amount is (A) on par with payments for Common Stock and other Safes and/or Preferred Stock who are also receiving Conversion Amounts or Proceeds on a similar as-converted to Common Stock basis, and (B) junior to payments described in clauses (i) and (ii) above (in the latter case, to the extent such payments are Cash-Out Amounts or similar liquidation preferences).

(e) **Termination**.  This Safe will automatically terminate (without relieving the Company of any obligations arising from a prior breach of or non-compliance with this Safe) immediately following the earliest to occur of: (i) the issuance of Capital Stock to the Investor pursuant to the automatic conversion of this Safe under Section 1(a); or (ii) the payment, or setting aside for payment, of amounts due the Investor pursuant to Section 1(b) or Section 1(c).

2.  *Definitions*

"**Capital Stock**" means the capital stock of the Company, including, without limitation, the "**Common Stock**" and the "**Preferred Stock**."

"**Change of Control**" means (i) a transaction or series of related transactions in which any "person" or "group" (within the meaning of Section 13(d) and 14(d) of the Securities Exchange Act of 1934, as amended), becomes the "beneficial owner" (as defined in Rule 13d-3 under the Securities Exchange Act of 1934, as amended), directly or indirectly, of more than 50% of the outstanding voting securities of the Company having the right to vote for the election of members of the Company's board of directors, (ii) any reorganization, merger or consolidation of the Company, other than a transaction or series of related transactions in which the holders of the voting securities of the Company outstanding immediately prior to such transaction or series of related transactions retain, immediately after such transaction or series of related transactions, at least a majority of the total voting power represented by the outstanding voting securities of the Company or such other surviving or resulting entity or (iii) a sale, lease or other disposition of all or substantially all of the assets of the Company.

"**Company Capitalization**" is calculated as of immediately prior to the Equity Financing and (without double-counting, in each case calculated on an as-converted to Common Stock basis):

- Includes all shares of Capital Stock issued and outstanding;
- Includes all Converting Securities;
- Includes all (i) issued and outstanding Options and (ii) Promised Options; and
- Includes the Unissued Option Pool, except that any increase to the Unissued Option Pool in connection with the Equity Financing shall only be included to the extent that the number of Promised Options exceeds the Unissued Option Pool prior to such increase.

"**Converting Securities**" includes this Safe and other convertible securities issued by the Company, including but not limited to: (i) other Safes; (ii) convertible promissory notes and other convertible debt instruments; and (iii) convertible securities that have the right to convert into shares of Capital Stock.

"**Direct Listing**" means the Company's initial listing of its Common Stock (other than shares of Common Stock not eligible for resale under Rule 144 under the Securities Act) on a national securities exchange by means of an effective registration statement on Form S-1 filed by the Company with the SEC that registers shares of existing capital stock of the

42

Company for resale, as approved by the Company's board of directors. For the avoidance of doubt, a Direct Listing shall not be deemed to be an underwritten offering and shall not involve any underwriting services.

"**Dissolution Event**" means (i) a voluntary termination of operations, (ii) a general assignment for the benefit of the Company's creditors or (iii) any other liquidation, dissolution or winding up of the Company (**excluding** a Liquidity Event), whether voluntary or involuntary.

"**Dividend Amount**" means, with respect to any date on which the Company pays a dividend on its outstanding Common Stock, the amount of such dividend that is paid per share of Common Stock multiplied by (x) the Purchase Amount divided by (y) the Liquidity Price (treating the dividend date as a Liquidity Event solely for purposes of calculating such Liquidity Price).

"**Equity Financing**" means a bona fide transaction or series of transactions with the principal purpose of raising capital, pursuant to which the Company issues and sells Preferred Stock at a fixed valuation, including but not limited to, a pre-money or post-money valuation.

"**Initial Public Offering**" means the closing of the Company's first firm commitment underwritten initial public offering of Common Stock pursuant to a registration statement filed under the Securities Act.

"**Liquidity Capitalization**" is calculated as of immediately prior to the Liquidity Event, and (without double-counting, in each case calculated on an as-converted to Common Stock basis):

- Includes all shares of Capital Stock issued and outstanding;
- Includes all (i) issued and outstanding Options and (ii) to the extent receiving Proceeds, Promised Options;
- Includes all Converting Securities, **other than** any Safes and other convertible securities (including without limitation shares of Preferred Stock) where the holders of such securities are receiving Cash-Out Amounts or similar liquidation preference payments in lieu of Conversion Amounts or similar "as-converted" payments; and
- Excludes the Unissued Option Pool.

"**Liquidity Event**" means a Change of Control, a Direct Listing or an Initial Public Offering.

"**Liquidity Price**" means the price per share equal to the Post-Money Valuation Cap divided by the Liquidity Capitalization.

"**Options**" includes options, restricted stock awards or purchases, RSUs, SARs, warrants or similar securities, vested or unvested.

"**Proceeds**" means cash and other assets (including without limitation stock consideration) that are proceeds from the Liquidity Event or the Dissolution Event, as applicable, and legally available for distribution.

"**Promised Options**" means promised but ungranted Options that are the greater of those (i) promised pursuant to agreements or understandings made prior to the execution of, or in connection with, the term sheet or letter of intent for the Equity Financing or Liquidity Event, as applicable (or the initial closing of the Equity Financing or consummation of the Liquidity Event, if there is no term sheet or letter of intent), (ii) in the case of an Equity Financing, treated as outstanding Options in the calculation of the Standard Preferred Stock's price per share, or (iii) in the case of a Liquidity Event, treated as outstanding Options in the calculation of the distribution of the Proceeds.

"**Safe**" means an instrument containing a future right to shares of Capital Stock, similar in form and content to this instrument, purchased by investors for the purpose of funding the Company's business operations. References to "this Safe" mean this specific instrument.

"**Safe Preferred Stock**" means the shares of the series of Preferred Stock issued to the Investor in an Equity Financing, having the identical rights, privileges, preferences and restrictions as the shares of Standard Preferred Stock, other than with respect to: (i) the per share liquidation preference and the initial conversion price for purposes of price-based

anti-dilution protection, which will equal the Safe Price; and (ii) the basis for any dividend rights, which will be based on the Safe Price.

"**Safe Price**" means the price per share equal to the Post-Money Valuation Cap divided by the Company Capitalization.

"**Standard Preferred Stock**" means the shares of the series of Preferred Stock issued to the investors investing new money in the Company in connection with the initial closing of the Equity Financing.

"**Unissued Option Pool**" means all shares of Capital Stock that are reserved, available for future grant and not subject to any outstanding Options or Promised Options (but in the case of a Liquidity Event, only to the extent Proceeds are payable on such Promised Options) under any equity incentive or similar Company plan.

3. *Company Representations*

(a)  The Company is a corporation duly organized, validly existing and in good standing under the laws of its state of incorporation, and has the power and authority to own, lease and operate its properties and carry on its business as now conducted.

(b)  The execution, delivery and performance by the Company of this Safe is within the power of the Company and has been duly authorized by all necessary actions on the part of the Company (subject to section 3(d)). This Safe constitutes a legal, valid and binding obligation of the Company, enforceable against the Company in accordance with its terms, except as limited by bankruptcy, insolvency or other laws of general application relating to or affecting the enforcement of creditors' rights generally and general principles of equity.  To its knowledge, the Company is not in violation of (i) its current certificate of incorporation or bylaws, (ii) any material statute, rule or regulation applicable to the Company or (iii) any material debt or contract to which the Company is a party or by which it is bound, where, in each case, such violation or default, individually, or together with all such violations or defaults, could reasonably be expected to have a material adverse effect on the Company.

(c)  The performance and consummation of the transactions contemplated by this Safe do not and will not: (i) violate any material judgment, statute, rule or regulation applicable to the Company; (ii) result in the acceleration of any material debt or contract to which the Company is a party or by which it is bound; or (iii) result in the creation or imposition of any lien on any property, asset or revenue of the Company or the suspension, forfeiture, or nonrenewal of any material permit, license or authorization applicable to the Company, its business or operations.

(d)  No consents or approvals are required in connection with the performance of this Safe, other than: (i) the Company's corporate approvals; (ii) any qualifications or filings under applicable securities laws; and (iii) necessary corporate approvals for the authorization of Capital Stock issuable pursuant to Section 1.

(e)  To its knowledge, the Company owns or possesses (or can obtain on commercially reasonable terms) sufficient legal rights to all patents, trademarks, service marks, trade names, copyrights, trade secrets, licenses, information, processes and other intellectual property rights necessary for its business as now conducted and as currently proposed to be conducted, without any conflict with, or infringement of the rights of, others.

4. *Investor Representations*

(a)  The Investor has full legal capacity, power and authority to execute and deliver this Safe and to perform its obligations hereunder. This Safe constitutes valid and binding obligation of the Investor, enforceable in accordance with its terms, except as limited by bankruptcy, insolvency or other laws of general application relating to or affecting the enforcement of creditors' rights generally and general principles of equity.

(b)  The Investor is an accredited investor as such term is defined in Rule 501 of Regulation D under the Securities Act, and acknowledges and agrees that if not an accredited investor at the time of an Equity Financing, the Company may void this Safe and return the Purchase Amount. The Investor has been advised that this Safe and the underlying securities have not been registered under the Securities Act, or any state securities laws and, therefore, cannot

44

be resold unless they are registered under the Securities Act and applicable state securities laws or unless an exemption from such registration requirements is available. The Investor is purchasing this Safe and the securities to be acquired by the Investor hereunder for its own account for investment, not as a nominee or agent, and not with a view to, or for resale in connection with, the distribution thereof, and the Investor has no present intention of selling, granting any participation in, or otherwise distributing the same. The Investor has such knowledge and experience in financial and business matters that the Investor is capable of evaluating the merits and risks of such investment, is able to incur a complete loss of such investment without impairing the Investor's financial condition and is able to bear the economic risk of such investment for an indefinite period of time.

**5.** *Miscellaneous*

(a) Any provision of this Safe may be amended, waived or modified by written consent of the Company and either (i) the Investor or (ii) the majority-in-interest of all then-outstanding Safes with the same "Post-Money Valuation Cap" and "Discount Rate" as this Safe (and Safes lacking one or both of such terms will be considered to be the same with respect to such term(s)), *provided that* with respect to clause (ii): (A) the Purchase Amount may not be amended, waived or modified in this manner, (B) the consent of the Investor and each holder of such Safes must be solicited (even if not obtained), and (C) such amendment, waiver or modification treats all such holders in the same manner. "Majority-in-interest" refers to the holders of the applicable group of Safes whose Safes have a total Purchase Amount greater than 50% of the total Purchase Amount of all of such applicable group of Safes.

(b) Any notice required or permitted by this Safe will be deemed sufficient when delivered personally or by overnight courier or sent by email to the relevant address listed on the signature page, or 48 hours after being deposited in the U.S. mail as certified or registered mail with postage prepaid, addressed to the party to be notified at such party's address listed on the signature page, as subsequently modified by written notice.

(c) The Investor is not entitled, as a holder of this Safe, to vote or be deemed a holder of Capital Stock for any purpose other than tax purposes, nor will anything in this Safe be construed to confer on the Investor, as such, any rights of a Company stockholder or rights to vote for the election of directors or on any matter submitted to Company stockholders, or to give or withhold consent to any corporate action or to receive notice of meetings, until shares have been issued on the terms described in Section 1. However, if the Company pays a dividend on outstanding shares of Common Stock (that is not payable in shares of Common Stock) while this Safe is outstanding, the Company will pay the Dividend Amount to the Investor at the same time.

(d) Neither this Safe nor the rights in this Safe are transferable or assignable, by operation of law or otherwise, by either party without the prior written consent of the other; *provided, however*, that this Safe and/or its rights may be assigned without the Company's consent by the Investor (i) to the Investor's estate, heirs, executors, administrators, guardians and/or successors in the event of Investor's death or disability, or (ii) to any other entity who directly or indirectly, controls, is controlled by or is under common control with the Investor, including, without limitation, any general partner, managing member, officer or director of the Investor, or any venture capital fund now or hereafter existing which is controlled by one or more general partners or managing members of, or shares the same management company with, the Investor; and *provided, further*, that the Company may assign this Safe in whole, without the consent of the Investor, in connection with a reincorporation to change the Company's domicile.

(e) In the event any one or more of the provisions of this Safe is for any reason held to be invalid, illegal or unenforceable, in whole or in part or in any respect, or in the event that any one or more of the provisions of this Safe operate or would prospectively operate to invalidate this Safe, then and in any such event, such provision(s) only will be deemed null and void and will not affect any other provision of this Safe and the remaining provisions of this Safe will remain operative and in full force and effect and will not be affected, prejudiced, or disturbed thereby.

(f) All rights and obligations hereunder will be governed by the laws of the State of [Governing Law Jurisdiction], without regard to the conflicts of law provisions of such jurisdiction.

(g) The parties acknowledge and agree that for United States federal and state income tax purposes this Safe is, and at all times has been, intended to be characterized as stock, and more particularly as common stock for purposes of Sections 304, 305, 306, 354, 368, 1036 and 1202 of the Internal Revenue Code of 1986, as amended. Accordingly, the

parties agree to treat this Safe consistent with the foregoing intent for all United States federal and state income tax purposes (including, without limitation, on their respective tax returns or other informational statements).

*(Signature page follows)*

46

IN WITNESS WHEREOF, the undersigned have caused this Safe to be duly executed and delivered.

**PALAMEDRIX, INC.**

By: _____
     Michael Shane Bowen
     Chief Executive Officer

Address: 652 Jocelyn Way

         Encinitas, CA 92024

Email: sb@palamedrix.com


**INVESTOR: Formic Ventures LLC**

By: _____
Name: Michael Antonov

Title: Manager

Address: 977 North Broadway

         North Massapequa, NY 11758

Email: michael@formic.vc

# EXHIBIT D

# POST-MONEY VALUATION CAP

THIS INSTRUMENT AND ANY SECURITIES ISSUABLE PURSUANT HERETO HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "**SECURITIES ACT**"), OR UNDER THE SECURITIES LAWS OF CERTAIN STATES.  THESE SECURITIES MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED, PLEDGED OR HYPOTHECATED EXCEPT AS PERMITTED IN THIS SAFE AND UNDER THE ACT AND APPLICABLE STATE SECURITIES LAWS PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT OR AN EXEMPTION THEREFROM.

## PALAMEDRIX, INC.

## SAFE
### (Simple Agreement for Future Equity)

THIS CERTIFIES THAT in exchange for the payment by Metaplanet Holdings OÜ (the "**Investor**") of $500,000.00 (the "**Purchase Amount**") on or about August 25, 2020, Palamedrix, Inc., a Delaware corporation (the "**Company**"), issues to the Investor the right to certain shares of the Company's Capital Stock, subject to the terms described below.

This Safe is one of the forms available at http://ycombinator.com/documents and the Company and the Investor agree that neither one has modified the form, except to fill in blanks and bracketed terms.

The "**Post-Money Valuation Cap**" is $20,000,000.  See **Section 2** for certain additional defined terms.

1. *Events*

(a) **Equity Financing**. If there is an Equity Financing before the termination of this Safe, on the initial closing of such Equity Financing, this Safe will automatically convert into the greater of: (1) the number of shares of Standard Preferred Stock equal to the Purchase Amount divided by the lowest price per share of the Standard Preferred Stock; or (2) the number of shares of Safe Preferred Stock equal to the Purchase Amount divided by the Safe Price.

In connection with the automatic conversion of this Safe into shares of Standard Preferred Stock or Safe Preferred Stock, the Investor will execute and deliver to the Company all of the transaction documents related to the Equity Financing; *provided,* that such documents (i) are the same documents to be entered into with the purchasers of Standard Preferred Stock, with appropriate variations for the Safe Preferred Stock if applicable, and (ii) have customary exceptions to any drag-along applicable to the Investor, including (without limitation) limited representations, warranties, liability and indemnification obligations for the Investor.

(b) **Liquidity Event**.  If there is a Liquidity Event before the termination of this Safe, this Safe will automatically be entitled (subject to the liquidation priority set forth in Section 1(d) below) to receive a portion of Proceeds, due and payable to the Investor immediately prior to, or concurrent with, the consummation of such Liquidity Event, equal to the greater of (i) the Purchase Amount (the "**Cash-Out Amount**") or (ii) the amount payable on the number of shares of Common Stock equal to the Purchase Amount divided by the Liquidity Price (the "**Conversion Amount**").  If any of the Company's securityholders are given a choice as to the form and amount of Proceeds to be received in a Liquidity Event, the Investor will be given the same choice, *provided* that the Investor may not choose to receive a form of consideration that the Investor would be ineligible to receive as a result of the Investor's failure to satisfy any requirement or limitation generally applicable to the Company's securityholders, or under any applicable laws.

Notwithstanding the foregoing, in connection with a Change of Control intended to qualify as a tax-free reorganization, the Company may reduce the cash portion of Proceeds payable to the Investor by the amount determined by its board of directors in good faith for such Change of Control to qualify as a tax-free reorganization for U.S. federal income tax purposes, provided that such reduction (A) does not reduce the total Proceeds payable to such Investor and (B) is applied in the same manner and on a pro rata basis to all securityholders who have equal priority to the Investor under Section 1(d).

(c) **Dissolution Event**. If there is a Dissolution Event before the termination of this Safe, the Investor will automatically be entitled (subject to the liquidation priority set forth in Section 1(d) below) to receive a portion of Proceeds equal to the Cash-Out Amount, due and payable to the Investor immediately prior to the consummation of the Dissolution Event.

(d) **Liquidation Priority**.  In a Liquidity Event or Dissolution Event, this Safe is intended to operate like standard non-participating Preferred Stock.  The Investor's right to receive its Cash-Out Amount is:

(i)      Junior to payment of outstanding indebtedness and creditor claims, including contractual claims for payment and convertible promissory notes (to the extent such convertible promissory notes are not actually or notionally converted into Capital Stock);

(ii)     On par with payments for other Safes and/or Preferred Stock, and if the applicable Proceeds are insufficient to permit full payments to the Investor and such other Safes and/or Preferred Stock, the applicable Proceeds will be distributed pro rata to the Investor and such other Safes and/or Preferred Stock in proportion to the full payments that would otherwise be due; and

(iii)    Senior to payments for Common Stock.

The Investor's right to receive its Conversion Amount is (A) on par with payments for Common Stock and other Safes and/or Preferred Stock who are also receiving Conversion Amounts or Proceeds on a similar as-converted to Common Stock basis, and (B) junior to payments described in clauses (i) and (ii) above (in the latter case, to the extent such payments are Cash-Out Amounts or similar liquidation preferences).

(e) **Termination**.  This Safe will automatically terminate (without relieving the Company of any obligations arising from a prior breach of or non-compliance with this Safe) immediately following the earliest to occur of: (i) the issuance of Capital Stock to the Investor pursuant to the automatic conversion of this Safe under Section 1(a); or (ii) the payment, or setting aside for payment, of amounts due the Investor pursuant to Section 1(b) or Section 1(c).

2. *Definitions*
"**Capital Stock**" means the capital stock of the Company, including, without limitation, the "**Common Stock**" and the "**Preferred Stock**."

"**Change of Control**" means (i) a transaction or series of related transactions in which any "person" or "group" (within the meaning of Section 13(d) and 14(d) of the Securities Exchange Act of 1934, as amended), becomes the "beneficial owner" (as defined in Rule 13d-3 under the Securities Exchange Act of 1934, as amended), directly or indirectly, of more than 50% of the outstanding voting securities of the Company having the right to vote for the election of members of the Company's board of directors, (ii) any reorganization, merger or consolidation of the Company, other than a transaction or series of related transactions in which the holders of the voting securities of the Company outstanding immediately prior to such transaction or series of related transactions retain, immediately after such transaction or series of related transactions, at least a majority of the total voting power represented by the outstanding voting securities of the Company or such other surviving or resulting entity or (iii) a sale, lease or other disposition of all or substantially all of the assets of the Company.

"**Company Capitalization**" is calculated as of immediately prior to the Equity Financing and (without double-counting, in each case calculated on an as-converted to Common Stock basis):

- Includes all shares of Capital Stock issued and outstanding;
- Includes all Converting Securities;
- Includes all (i) issued and outstanding Options and (ii) Promised Options; and
- Includes the Unissued Option Pool, except that any increase to the Unissued Option Pool in connection with the Equity Financing shall only be included to the extent that the number of Promised Options exceeds the Unissued Option Pool prior to such increase.

"**Converting Securities**" includes this Safe and other convertible securities issued by the Company, including but not limited to: (i) other Safes; (ii) convertible promissory notes and other convertible debt instruments; and (iii) convertible securities that have the right to convert into shares of Capital Stock.

"**Direct Listing**" means the Company's initial listing of its Common Stock (other than shares of Common Stock not eligible for resale under Rule 144 under the Securities Act) on a national securities exchange by means of an effective registration statement on Form S-1 filed by the Company with the SEC that registers shares of existing capital stock of the

50

Company for resale, as approved by the Company's board of directors. For the avoidance of doubt, a Direct Listing shall not be deemed to be an underwritten offering and shall not involve any underwriting services.

"**Dissolution Event**" means (i) a voluntary termination of operations, (ii) a general assignment for the benefit of the Company's creditors or (iii) any other liquidation, dissolution or winding up of the Company (**excluding** a Liquidity Event), whether voluntary or involuntary.

"**Dividend Amount**" means, with respect to any date on which the Company pays a dividend on its outstanding Common Stock, the amount of such dividend that is paid per share of Common Stock multiplied by (x) the Purchase Amount divided by (y) the Liquidity Price (treating the dividend date as a Liquidity Event solely for purposes of calculating such Liquidity Price).

"**Equity Financing**" means a bona fide transaction or series of transactions with the principal purpose of raising capital, pursuant to which the Company issues and sells Preferred Stock at a fixed valuation, including but not limited to, a pre-money or post-money valuation.

"**Initial Public Offering**" means the closing of the Company's first firm commitment underwritten initial public offering of Common Stock pursuant to a registration statement filed under the Securities Act.

"**Liquidity Capitalization**" is calculated as of immediately prior to the Liquidity Event, and (without double-counting, in each case calculated on an as-converted to Common Stock basis):

- Includes all shares of Capital Stock issued and outstanding;
- Includes all (i) issued and outstanding Options and (ii) to the extent receiving Proceeds, Promised Options;
- Includes all Converting Securities, **other than** any Safes and other convertible securities (including without limitation shares of Preferred Stock) where the holders of such securities are receiving Cash-Out Amounts or similar liquidation preference payments in lieu of Conversion Amounts or similar "as-converted" payments; and
- Excludes the Unissued Option Pool.

"**Liquidity Event**" means a Change of Control, a Direct Listing or an Initial Public Offering.

"**Liquidity Price**" means the price per share equal to the Post-Money Valuation Cap divided by the Liquidity Capitalization.

"**Options**" includes options, restricted stock awards or purchases, RSUs, SARs, warrants or similar securities, vested or unvested.

"**Proceeds**" means cash and other assets (including without limitation stock consideration) that are proceeds from the Liquidity Event or the Dissolution Event, as applicable, and legally available for distribution.

"**Promised Options**" means promised but ungranted Options that are the greater of those (i) promised pursuant to agreements or understandings made prior to the execution of, or in connection with, the term sheet or letter of intent for the Equity Financing or Liquidity Event, as applicable (or the initial closing of the Equity Financing or consummation of the Liquidity Event, if there is no term sheet or letter of intent), (ii) in the case of an Equity Financing, treated as outstanding Options in the calculation of the Standard Preferred Stock's price per share, or (iii) in the case of a Liquidity Event, treated as outstanding Options in the calculation of the distribution of the Proceeds.

"**Safe**" means an instrument containing a future right to shares of Capital Stock, similar in form and content to this instrument, purchased by investors for the purpose of funding the Company's business operations.  References to "this Safe" mean this specific instrument.

"**Safe Preferred Stock**" means the shares of the series of Preferred Stock issued to the Investor in an Equity Financing, having the identical rights, privileges, preferences and restrictions as the shares of Standard Preferred Stock, other than with respect to: (i) the per share liquidation preference and the initial conversion price for purposes of price-based

anti-dilution protection, which will equal the Safe Price; and (ii) the basis for any dividend rights, which will be based on the Safe Price.

"**Safe Price**" means the price per share equal to the Post-Money Valuation Cap divided by the Company Capitalization.

"**Standard Preferred Stock**" means the shares of the series of Preferred Stock issued to the investors investing new money in the Company in connection with the initial closing of the Equity Financing.

"**Unissued Option Pool**" means all shares of Capital Stock that are reserved, available for future grant and not subject to any outstanding Options or Promised Options (but in the case of a Liquidity Event, only to the extent Proceeds are payable on such Promised Options) under any equity incentive or similar Company plan.

**3.   *Company Representations***

(a)  The Company is a corporation duly organized, validly existing and in good standing under the laws of its state of incorporation, and has the power and authority to own, lease and operate its properties and carry on its business as now conducted.

(b)  The execution, delivery and performance by the Company of this Safe is within the power of the Company and has been duly authorized by all necessary actions on the part of the Company (subject to section 3(d)). This Safe constitutes a legal, valid and binding obligation of the Company, enforceable against the Company in accordance with its terms, except as limited by bankruptcy, insolvency or other laws of general application relating to or affecting the enforcement of creditors' rights generally and general principles of equity.   To its knowledge, the Company is not in violation of (i) its current certificate of incorporation or bylaws, (ii) any material statute, rule or regulation applicable to the Company or (iii) any material debt or contract to which the Company is a party or by which it is bound, where, in each case, such violation or default, individually, or together with all such violations or defaults, could reasonably be expected to have a material adverse effect on the Company.

(c)  The performance and consummation of the transactions contemplated by this Safe do not and will not: (i) violate any material judgment, statute, rule or regulation applicable to the Company; (ii) result in the acceleration of any material debt or contract to which the Company is a party or by which it is bound; or (iii) result in the creation or imposition of any lien on any property, asset or revenue of the Company or the suspension, forfeiture, or nonrenewal of any material permit, license or authorization applicable to the Company, its business or operations.

(d)  No consents or approvals are required in connection with the performance of this Safe, other than: (i) the Company's corporate approvals; (ii) any qualifications or filings under applicable securities laws; and (iii) necessary corporate approvals for the authorization of Capital Stock issuable pursuant to Section 1.

(e)  To its knowledge, the Company owns or possesses (or can obtain on commercially reasonable terms) sufficient legal rights to all patents, trademarks, service marks, trade names, copyrights, trade secrets, licenses, information, processes and other intellectual property rights necessary for its business as now conducted and as currently proposed to be conducted, without any conflict with, or infringement of the rights of, others.

**4.   *Investor Representations***

(a)  The Investor has full legal capacity, power and authority to execute and deliver this Safe and to perform its obligations hereunder. This Safe constitutes valid and binding obligation of the Investor, enforceable in accordance with its terms, except as limited by bankruptcy, insolvency or other laws of general application relating to or affecting the enforcement of creditors' rights generally and general principles of equity.

(b)  The Investor is an accredited investor as such term is defined in Rule 501 of Regulation D under the Securities Act, and acknowledges and agrees that if not an accredited investor at the time of an Equity Financing, the Company may void this Safe and return the Purchase Amount. The Investor has been advised that this Safe and the underlying securities have not been registered under the Securities Act, or any state securities laws and, therefore, cannot

52

be resold unless they are registered under the Securities Act and applicable state securities laws or unless an exemption from such registration requirements is available. The Investor is purchasing this Safe and the securities to be acquired by the Investor hereunder for its own account for investment, not as a nominee or agent, and not with a view to, or for resale in connection with, the distribution thereof, and the Investor has no present intention of selling, granting any participation in, or otherwise distributing the same. The Investor has such knowledge and experience in financial and business matters that the Investor is capable of evaluating the merits and risks of such investment, is able to incur a complete loss of such investment without impairing the Investor's financial condition and is able to bear the economic risk of such investment for an indefinite period of time.

**5.   *Miscellaneous***

(a)  Any provision of this Safe may be amended, waived or modified by written consent of the Company and either (i) the Investor or (ii) the majority-in-interest of all then-outstanding Safes with the same "Post-Money Valuation Cap" and "Discount Rate" as this Safe (and Safes lacking one or both of such terms will be considered to be the same with respect to such term(s)), *provided that* with respect to clause (ii): (A) the Purchase Amount may not be amended, waived or modified in this manner, (B) the consent of the Investor and each holder of such Safes must be solicited (even if not obtained), and (C) such amendment, waiver or modification treats all such holders in the same manner. "Majority-in-interest" refers to the holders of the applicable group of Safes whose Safes have a total Purchase Amount greater than 50% of the total Purchase Amount of all of such applicable group of Safes.

(b)  Any notice required or permitted by this Safe will be deemed sufficient when delivered personally or by overnight courier or sent by email to the relevant address listed on the signature page, or 48 hours after being deposited in the U.S. mail as certified or registered mail with postage prepaid, addressed to the party to be notified at such party's address listed on the signature page, as subsequently modified by written notice.

(c)  The Investor is not entitled, as a holder of this Safe, to vote or be deemed a holder of Capital Stock for any purpose other than tax purposes, nor will anything in this Safe be construed to confer on the Investor, as such, any rights of a Company stockholder or rights to vote for the election of directors or on any matter submitted to Company stockholders, or to give or withhold consent to any corporate action or to receive notice of meetings, until shares have been issued on the terms described in Section 1.  However, if the Company pays a dividend on outstanding shares of Common Stock (that is not payable in shares of Common Stock) while this Safe is outstanding, the Company will pay the Dividend Amount to the Investor at the same time.

(d)  Neither this Safe nor the rights in this Safe are transferable or assignable, by operation of law or otherwise, by either party without the prior written consent of the other; *provided, however*, that this Safe and/or its rights may be assigned without the Company's consent by the Investor (i) to the Investor's estate, heirs, executors, administrators, guardians and/or successors in the event of Investor's death or disability, or (ii) to any other entity who directly or indirectly, controls, is controlled by or is under common control with the Investor, including, without limitation, any general partner, managing member, officer or director of the Investor, or any venture capital fund now or hereafter existing which is controlled by one or more general partners or managing members of, or shares the same management company with, the Investor; and *provided, further*, that the Company may assign this Safe in whole, without the consent of the Investor, in connection with a reincorporation to change the Company's domicile.

(e)  In the event any one or more of the provisions of this Safe is for any reason held to be invalid, illegal or unenforceable, in whole or in part or in any respect, or in the event that any one or more of the provisions of this Safe operate or would prospectively operate to invalidate this Safe, then and in any such event, such provision(s) only will be deemed null and void and will not affect any other provision of this Safe and the remaining provisions of this Safe will remain operative and in full force and effect and will not be affected, prejudiced, or disturbed thereby.

(f)  All rights and obligations hereunder will be governed by the laws of the State of California, without regard to the conflicts of law provisions of such jurisdiction.

(g)  The parties acknowledge and agree that for United States federal and state income tax purposes this Safe is, and at all times has been, intended to be characterized as stock, and more particularly as common stock for purposes of Sections 304, 305, 306, 354, 368, 1036 and 1202 of the Internal Revenue Code of 1986, as amended.  Accordingly, the

parties agree to treat this Safe consistent with the foregoing intent for all United States federal and state income tax purposes (including, without limitation, on their respective tax returns or other informational statements).

*(Signature page follows)*

IN WITNESS WHEREOF, the undersigned have caused this Safe to be duly executed and delivered.

**PALAMEDRIX, INC.**

By: _____

Michael Shane Bowen
Chief Executive Officer

Address: 652 Jocelyn Way
_____
Encinitas, CA
_____

Email: shanebowen@palamedrix.com
_____


**INVESTOR:**
**Metaplanet Holdings OÜ**

By: _____

Karl-Rauno Miljand
Portfolio Manager, acting under PoA


By: _____

Keiu Heinpalu
Lawyer, acting under PoA

Address: Toompuiestee 33a, 10149, Tallinn, Estonia


Email: rauno@metaplanet.com
_____

# EXHIBIT E

# POST-MONEY VALUATION CAP

THIS INSTRUMENT AND ANY SECURITIES ISSUABLE PURSUANT HERETO HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "**SECURITIES ACT**"), OR UNDER THE SECURITIES LAWS OF CERTAIN STATES.  THESE SECURITIES MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED, PLEDGED OR HYPOTHECATED EXCEPT AS PERMITTED IN THIS SAFE AND UNDER THE ACT AND APPLICABLE STATE SECURITIES LAWS PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT OR AN EXEMPTION THEREFROM.

## PALAMEDRIX, INC.

## SAFE
### (Simple Agreement for Future Equity)

THIS CERTIFIES THAT in exchange for the payment by **Michael Antonov Charitable Foundation** (the "**Investor**") of **$150,000** (the "**Purchase Amount**") on or about **December 30, 2020**, Palamedrix, Inc., a Delaware corporation (the "**Company**"), issues to the Investor the right to certain shares of the Company's Capital Stock, subject to the terms described below.

This Safe is one of the forms available at http://ycombinator.com/documents and the Company and the Investor agree that neither one has modified the form, except to fill in blanks and bracketed terms.

The "**Post-Money Valuation Cap**" is **$30,000,000**.  See **Section 2** for certain additional defined terms.

1. *Events*

(a) **Equity Financing**. If there is an Equity Financing before the termination of this Safe, on the initial closing of such Equity Financing, this Safe will automatically convert into the greater of: (1) the number of shares of Standard Preferred Stock equal to the Purchase Amount divided by the lowest price per share of the Standard Preferred Stock; or (2) the number of shares of Safe Preferred Stock equal to the Purchase Amount divided by the Safe Price.

In connection with the automatic conversion of this Safe into shares of Standard Preferred Stock or Safe Preferred Stock, the Investor will execute and deliver to the Company all of the transaction documents related to the Equity Financing; *provided,* that such documents (i) are the same documents to be entered into with the purchasers of Standard Preferred Stock, with appropriate variations for the Safe Preferred Stock if applicable, and (ii) have customary exceptions to any drag-along applicable to the Investor, including (without limitation) limited representations, warranties, liability and indemnification obligations for the Investor.

(b) **Liquidity Event**.  If there is a Liquidity Event before the termination of this Safe, this Safe will automatically be entitled (subject to the liquidation priority set forth in Section 1(d) below) to receive a portion of Proceeds, due and payable to the Investor immediately prior to, or concurrent with, the consummation of such Liquidity Event, equal to the greater of (i) the Purchase Amount (the "**Cash-Out Amount**") or (ii) the amount payable on the number of shares of Common Stock equal to the Purchase Amount divided by the Liquidity Price (the "**Conversion Amount**").  If any of the Company's securityholders are given a choice as to the form and amount of Proceeds to be received in a Liquidity Event, the Investor will be given the same choice, *provided* that the Investor may not choose to receive a form of consideration that the Investor would be ineligible to receive as a result of the Investor's failure to satisfy any requirement or limitation generally applicable to the Company's securityholders, or under any applicable laws.

Notwithstanding the foregoing, in connection with a Change of Control intended to qualify as a tax-free reorganization, the Company may reduce the cash portion of Proceeds payable to the Investor by the amount determined by its board of directors in good faith for such Change of Control to qualify as a tax-free reorganization for U.S. federal income tax purposes, provided that such reduction (A) does not reduce the total Proceeds payable to such Investor and (B) is applied in the same manner and on a pro rata basis to all securityholders who have equal priority to the Investor under Section 1(d).

(c) **Dissolution Event**. If there is a Dissolution Event before the termination of this Safe, the Investor will automatically be entitled (subject to the liquidation priority set forth in Section 1(d) below) to receive a portion of Proceeds equal to the Cash-Out Amount, due and payable to the Investor immediately prior to the consummation of the Dissolution Event.

(d) **Liquidation Priority**.  In a Liquidity Event or Dissolution Event, this Safe is intended to operate like standard non-participating Preferred Stock.  The Investor's right to receive its Cash-Out Amount is:

(i)  Junior to payment of outstanding indebtedness and creditor claims, including contractual claims for payment and convertible promissory notes (to the extent such convertible promissory notes are not actually or notionally converted into Capital Stock);

(ii)  On par with payments for other Safes and/or Preferred Stock, and if the applicable Proceeds are insufficient to permit full payments to the Investor and such other Safes and/or Preferred Stock, the applicable Proceeds will be distributed pro rata to the Investor and such other Safes and/or Preferred Stock in proportion to the full payments that would otherwise be due; and

(iii)  Senior to payments for Common Stock.

The Investor's right to receive its Conversion Amount is (A) on par with payments for Common Stock and other Safes and/or Preferred Stock who are also receiving Conversion Amounts or Proceeds on a similar as-converted to Common Stock basis, and (B) junior to payments described in clauses (i) and (ii) above (in the latter case, to the extent such payments are Cash-Out Amounts or similar liquidation preferences).

(e) **Termination**.  This Safe will automatically terminate (without relieving the Company of any obligations arising from a prior breach of or non-compliance with this Safe) immediately following the earliest to occur of: (i) the issuance of Capital Stock to the Investor pursuant to the automatic conversion of this Safe under Section 1(a); or (ii) the payment, or setting aside for payment, of amounts due the Investor pursuant to Section 1(b) or Section 1(c).

2.  *Definitions*

"**Capital Stock**" means the capital stock of the Company, including, without limitation, the "**Common Stock**" and the "**Preferred Stock**."

"**Change of Control**" means (i) a transaction or series of related transactions in which any "person" or "group" (within the meaning of Section 13(d) and 14(d) of the Securities Exchange Act of 1934, as amended), becomes the "beneficial owner" (as defined in Rule 13d-3 under the Securities Exchange Act of 1934, as amended), directly or indirectly, of more than 50% of the outstanding voting securities of the Company having the right to vote for the election of members of the Company's board of directors, (ii) any reorganization, merger or consolidation of the Company, other than a transaction or series of related transactions in which the holders of the voting securities of the Company outstanding immediately prior to such transaction or series of related transactions retain, immediately after such transaction or series of related transactions, at least a majority of the total voting power represented by the outstanding voting securities of the Company or such other surviving or resulting entity or (iii) a sale, lease or other disposition of all or substantially all of the assets of the Company.

"**Company Capitalization**" is calculated as of immediately prior to the Equity Financing and (without double-counting, in each case calculated on an as-converted to Common Stock basis):

- Includes all shares of Capital Stock issued and outstanding;
- Includes all Converting Securities;
- Includes all (i) issued and outstanding Options and (ii) Promised Options; and
- Includes the Unissued Option Pool, except that any increase to the Unissued Option Pool in connection with the Equity Financing shall only be included to the extent that the number of Promised Options exceeds the Unissued Option Pool prior to such increase.

"**Converting Securities**" includes this Safe and other convertible securities issued by the Company, including but not limited to: (i) other Safes; (ii) convertible promissory notes and other convertible debt instruments; and (iii) convertible securities that have the right to convert into shares of Capital Stock.

"**Direct Listing**" means the Company's initial listing of its Common Stock (other than shares of Common Stock not eligible for resale under Rule 144 under the Securities Act) on a national securities exchange by means of an effective registration statement on Form S-1 filed by the Company with the SEC that registers shares of existing capital stock of the

58

Company for resale, as approved by the Company's board of directors. For the avoidance of doubt, a Direct Listing shall not be deemed to be an underwritten offering and shall not involve any underwriting services.

"**Dissolution Event**" means (i) a voluntary termination of operations, (ii) a general assignment for the benefit of the Company's creditors or (iii) any other liquidation, dissolution or winding up of the Company (**excluding** a Liquidity Event), whether voluntary or involuntary.

"**Dividend Amount**" means, with respect to any date on which the Company pays a dividend on its outstanding Common Stock, the amount of such dividend that is paid per share of Common Stock multiplied by (x) the Purchase Amount divided by (y) the Liquidity Price (treating the dividend date as a Liquidity Event solely for purposes of calculating such Liquidity Price).

"**Equity Financing**" means a bona fide transaction or series of transactions with the principal purpose of raising capital, pursuant to which the Company issues and sells Preferred Stock at a fixed valuation, including but not limited to, a pre-money or post-money valuation.

"**Initial Public Offering**" means the closing of the Company's first firm commitment underwritten initial public offering of Common Stock pursuant to a registration statement filed under the Securities Act.

"**Liquidity Capitalization**" is calculated as of immediately prior to the Liquidity Event, and (without double-counting, in each case calculated on an as-converted to Common Stock basis):

- Includes all shares of Capital Stock issued and outstanding;
- Includes all (i) issued and outstanding Options and (ii) to the extent receiving Proceeds, Promised Options;
- Includes all Converting Securities, **other than** any Safes and other convertible securities (including without limitation shares of Preferred Stock) where the holders of such securities are receiving Cash-Out Amounts or similar liquidation preference payments in lieu of Conversion Amounts or similar "as-converted" payments; and
- Excludes the Unissued Option Pool.

"**Liquidity Event**" means a Change of Control, a Direct Listing or an Initial Public Offering.

"**Liquidity Price**" means the price per share equal to the Post-Money Valuation Cap divided by the Liquidity Capitalization.

"**Options**" includes options, restricted stock awards or purchases, RSUs, SARs, warrants or similar securities, vested or unvested.

"**Proceeds**" means cash and other assets (including without limitation stock consideration) that are proceeds from the Liquidity Event or the Dissolution Event, as applicable, and legally available for distribution.

"**Promised Options**" means promised but ungranted Options that are the greater of those (i) promised pursuant to agreements or understandings made prior to the execution of, or in connection with, the term sheet or letter of intent for the Equity Financing or Liquidity Event, as applicable (or the initial closing of the Equity Financing or consummation of the Liquidity Event, if there is no term sheet or letter of intent), (ii) in the case of an Equity Financing, treated as outstanding Options in the calculation of the Standard Preferred Stock's price per share, or (iii) in the case of a Liquidity Event, treated as outstanding Options in the calculation of the distribution of the Proceeds.

"**Safe**" means an instrument containing a future right to shares of Capital Stock, similar in form and content to this instrument, purchased by investors for the purpose of funding the Company's business operations. References to "this Safe" mean this specific instrument.

"**Safe Preferred Stock**" means the shares of the series of Preferred Stock issued to the Investor in an Equity Financing, having the identical rights, privileges, preferences and restrictions as the shares of Standard Preferred Stock, other than with respect to: (i) the per share liquidation preference and the initial conversion price for purposes of price-based

anti-dilution protection, which will equal the Safe Price; and (ii) the basis for any dividend rights, which will be based on the Safe Price.

"**Safe Price**" means the price per share equal to the Post-Money Valuation Cap divided by the Company Capitalization.

"**Standard Preferred Stock**" means the shares of the series of Preferred Stock issued to the investors investing new money in the Company in connection with the initial closing of the Equity Financing.

"**Unissued Option Pool**" means all shares of Capital Stock that are reserved, available for future grant and not subject to any outstanding Options or Promised Options (but in the case of a Liquidity Event, only to the extent Proceeds are payable on such Promised Options) under any equity incentive or similar Company plan.

3. *Company Representations*

(a)  The Company is a corporation duly organized, validly existing and in good standing under the laws of its state of incorporation, and has the power and authority to own, lease and operate its properties and carry on its business as now conducted.

(b)  The execution, delivery and performance by the Company of this Safe is within the power of the Company and has been duly authorized by all necessary actions on the part of the Company (subject to section 3(d)). This Safe constitutes a legal, valid and binding obligation of the Company, enforceable against the Company in accordance with its terms, except as limited by bankruptcy, insolvency or other laws of general application relating to or affecting the enforcement of creditors' rights generally and general principles of equity.   To its knowledge, the Company is not in violation of (i) its current certificate of incorporation or bylaws, (ii) any material statute, rule or regulation applicable to the Company or (iii) any material debt or contract to which the Company is a party or by which it is bound, where, in each case, such violation or default, individually, or together with all such violations or defaults, could reasonably be expected to have a material adverse effect on the Company.

(c)  The performance and consummation of the transactions contemplated by this Safe do not and will not: (i) violate any material judgment, statute, rule or regulation applicable to the Company; (ii) result in the acceleration of any material debt or contract to which the Company is a party or by which it is bound; or (iii) result in the creation or imposition of any lien on any property, asset or revenue of the Company or the suspension, forfeiture, or nonrenewal of any material permit, license or authorization applicable to the Company, its business or operations.

(d)  No consents or approvals are required in connection with the performance of this Safe, other than: (i) the Company's corporate approvals; (ii) any qualifications or filings under applicable securities laws; and (iii) necessary corporate approvals for the authorization of Capital Stock issuable pursuant to Section 1.

(e)  To its knowledge, the Company owns or possesses (or can obtain on commercially reasonable terms) sufficient legal rights to all patents, trademarks, service marks, trade names, copyrights, trade secrets, licenses, information, processes and other intellectual property rights necessary for its business as now conducted and as currently proposed to be conducted, without any conflict with, or infringement of the rights of, others.

4. *Investor Representations*

(a)  The Investor has full legal capacity, power and authority to execute and deliver this Safe and to perform its obligations hereunder. This Safe constitutes valid and binding obligation of the Investor, enforceable in accordance with its terms, except as limited by bankruptcy, insolvency or other laws of general application relating to or affecting the enforcement of creditors' rights generally and general principles of equity.

(b)  The Investor is an accredited investor as such term is defined in Rule 501 of Regulation D under the Securities Act, and acknowledges and agrees that if not an accredited investor at the time of an Equity Financing, the Company may void this Safe and return the Purchase Amount. The Investor has been advised that this Safe and the underlying securities have not been registered under the Securities Act, or any state securities laws and, therefore, cannot

be resold unless they are registered under the Securities Act and applicable state securities laws or unless an exemption from such registration requirements is available. The Investor is purchasing this Safe and the securities to be acquired by the Investor hereunder for its own account for investment, not as a nominee or agent, and not with a view to, or for resale in connection with, the distribution thereof, and the Investor has no present intention of selling, granting any participation in, or otherwise distributing the same. The Investor has such knowledge and experience in financial and business matters that the Investor is capable of evaluating the merits and risks of such investment, is able to incur a complete loss of such investment without impairing the Investor's financial condition and is able to bear the economic risk of such investment for an indefinite period of time.

**5.** *Miscellaneous*

(a)  Any provision of this Safe may be amended, waived or modified by written consent of the Company and either (i) the Investor or (ii) the majority-in-interest of all then-outstanding Safes with the same "Post-Money Valuation Cap" and "Discount Rate" as this Safe (and Safes lacking one or both of such terms will be considered to be the same with respect to such term(s)), *provided that* with respect to clause (ii): (A) the Purchase Amount may not be amended, waived or modified in this manner, (B) the consent of the Investor and each holder of such Safes must be solicited (even if not obtained), and (C) such amendment, waiver or modification treats all such holders in the same manner. "Majority-in-interest" refers to the holders of the applicable group of Safes whose Safes have a total Purchase Amount greater than 50% of the total Purchase Amount of all of such applicable group of Safes.

(b)  Any notice required or permitted by this Safe will be deemed sufficient when delivered personally or by overnight courier or sent by email to the relevant address listed on the signature page, or 48 hours after being deposited in the U.S. mail as certified or registered mail with postage prepaid, addressed to the party to be notified at such party's address listed on the signature page, as subsequently modified by written notice.

(c)  The Investor is not entitled, as a holder of this Safe, to vote or be deemed a holder of Capital Stock for any purpose other than tax purposes, nor will anything in this Safe be construed to confer on the Investor, as such, any rights of a Company stockholder or rights to vote for the election of directors or on any matter submitted to Company stockholders, or to give or withhold consent to any corporate action or to receive notice of meetings, until shares have been issued on the terms described in Section 1.  However, if the Company pays a dividend on outstanding shares of Common Stock (that is not payable in shares of Common Stock) while this Safe is outstanding, the Company will pay the Dividend Amount to the Investor at the same time.

(d)  Neither this Safe nor the rights in this Safe are transferable or assignable, by operation of law or otherwise, by either party without the prior written consent of the other; *provided, however*, that this Safe and/or its rights may be assigned without the Company's consent by the Investor (i) to the Investor's estate, heirs, executors, administrators, guardians and/or successors in the event of Investor's death or disability, or (ii) to any other entity who directly or indirectly, controls, is controlled by or is under common control with the Investor, including, without limitation, any general partner, managing member, officer or director of the Investor, or any venture capital fund now or hereafter existing which is controlled by one or more general partners or managing members of, or shares the same management company with, the Investor; and *provided, further*, that the Company may assign this Safe in whole, without the consent of the Investor, in connection with a reincorporation to change the Company's domicile.

(e)  In the event any one or more of the provisions of this Safe is for any reason held to be invalid, illegal or unenforceable, in whole or in part or in any respect, or in the event that any one or more of the provisions of this Safe operate or would prospectively operate to invalidate this Safe, then and in any such event, such provision(s) only will be deemed null and void and will not affect any other provision of this Safe and the remaining provisions of this Safe will remain operative and in full force and effect and will not be affected, prejudiced, or disturbed thereby.

(f)  All rights and obligations hereunder will be governed by the laws of the State of [Governing Law Jurisdiction], without regard to the conflicts of law provisions of such jurisdiction.

(g)  The parties acknowledge and agree that for United States federal and state income tax purposes this Safe is, and at all times has been, intended to be characterized as stock, and more particularly as common stock for purposes of Sections 304, 305, 306, 354, 368, 1036 and 1202 of the Internal Revenue Code of 1986, as amended.  Accordingly, the

DocuSign Envelope ID: 6A85A5E0-F257-41E6-AFF5-7897529D7DE1

parties agree to treat this Safe consistent with the foregoing intent for all United States federal and state income tax purposes (including, without limitation, on their respective tax returns or other informational statements).

*(Signature page follows)*

62

IN WITNESS WHEREOF, the undersigned have caused this Safe to be duly executed and delivered.

**PALAMEDRIX, INC.**

By: _____

       Michael Shane Bowen

       Chief Executive Officer

Address: <u>652 Jocelyn Way</u>

              <u>Encinitas, CA 92024</u>

Email: <u>sb@palamedrix.com</u>

**INVESTOR:**

**Michael Antonov Charitable Foundation**

By: _____

Name: <u>Michael Antonov</u>

Title: <u>Manager</u>

Address: <u>977 North Broadway</u>

              <u>North Massapequa, NY 11758</u>

Email: <u>michael@formic.vc</u>

# EXHIBIT F

# POST-MONEY VALUATION CAP

THIS INSTRUMENT AND ANY SECURITIES ISSUABLE PURSUANT HERETO HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "**SECURITIES ACT**"), OR UNDER THE SECURITIES LAWS OF CERTAIN STATES.  THESE SECURITIES MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED, PLEDGED OR HYPOTHECATED EXCEPT AS PERMITTED IN THIS SAFE AND UNDER THE ACT AND APPLICABLE STATE SECURITIES LAWS PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT OR AN EXEMPTION THEREFROM.

## PALAMEDRIX, INC.

## SAFE
### (Simple Agreement for Future Equity)

THIS CERTIFIES THAT in exchange for the payment by **Michael Antonov Charitable Foundation** (the "**Investor**") of **$150,000** (the "**Purchase Amount**") on or about **December 30, 2020**, Palamedrix, Inc., a Delaware corporation (the "**Company**"), issues to the Investor the right to certain shares of the Company's Capital Stock, subject to the terms described below.

This Safe is one of the forms available at http://ycombinator.com/documents and the Company and the Investor agree that neither one has modified the form, except to fill in blanks and bracketed terms.

The "**Post-Money Valuation Cap**" is **$25,000,000**.  See **Section 2** for certain additional defined terms.

1. *Events*

   (a) **Equity Financing**. If there is an Equity Financing before the termination of this Safe, on the initial closing of such Equity Financing, this Safe will automatically convert into the greater of: (1) the number of shares of Standard Preferred Stock equal to the Purchase Amount divided by the lowest price per share of the Standard Preferred Stock; or (2) the number of shares of Safe Preferred Stock equal to the Purchase Amount divided by the Safe Price.

   In connection with the automatic conversion of this Safe into shares of Standard Preferred Stock or Safe Preferred Stock, the Investor will execute and deliver to the Company all of the transaction documents related to the Equity Financing; *provided,* that such documents (i) are the same documents to be entered into with the purchasers of Standard Preferred Stock, with appropriate variations for the Safe Preferred Stock if applicable, and (ii) have customary exceptions to any drag-along applicable to the Investor, including (without limitation) limited representations, warranties, liability and indemnification obligations for the Investor.

   (b) **Liquidity Event**.  If there is a Liquidity Event before the termination of this Safe, this Safe will automatically be entitled (subject to the liquidation priority set forth in Section 1(d) below) to receive a portion of Proceeds, due and payable to the Investor immediately prior to, or concurrent with, the consummation of such Liquidity Event, equal to the greater of (i) the Purchase Amount (the "**Cash-Out Amount**") or (ii) the amount payable on the number of shares of Common Stock equal to the Purchase Amount divided by the Liquidity Price (the "**Conversion Amount**").  If any of the Company's securityholders are given a choice as to the form and amount of Proceeds to be received in a Liquidity Event, the Investor will be given the same choice, *provided* that the Investor may not choose to receive a form of consideration that the Investor would be ineligible to receive as a result of the Investor's failure to satisfy any requirement or limitation generally applicable to the Company's securityholders, or under any applicable laws.

   Notwithstanding the foregoing, in connection with a Change of Control intended to qualify as a tax-free reorganization, the Company may reduce the cash portion of Proceeds payable to the Investor by the amount determined by its board of directors in good faith for such Change of Control to qualify as a tax-free reorganization for U.S. federal income tax purposes, provided that such reduction (A) does not reduce the total Proceeds payable to such Investor and (B) is applied in the same manner and on a pro rata basis to all securityholders who have equal priority to the Investor under Section 1(d).

   (c) **Dissolution Event**. If there is a Dissolution Event before the termination of this Safe, the Investor will automatically be entitled (subject to the liquidation priority set forth in Section 1(d) below) to receive a portion of Proceeds equal to the Cash-Out Amount, due and payable to the Investor immediately prior to the consummation of the Dissolution Event.

(d) **Liquidation Priority**. In a Liquidity Event or Dissolution Event, this Safe is intended to operate like standard non-participating Preferred Stock. The Investor's right to receive its Cash-Out Amount is:

      (i) Junior to payment of outstanding indebtedness and creditor claims, including contractual claims for payment and convertible promissory notes (to the extent such convertible promissory notes are not actually or notionally converted into Capital Stock);

      (ii) On par with payments for other Safes and/or Preferred Stock, and if the applicable Proceeds are insufficient to permit full payments to the Investor and such other Safes and/or Preferred Stock, the applicable Proceeds will be distributed pro rata to the Investor and such other Safes and/or Preferred Stock in proportion to the full payments that would otherwise be due; and

      (iii) Senior to payments for Common Stock.

The Investor's right to receive its Conversion Amount is (A) on par with payments for Common Stock and other Safes and/or Preferred Stock who are also receiving Conversion Amounts or Proceeds on a similar as-converted to Common Stock basis, and (B) junior to payments described in clauses (i) and (ii) above (in the latter case, to the extent such payments are Cash-Out Amounts or similar liquidation preferences).

(e) **Termination**. This Safe will automatically terminate (without relieving the Company of any obligations arising from a prior breach of or non-compliance with this Safe) immediately following the earliest to occur of: (i) the issuance of Capital Stock to the Investor pursuant to the automatic conversion of this Safe under Section 1(a); or (ii) the payment, or setting aside for payment, of amounts due the Investor pursuant to Section 1(b) or Section 1(c).

2. *Definitions*

"**Capital Stock**" means the capital stock of the Company, including, without limitation, the "**Common Stock**" and the "**Preferred Stock**."

"**Change of Control**" means (i) a transaction or series of related transactions in which any "person" or "group" (within the meaning of Section 13(d) and 14(d) of the Securities Exchange Act of 1934, as amended), becomes the "beneficial owner" (as defined in Rule 13d-3 under the Securities Exchange Act of 1934, as amended), directly or indirectly, of more than 50% of the outstanding voting securities of the Company having the right to vote for the election of members of the Company's board of directors, (ii) any reorganization, merger or consolidation of the Company, other than a transaction or series of related transactions in which the holders of the voting securities of the Company outstanding immediately prior to such transaction or series of related transactions retain, immediately after such transaction or series of related transactions, at least a majority of the total voting power represented by the outstanding voting securities of the Company or such other surviving or resulting entity or (iii) a sale, lease or other disposition of all or substantially all of the assets of the Company.

"**Company Capitalization**" is calculated as of immediately prior to the Equity Financing and (without double-counting, in each case calculated on an as-converted to Common Stock basis):

- Includes all shares of Capital Stock issued and outstanding;
- Includes all Converting Securities;
- Includes all (i) issued and outstanding Options and (ii) Promised Options; and
- Includes the Unissued Option Pool, except that any increase to the Unissued Option Pool in connection with the Equity Financing shall only be included to the extent that the number of Promised Options exceeds the Unissued Option Pool prior to such increase.

"**Converting Securities**" includes this Safe and other convertible securities issued by the Company, including but not limited to: (i) other Safes; (ii) convertible promissory notes and other convertible debt instruments; and (iii) convertible securities that have the right to convert into shares of Capital Stock.

"**Direct Listing**" means the Company's initial listing of its Common Stock (other than shares of Common Stock not eligible for resale under Rule 144 under the Securities Act) on a national securities exchange by means of an effective registration statement on Form S-1 filed by the Company with the SEC that registers shares of existing capital stock of the

66

DocuSign Envelope ID: 69C0D6EF-631A-4996-8889-FEB027A46768

**POST-MONEY VALUATION CAP**

Company for resale, as approved by the Company's board of directors. For the avoidance of doubt, a Direct Listing shall not be deemed to be an underwritten offering and shall not involve any underwriting services.

"**Dissolution Event**" means (i) a voluntary termination of operations, (ii) a general assignment for the benefit of the Company's creditors or (iii) any other liquidation, dissolution or winding up of the Company (**excluding** a Liquidity Event), whether voluntary or involuntary.

"**Dividend Amount**" means, with respect to any date on which the Company pays a dividend on its outstanding Common Stock, the amount of such dividend that is paid per share of Common Stock multiplied by (x) the Purchase Amount divided by (y) the Liquidity Price (treating the dividend date as a Liquidity Event solely for purposes of calculating such Liquidity Price).

"**Equity Financing**" means a bona fide transaction or series of transactions with the principal purpose of raising capital, pursuant to which the Company issues and sells Preferred Stock at a fixed valuation, including but not limited to, a pre-money or post-money valuation.

"**Initial Public Offering**" means the closing of the Company's first firm commitment underwritten initial public offering of Common Stock pursuant to a registration statement filed under the Securities Act.

"**Liquidity Capitalization**" is calculated as of immediately prior to the Liquidity Event, and (without double-counting, in each case calculated on an as-converted to Common Stock basis):

- Includes all shares of Capital Stock issued and outstanding;
- Includes all (i) issued and outstanding Options and (ii) to the extent receiving Proceeds, Promised Options;
- Includes all Converting Securities, **other than** any Safes and other convertible securities (including without limitation shares of Preferred Stock) where the holders of such securities are receiving Cash-Out Amounts or similar liquidation preference payments in lieu of Conversion Amounts or similar "as-converted" payments; and
- Excludes the Unissued Option Pool.

"**Liquidity Event**" means a Change of Control, a Direct Listing or an Initial Public Offering.

"**Liquidity Price**" means the price per share equal to the Post-Money Valuation Cap divided by the Liquidity Capitalization.

"**Options**" includes options, restricted stock awards or purchases, RSUs, SARs, warrants or similar securities, vested or unvested.

"**Proceeds**" means cash and other assets (including without limitation stock consideration) that are proceeds from the Liquidity Event or the Dissolution Event, as applicable, and legally available for distribution.

"**Promised Options**" means promised but ungranted Options that are the greater of those (i) promised pursuant to agreements or understandings made prior to the execution of, or in connection with, the term sheet or letter of intent for the Equity Financing or Liquidity Event, as applicable (or the initial closing of the Equity Financing or consummation of the Liquidity Event, if there is no term sheet or letter of intent), (ii) in the case of an Equity Financing, treated as outstanding Options in the calculation of the Standard Preferred Stock's price per share, or (iii) in the case of a Liquidity Event, treated as outstanding Options in the calculation of the distribution of the Proceeds.

"**Safe**" means an instrument containing a future right to shares of Capital Stock, similar in form and content to this instrument, purchased by investors for the purpose of funding the Company's business operations. References to "this Safe" mean this specific instrument.

"**Safe Preferred Stock**" means the shares of the series of Preferred Stock issued to the Investor in an Equity Financing, having the identical rights, privileges, preferences and restrictions as the shares of Standard Preferred Stock, other than with respect to: (i) the per share liquidation preference and the initial conversion price for purposes of price-based

anti-dilution protection, which will equal the Safe Price; and (ii) the basis for any dividend rights, which will be based on the Safe Price.

"**Safe Price**" means the price per share equal to the Post-Money Valuation Cap divided by the Company Capitalization.

"**Standard Preferred Stock**" means the shares of the series of Preferred Stock issued to the investors investing new money in the Company in connection with the initial closing of the Equity Financing.

"**Unissued Option Pool**" means all shares of Capital Stock that are reserved, available for future grant and not subject to any outstanding Options or Promised Options (but in the case of a Liquidity Event, only to the extent Proceeds are payable on such Promised Options) under any equity incentive or similar Company plan.

3.  *Company Representations*

(a)  The Company is a corporation duly organized, validly existing and in good standing under the laws of its state of incorporation, and has the power and authority to own, lease and operate its properties and carry on its business as now conducted.

(b)  The execution, delivery and performance by the Company of this Safe is within the power of the Company and has been duly authorized by all necessary actions on the part of the Company (subject to section 3(d)). This Safe constitutes a legal, valid and binding obligation of the Company, enforceable against the Company in accordance with its terms, except as limited by bankruptcy, insolvency or other laws of general application relating to or affecting the enforcement of creditors' rights generally and general principles of equity.  To its knowledge, the Company is not in violation of (i) its current certificate of incorporation or bylaws, (ii) any material statute, rule or regulation applicable to the Company or (iii) any material debt or contract to which the Company is a party or by which it is bound, where, in each case, such violation or default, individually, or together with all such violations or defaults, could reasonably be expected to have a material adverse effect on the Company.

(c)  The performance and consummation of the transactions contemplated by this Safe do not and will not: (i) violate any material judgment, statute, rule or regulation applicable to the Company; (ii) result in the acceleration of any material debt or contract to which the Company is a party or by which it is bound; or (iii) result in the creation or imposition of any lien on any property, asset or revenue of the Company or the suspension, forfeiture, or nonrenewal of any material permit, license or authorization applicable to the Company, its business or operations.

(d)  No consents or approvals are required in connection with the performance of this Safe, other than: (i) the Company's corporate approvals; (ii) any qualifications or filings under applicable securities laws; and (iii) necessary corporate approvals for the authorization of Capital Stock issuable pursuant to Section 1.

(e)  To its knowledge, the Company owns or possesses (or can obtain on commercially reasonable terms) sufficient legal rights to all patents, trademarks, service marks, trade names, copyrights, trade secrets, licenses, information, processes and other intellectual property rights necessary for its business as now conducted and as currently proposed to be conducted, without any conflict with, or infringement of the rights of, others.

4.  *Investor Representations*

(a)  The Investor has full legal capacity, power and authority to execute and deliver this Safe and to perform its obligations hereunder. This Safe constitutes valid and binding obligation of the Investor, enforceable in accordance with its terms, except as limited by bankruptcy, insolvency or other laws of general application relating to or affecting the enforcement of creditors' rights generally and general principles of equity.

(b)  The Investor is an accredited investor as such term is defined in Rule 501 of Regulation D under the Securities Act, and acknowledges and agrees that if not an accredited investor at the time of an Equity Financing, the Company may void this Safe and return the Purchase Amount. The Investor has been advised that this Safe and the underlying securities have not been registered under the Securities Act, or any state securities laws and, therefore, cannot

68

be resold unless they are registered under the Securities Act and applicable state securities laws or unless an exemption from such registration requirements is available. The Investor is purchasing this Safe and the securities to be acquired by the Investor hereunder for its own account for investment, not as a nominee or agent, and not with a view to, or for resale in connection with, the distribution thereof, and the Investor has no present intention of selling, granting any participation in, or otherwise distributing the same. The Investor has such knowledge and experience in financial and business matters that the Investor is capable of evaluating the merits and risks of such investment, is able to incur a complete loss of such investment without impairing the Investor's financial condition and is able to bear the economic risk of such investment for an indefinite period of time.

**5.   *Miscellaneous***

(a)   Any provision of this Safe may be amended, waived or modified by written consent of the Company and either (i) the Investor or (ii) the majority-in-interest of all then-outstanding Safes with the same "Post-Money Valuation Cap" and "Discount Rate" as this Safe (and Safes lacking one or both of such terms will be considered to be the same with respect to such term(s)), *provided that* with respect to clause (ii): (A) the Purchase Amount may not be amended, waived or modified in this manner, (B) the consent of the Investor and each holder of such Safes must be solicited (even if not obtained), and (C) such amendment, waiver or modification treats all such holders in the same manner. "Majority-in-interest" refers to the holders of the applicable group of Safes whose Safes have a total Purchase Amount greater than 50% of the total Purchase Amount of all of such applicable group of Safes.

(b)   Any notice required or permitted by this Safe will be deemed sufficient when delivered personally or by overnight courier or sent by email to the relevant address listed on the signature page, or 48 hours after being deposited in the U.S. mail as certified or registered mail with postage prepaid, addressed to the party to be notified at such party's address listed on the signature page, as subsequently modified by written notice.

(c)   The Investor is not entitled, as a holder of this Safe, to vote or be deemed a holder of Capital Stock for any purpose other than tax purposes, nor will anything in this Safe be construed to confer on the Investor, as such, any rights of a Company stockholder or rights to vote for the election of directors or on any matter submitted to Company stockholders, or to give or withhold consent to any corporate action or to receive notice of meetings, until shares have been issued on the terms described in Section 1.  However, if the Company pays a dividend on outstanding shares of Common Stock (that is not payable in shares of Common Stock) while this Safe is outstanding, the Company will pay the Dividend Amount to the Investor at the same time.

(d)   Neither this Safe nor the rights in this Safe are transferable or assignable, by operation of law or otherwise, by either party without the prior written consent of the other; *provided, however*, that this Safe and/or its rights may be assigned without the Company's consent by the Investor (i) to the Investor's estate, heirs, executors, administrators, guardians and/or successors in the event of Investor's death or disability, or (ii) to any other entity who directly or indirectly, controls, is controlled by or is under common control with the Investor, including, without limitation, any general partner, managing member, officer or director of the Investor, or any venture capital fund now or hereafter existing which is controlled by one or more general partners or managing members of, or shares the same management company with, the Investor; and *provided, further*, that the Company may assign this Safe in whole, without the consent of the Investor, in connection with a reincorporation to change the Company's domicile.

(e)   In the event any one or more of the provisions of this Safe is for any reason held to be invalid, illegal or unenforceable, in whole or in part or in any respect, or in the event that any one or more of the provisions of this Safe operate or would prospectively operate to invalidate this Safe, then and in any such event, such provision(s) only will be deemed null and void and will not affect any other provision of this Safe and the remaining provisions of this Safe will remain operative and in full force and effect and will not be affected, prejudiced, or disturbed thereby.

(f)   All rights and obligations hereunder will be governed by the laws of the State of [Governing Law Jurisdiction], without regard to the conflicts of law provisions of such jurisdiction.

(g)   The parties acknowledge and agree that for United States federal and state income tax purposes this Safe is, and at all times has been, intended to be characterized as stock, and more particularly as common stock for purposes of Sections 304, 305, 306, 354, 368, 1036 and 1202 of the Internal Revenue Code of 1986, as amended.  Accordingly, the

parties agree to treat this Safe consistent with the foregoing intent for all United States federal and state income tax purposes (including, without limitation, on their respective tax returns or other informational statements).

(*Signature page follows*)

70

IN WITNESS WHEREOF, the undersigned have caused this Safe to be duly executed and delivered.

**PALAMEDRIX, INC.**

By: _____

Michael Shane Bowen

Chief Executive Officer

Address: 652 Jocelyn Way

Encinitas, CA 92024

Email: sb@palamedrix.com

**INVESTOR:**

**Michael Antonov Charitable Foundation**

By: _____

Name: Michael Antonov

Title: Manager

Address: 977 North Broadway

North Massapequa, NY 11758

Email: michael@formic.vc

# EXHIBIT G

0HIS INSTRUMENT AND ANY SECURITIES ISSUABLE PURSUANT HERETO HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "**SECURITIES ACT**"), OR UNDER THE SECURITIES LAWS OF CERTAIN STATES.  THESE SECURITIES MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED, PLEDGED OR HYPOTHECATED EXCEPT AS PERMITTED IN THIS SAFE AND UNDER THE ACT AND APPLICABLE STATE SECURITIES LAWS PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT OR AN EXEMPTION THEREFROM.

# PALAMEDRIX, INC.

## SAFE
### (Simple Agreement for Future Equity)

THIS CERTIFIES THAT in exchange for the payment by **Formic Ventures LLC** (the "**Investor**") of **$4,000,000** (the "**Purchase Amount**") on or about **June 22, 2021**, Palamedrix, Inc., a Delaware corporation (the "**Company**"), issues to the Investor the right to certain shares of the Company's Capital Stock, subject to the terms described below.

The "**Post-Money Valuation Cap**" is $165,000,000.

The "**Discount Rate**" is 80%.

See **Section 2** for certain additional defined terms.

1.  *Events*

(a) **Equity Financing**. If there is an Equity Financing before the termination of this Safe, on the initial closing of such Equity Financing, this Safe will automatically convert into the number of shares of Safe Preferred Stock equal to the Purchase Amount divided by the Conversion Price.

In connection with the automatic conversion of this Safe into shares of Safe Preferred Stock, the Investor will execute and deliver to the Company all of the transaction documents related to the Equity Financing; *provided,* that such documents (i) are the same documents to be entered into with the purchasers of Standard Preferred Stock, with appropriate variations for the Safe Preferred Stock if applicable, and (ii) have customary exceptions to any drag-along applicable to the Investor, including (without limitation) limited representations, warranties, liability and indemnification obligations for the Investor.

(b) **Liquidity Event**.  If there is a Liquidity Event before the termination of this Safe, this Safe will automatically be entitled (subject to the liquidation priority set forth in Section 1(d) below) to receive a portion of Proceeds, due and payable to the Investor immediately prior to, or concurrent with, the consummation of such Liquidity Event, in an amount that is equal to 1.4x the Purchase Amount (the "**Cash-Out Amount**").  If any of the Company's securityholders are given a choice as to the form and amount of Proceeds to be received in a Liquidity Event, the Investor will be given the same choice, *provided* that the Investor may not choose to receive a form of consideration that the Investor would be ineligible to receive as a result of the Investor's failure to satisfy any requirement or limitation generally applicable to the Company's securityholders, or under any applicable laws.

Notwithstanding the foregoing, in connection with a Change of Control intended to qualify as a tax-free reorganization, the Company may reduce the cash portion of Proceeds payable to the Investor by the amount determined by its board of directors in good faith for such Change of Control to qualify as a tax-free reorganization for U.S. federal income tax purposes, provided that such reduction (A) does not reduce the total Proceeds payable to such Investor and (B) is applied in the same manner and on a pro rata basis to all securityholders who have equal priority to the Investor under Section 1(d).

(c) **Dissolution Event**.  If there is a Dissolution Event before the termination of this Safe, the Investor will automatically be entitled (subject to the liquidation priority set forth in Section 1(d) below) to receive a portion of Proceeds equal to the Cash-Out Amount due and payable to Investor should a Liquidity Event have been consummated as of the same date on which such Dissolution Event is consummated, due and payable to the Investor immediately prior to the consummation of the Dissolution Event.

(d) **Liquidation Priority**.  In a Liquidity Event or Dissolution Event, the Investor's right to receive its Cash-Out Amount is:

(i)      Junior to payment of outstanding indebtedness and creditor claims, including contractual claims for payment and convertible promissory notes (to the extent such convertible promissory notes are not actually or notionally converted into Capital Stock);

(ii)      On par with payments for other Safes and/or Preferred Stock, and if the applicable Proceeds are insufficient to permit full payments to the Investor and such other Safes and/or Preferred Stock, the applicable Proceeds will be distributed pro rata to the Investor and such other Safes and/or Preferred Stock in proportion to the full payments that would otherwise be due; and

(iii)      Senior to payments for Common Stock.

(e) **Termination**.  This Safe will automatically terminate (without relieving the Company of any obligations arising from a prior breach of or non-compliance with this Safe) immediately following the earliest to occur of: (i) the issuance of Capital Stock to the Investor pursuant to the automatic conversion of this Safe under Section 1(a); or (ii) the payment, or setting aside for payment, of amounts due the Investor pursuant to Section 1(b) or Section 1(c).

2.   *Definitions*

"**Capital Stock**" means the capital stock of the Company, including, without limitation, the "**Common Stock**" and the "**Preferred Stock**."

"**Change of Control**" means (i) a transaction or series of related transactions in which any "person" or "group" (within the meaning of Section 13(d) and 14(d) of the Securities Exchange Act of 1934, as amended), becomes the "beneficial owner" (as defined in Rule 13d-3 under the Securities Exchange Act of 1934, as amended), directly or indirectly, of more than 50% of the outstanding voting securities of the Company having the right to vote for the election of members of the Company's board of directors, (ii) any reorganization, merger or consolidation of the Company, other than a transaction or series of related transactions in which the holders of the voting securities of the Company outstanding immediately prior to such transaction or series of related transactions retain, immediately after such transaction or series of related transactions, at least a majority of the total voting power represented by the outstanding voting securities of the Company or such other surviving or resulting entity or (iii) a sale, lease or other disposition of all or substantially all of the assets of the Company.

"**Company Capitalization**" is calculated as of immediately prior to the Equity Financing and (without double-counting, in each case calculated on an as-converted to Common Stock basis):

- Includes all shares of Capital Stock issued and outstanding;
- Includes all Converting Securities;
- Includes all (i) issued and outstanding Options and (ii) Promised Options; and
- Includes the Unissued Option Pool, except that any increase to the Unissued Option Pool in connection with the Equity Financing shall only be included to the extent that the number of Promised Options exceeds the Unissued Option Pool prior to such increase.

"**Conversion Price**" means the either: (1) the Safe Price or (2) the Discount Price, whichever calculation results in a greater number of shares of Safe Preferred Stock.

"**Converting Securities**" includes this Safe and other convertible securities issued by the Company, including but not limited to: (i) other Safes; (ii) convertible promissory notes and other convertible debt instruments; and (iii) convertible securities that have the right to convert into shares of Capital Stock.

"**Direct Listing**" means the Company's initial listing of its Common Stock (other than shares of Common Stock not eligible for resale under Rule 144 under the Securities Act) on a national securities exchange by means of an effective registration statement on Form S-1 filed by the Company with the SEC that registers shares of existing capital stock of the

Company for resale, as approved by the Company's board of directors. For the avoidance of doubt, a Direct Listing shall not be deemed to be an underwritten offering and shall not involve any underwriting services.

"**Discount Price**" means the price per share of the Standard Preferred Stock sold in the Equity Financing multiplied by the Discount Rate.

"**Dissolution Event**" means (i) a voluntary termination of operations, (ii) a general assignment for the benefit of the Company's creditors or (iii) any other liquidation, dissolution or winding up of the Company (**excluding** a Liquidity Event), whether voluntary or involuntary.

"**Dividend Amount**" means, with respect to any date on which the Company pays a dividend on its outstanding Common Stock, the amount of such dividend that is paid per share of Common Stock multiplied by (x) the Purchase Amount divided by (y) the Liquidity Price (treating the dividend date as a Liquidity Event solely for purposes of calculating such Liquidity Price).

"**Equity Financing**" means a bona fide transaction or series of transactions with the principal purpose of raising capital, pursuant to which the Company issues and sells Preferred Stock at a fixed valuation, including but not limited to, a pre-money or post-money valuation.

"**Initial Public Offering**" means the closing of the Company's first firm commitment underwritten initial public offering of Common Stock pursuant to a registration statement filed under the Securities Act.

"**Liquidity Capitalization**" is calculated as of immediately prior to the Liquidity Event, and (without double-counting, in each case calculated on an as-converted to Common Stock basis):

- Includes all shares of Capital Stock issued and outstanding;
- Includes all (i) issued and outstanding Options and (ii) to the extent receiving Proceeds, Promised Options;
- Includes all Converting Securities, **other than** any Safes and other convertible securities (including without limitation shares of Preferred Stock) where the holders of such securities are receiving Cash-Out Amounts or similar liquidation preference payments in lieu of conversion amounts or similar "as-converted" payments; and
- Excludes the Unissued Option Pool.

"**Liquidity Event**" means a Change of Control, a Direct Listing or an Initial Public Offering.

"**Liquidity Price**" means the price per share equal to the Post-Money Valuation Cap divided by the Liquidity Capitalization.

"**Options**" includes options, restricted stock awards or purchases, RSUs, SARs, warrants or similar securities, vested or unvested.

"**Proceeds**" means cash and other assets (including without limitation stock consideration) that are proceeds from the Liquidity Event or the Dissolution Event, as applicable, and legally available for distribution.

"**Promised Options**" means promised but ungranted Options that are the greater of those (i) promised pursuant to agreements or understandings made prior to the execution of, or in connection with, the term sheet or letter of intent for the Equity Financing or Liquidity Event, as applicable (or the initial closing of the Equity Financing or consummation of the Liquidity Event, if there is no term sheet or letter of intent), (ii) in the case of an Equity Financing, treated as outstanding Options in the calculation of the Standard Preferred Stock's price per share, or (iii) in the case of a Liquidity Event, treated as outstanding Options in the calculation of the distribution of the Proceeds.

"**Safe**" means an instrument containing a future right to shares of Capital Stock, similar in form and content to this instrument, purchased by investors for the purpose of funding the Company's business operations. References to "this Safe" mean this specific instrument.

"**Safe Preferred Stock**" means the shares of the series of Preferred Stock issued to the Investor in an Equity Financing, having the identical rights, privileges, preferences and restrictions as the shares of Standard Preferred Stock, other than with respect to: (i) the per share liquidation preference and the initial conversion price for purposes of price-based anti-dilution protection, which will equal the Conversion Price; and (ii) the basis for any dividend rights, which will be based on the Conversion Price.

"**Safe Price**" means the price per share equal to the Post-Money Valuation Cap divided by the Company Capitalization.

"**Standard Preferred Stock**" means the shares of the series of Preferred Stock issued to the investors investing new money in the Company in connection with the initial closing of the Equity Financing.

"**Unissued Option Pool**" means all shares of Capital Stock that are reserved, available for future grant and not subject to any outstanding Options or Promised Options (but in the case of a Liquidity Event, only to the extent Proceeds are payable on such Promised Options) under any equity incentive or similar Company plan.

3. *Company Representations*

(a)  The Company is a corporation duly organized, validly existing and in good standing under the laws of its state of incorporation, and has the power and authority to own, lease and operate its properties and carry on its business as now conducted.

(b)  The execution, delivery and performance by the Company of this Safe is within the power of the Company and has been duly authorized by all necessary actions on the part of the Company (subject to section 3(d)). This Safe constitutes a legal, valid and binding obligation of the Company, enforceable against the Company in accordance with its terms, except as limited by bankruptcy, insolvency or other laws of general application relating to or affecting the enforcement of creditors' rights generally and general principles of equity.  To its knowledge, the Company is not in violation of (i) its current certificate of incorporation or bylaws, (ii) any material statute, rule or regulation applicable to the Company or (iii) any material debt or contract to which the Company is a party or by which it is bound, where, in each case, such violation or default, individually, or together with all such violations or defaults, could reasonably be expected to have a material adverse effect on the Company.

(c)  The performance and consummation of the transactions contemplated by this Safe do not and will not: (i) violate any material judgment, statute, rule or regulation applicable to the Company; (ii) result in the acceleration of any material debt or contract to which the Company is a party or by which it is bound; or (iii) result in the creation or imposition of any lien on any property, asset or revenue of the Company or the suspension, forfeiture, or nonrenewal of any material permit, license or authorization applicable to the Company, its business or operations.

(d)  No consents or approvals are required in connection with the performance of this Safe, other than: (i) the Company's corporate approvals; (ii) any qualifications or filings under applicable securities laws; and (iii) necessary corporate approvals for the authorization of Capital Stock issuable pursuant to Section 1.

(e)  To its knowledge, the Company owns or possesses (or can obtain on commercially reasonable terms) sufficient legal rights to all patents, trademarks, service marks, trade names, copyrights, trade secrets, licenses, information, processes and other intellectual property rights necessary for its business as now conducted and as currently proposed to be conducted, without any conflict with, or infringement of the rights of, others.

4. *Investor Representations*

(a)  The Investor has full legal capacity, power and authority to execute and deliver this Safe and to perform its obligations hereunder. This Safe constitutes valid and binding obligation of the Investor, enforceable in accordance with its terms, except as limited by bankruptcy, insolvency or other laws of general application relating to or affecting the enforcement of creditors' rights generally and general principles of equity.

76

DocuSign Envelope ID: FE1588A6-B018-4F00-B521-63F792900529

(b) The Investor is an accredited investor as such term is defined in Rule 501 of Regulation D under the Securities Act, and acknowledges and agrees that if not an accredited investor at the time of an Equity Financing, the Company may void this Safe and return the Purchase Amount. The Investor has been advised that this Safe and the underlying securities have not been registered under the Securities Act, or any state securities laws and, therefore, cannot be resold unless they are registered under the Securities Act and applicable state securities laws or unless an exemption from such registration requirements is available. The Investor is purchasing this Safe and the securities to be acquired by the Investor hereunder for its own account for investment, not as a nominee or agent, and not with a view to, or for resale in connection with, the distribution thereof, and the Investor has no present intention of selling, granting any participation in, or otherwise distributing the same. The Investor has such knowledge and experience in financial and business matters that the Investor is capable of evaluating the merits and risks of such investment, is able to incur a complete loss of such investment without impairing the Investor's financial condition and is able to bear the economic risk of such investment for an indefinite period of time.

5. **_Miscellaneous_**

(a) Any provision of this Safe may be amended, waived or modified by written consent of the Company and either (i) the Investor or (ii) the majority-in-interest of all then-outstanding Safes with the same "Post-Money Valuation Cap" and "Discount Rate" as this Safe (and Safes lacking one or both of such terms will be considered to be the same with respect to such term(s)), _provided that_ with respect to clause (ii): (A) the Purchase Amount may not be amended, waived or modified in this manner, (B) the consent of the Investor and each holder of such Safes must be solicited (even if not obtained), and (C) such amendment, waiver or modification treats all such holders in the same manner. "Majority-in-interest" refers to the holders of the applicable group of Safes whose Safes have a total Purchase Amount greater than 50% of the total Purchase Amount of all of such applicable group of Safes.

(b) Any notice required or permitted by this Safe will be deemed sufficient when delivered personally or by overnight courier or sent by email to the relevant address listed on the signature page, or 48 hours after being deposited in the U.S. mail as certified or registered mail with postage prepaid, addressed to the party to be notified at such party's address listed on the signature page, as subsequently modified by written notice.

(c) The Investor is not entitled, as a holder of this Safe, to vote or be deemed a holder of Capital Stock for any purpose other than tax purposes, nor will anything in this Safe be construed to confer on the Investor, as such, any rights of a Company stockholder or rights to vote for the election of directors or on any matter submitted to Company stockholders, or to give or withhold consent to any corporate action or to receive notice of meetings, until shares have been issued on the terms described in Section 1.  However, if the Company pays a dividend on outstanding shares of Common Stock (that is not payable in shares of Common Stock) while this Safe is outstanding, the Company will pay the Dividend Amount to the Investor at the same time.

(d) Neither this Safe nor the rights in this Safe are transferable or assignable, by operation of law or otherwise, by either party without the prior written consent of the other; _provided, however_, that this Safe and/or its rights may be assigned without the Company's consent by the Investor (i) to the Investor's estate, heirs, executors, administrators, guardians and/or successors in the event of Investor's death or disability, or (ii) to any other entity who directly or indirectly, controls, is controlled by or is under common control with the Investor, including, without limitation, any general partner, managing member, officer or director of the Investor, or any venture capital fund now or hereafter existing which is controlled by one or more general partners or managing members of, or shares the same management company with, the Investor; and _provided, further_, that the Company may assign this Safe in whole, without the consent of the Investor, in connection with a reincorporation to change the Company's domicile.

(e) In the event any one or more of the provisions of this Safe is for any reason held to be invalid, illegal or unenforceable, in whole or in part or in any respect, or in the event that any one or more of the provisions of this Safe operate or would prospectively operate to invalidate this Safe, then and in any such event, such provision(s) only will be deemed null and void and will not affect any other provision of this Safe and the remaining provisions of this Safe will remain operative and in full force and effect and will not be affected, prejudiced, or disturbed thereby.

(f) All rights and obligations hereunder will be governed by the laws of the State of California, without regard to the conflicts of law provisions of such jurisdiction.

(g) The parties acknowledge and agree that for United States federal and state income tax purposes this Safe is, and at all times has been, intended to be characterized as stock, and more particularly as common stock for purposes of Sections 304, 305, 306, 354, 368, 1036 and 1202 of the Internal Revenue Code of 1986, as amended. Accordingly, the parties agree to treat this Safe consistent with the foregoing intent for all United States federal and state income tax purposes (including, without limitation, on their respective tax returns or other informational statements).

*(Signature page follows)*

IN WITNESS WHEREOF, the undersigned have caused this Safe to be duly executed and delivered.

**PALAMEDRIX, INC.**

By: _____

Michael Shane Bowen
Chief Executive Officer

Address: 703 Passiflora Ave.
            Encinitas, CA 92024

Email: sb@palamedrix.com

**INVESTOR:**

**Formic Ventures LLC**

By: _____

Name:  Michael Antonov

Title: Manager

Address:
977 North Broadway
North Massapequa, NY 11758

Email: michael@formic.vc

# EXHIBIT H

DocuSign Envelope ID: D92C7764-A543-4851-B419-E44E234255DE

THIS INSTRUMENT AND ANY SECURITIES ISSUABLE PURSUANT HERETO HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "**SECURITIES ACT**"), OR UNDER THE SECURITIES LAWS OF CERTAIN STATES.  THESE SECURITIES MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED, PLEDGED OR HYPOTHECATED EXCEPT AS PERMITTED IN THIS SAFE AND UNDER THE ACT AND APPLICABLE STATE SECURITIES LAWS PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT OR AN EXEMPTION THEREFROM.

**PALAMEDRIX, INC.**

**SAFE**
**(Simple Agreement for Future Equity)**

THIS CERTIFIES THAT in exchange for the payment by **Metaplanet Holdings OÜ** (the "**Investor**") of **$4,500,000** (the "**Purchase Amount**") on or about **June 22, 2021**, Palamedrix, Inc., a Delaware corporation (the "**Company**"), issues to the Investor the right to certain shares of the Company's Capital Stock, subject to the terms described below.

The "**Post-Money Valuation Cap**" is $165,000,000.

The "**Discount Rate**" is 80%.

See **Section 2** for certain additional defined terms.

1.   *Events*

(a)  **Equity Financing**. If there is an Equity Financing before the termination of this Safe, on the initial closing of such Equity Financing, this Safe will automatically convert into the number of shares of Safe Preferred Stock equal to the Purchase Amount divided by the Conversion Price.

In connection with the automatic conversion of this Safe into shares of Safe Preferred Stock, the Investor will execute and deliver to the Company all of the transaction documents related to the Equity Financing; *provided,* that such documents (i) are the same documents to be entered into with the purchasers of Standard Preferred Stock, with appropriate variations for the Safe Preferred Stock if applicable, and (ii) have customary exceptions to any drag-along applicable to the Investor, including (without limitation) limited representations, warranties, liability and indemnification obligations for the Investor.

(b)  **Liquidity Event**.  If there is a Liquidity Event before the termination of this Safe, this Safe will automatically be entitled (subject to the liquidation priority set forth in Section 1(d) below) to receive a portion of Proceeds, due and payable to the Investor immediately prior to, or concurrent with, the consummation of such Liquidity Event, in an amount that is equal to 1.4x the Purchase Amount (the "**Cash-Out Amount**").  If any of the Company's securityholders are given a choice as to the form and amount of Proceeds to be received in a Liquidity Event, the Investor will be given the same choice, *provided* that the Investor may not choose to receive a form of consideration that the Investor would be ineligible to receive as a result of the Investor's failure to satisfy any requirement or limitation generally applicable to the Company's securityholders, or under any applicable laws.

Notwithstanding the foregoing, in connection with a Change of Control intended to qualify as a tax-free reorganization, the Company may reduce the cash portion of Proceeds payable to the Investor by the amount determined by its board of directors in good faith for such Change of Control to qualify as a tax-free reorganization for U.S. federal income tax purposes, provided that such reduction (A) does not reduce the total Proceeds payable to such Investor and (B) is applied in the same manner and on a pro rata basis to all securityholders who have equal priority to the Investor under Section 1(d).

(c)  **Dissolution Event**.  If there is a Dissolution Event before the termination of this Safe, the Investor will automatically be entitled (subject to the liquidation priority set forth in Section 1(d) below) to receive a portion of Proceeds equal to the Cash-Out Amount due and payable to Investor should a Liquidity Event have been consummated as of the same date on which such Dissolution Event is consummated, due and payable to the Investor immediately prior to the consummation of the Dissolution Event.

81

(d) **Liquidation Priority**.  In a Liquidity Event or Dissolution Event, the Investor's right to receive its Cash-Out Amount is:

       (i)     Junior to payment of outstanding indebtedness and creditor claims, including contractual claims for payment and convertible promissory notes (to the extent such convertible promissory notes are not actually or notionally converted into Capital Stock);

       (ii)    On par with payments for other Safes and/or Preferred Stock, and if the applicable Proceeds are insufficient to permit full payments to the Investor and such other Safes and/or Preferred Stock, the applicable Proceeds will be distributed pro rata to the Investor and such other Safes and/or Preferred Stock in proportion to the full payments that would otherwise be due; and

       (iii)   Senior to payments for Common Stock.

(e) **Termination**.  This Safe will automatically terminate (without relieving the Company of any obligations arising from a prior breach of or non-compliance with this Safe) immediately following the earliest to occur of: (i) the issuance of Capital Stock to the Investor pursuant to the automatic conversion of this Safe under Section 1(a); or (ii) the payment, or setting aside for payment, of amounts due the Investor pursuant to Section 1(b) or Section 1(c).

2.  *Definitions*

"**Capital Stock**" means the capital stock of the Company, including, without limitation, the "**Common Stock**" and the "**Preferred Stock**."

"**Change of Control**" means (i) a transaction or series of related transactions in which any "person" or "group" (within the meaning of Section 13(d) and 14(d) of the Securities Exchange Act of 1934, as amended), becomes the "beneficial owner" (as defined in Rule 13d-3 under the Securities Exchange Act of 1934, as amended), directly or indirectly, of more than 50% of the outstanding voting securities of the Company having the right to vote for the election of members of the Company's board of directors, (ii) any reorganization, merger or consolidation of the Company, other than a transaction or series of related transactions in which the holders of the voting securities of the Company outstanding immediately prior to such transaction or series of related transactions retain, immediately after such transaction or series of related transactions, at least a majority of the total voting power represented by the outstanding voting securities of the Company or such other surviving or resulting entity or (iii) a sale, lease or other disposition of all or substantially all of the assets of the Company.

"**Company Capitalization**" is calculated as of immediately prior to the Equity Financing and (without double-counting, in each case calculated on an as-converted to Common Stock basis):

- Includes all shares of Capital Stock issued and outstanding;
- Includes all Converting Securities;
- Includes all (i) issued and outstanding Options and (ii) Promised Options; and
- Includes the Unissued Option Pool, except that any increase to the Unissued Option Pool in connection with the Equity Financing shall only be included to the extent that the number of Promised Options exceeds the Unissued Option Pool prior to such increase.

"**Conversion Price**" means the either: (1) the Safe Price or (2) the Discount Price, whichever calculation results in a greater number of shares of Safe Preferred Stock.

"**Converting Securities**" includes this Safe and other convertible securities issued by the Company, including but not limited to: (i) other Safes; (ii) convertible promissory notes and other convertible debt instruments; and (iii) convertible securities that have the right to convert into shares of Capital Stock.

"**Direct Listing**" means the Company's initial listing of its Common Stock (other than shares of Common Stock not eligible for resale under Rule 144 under the Securities Act) on a national securities exchange by means of an effective registration statement on Form S-1 filed by the Company with the SEC that registers shares of existing capital stock of the

Company for resale, as approved by the Company's board of directors. For the avoidance of doubt, a Direct Listing shall not be deemed to be an underwritten offering and shall not involve any underwriting services.

"**Discount Price**" means the price per share of the Standard Preferred Stock sold in the Equity Financing multiplied by the Discount Rate.

"**Dissolution Event**" means (i) a voluntary termination of operations, (ii) a general assignment for the benefit of the Company's creditors or (iii) any other liquidation, dissolution or winding up of the Company (**excluding** a Liquidity Event), whether voluntary or involuntary.

"**Dividend Amount**" means, with respect to any date on which the Company pays a dividend on its outstanding Common Stock, the amount of such dividend that is paid per share of Common Stock multiplied by (x) the Purchase Amount divided by (y) the Liquidity Price (treating the dividend date as a Liquidity Event solely for purposes of calculating such Liquidity Price).

"**Equity Financing**" means a bona fide transaction or series of transactions with the principal purpose of raising capital, pursuant to which the Company issues and sells Preferred Stock at a fixed valuation, including but not limited to, a pre-money or post-money valuation.

"**Initial Public Offering**" means the closing of the Company's first firm commitment underwritten initial public offering of Common Stock pursuant to a registration statement filed under the Securities Act.

"**Liquidity Capitalization**" is calculated as of immediately prior to the Liquidity Event, and (without double-counting, in each case calculated on an as-converted to Common Stock basis):

- Includes all shares of Capital Stock issued and outstanding;
- Includes all (i) issued and outstanding Options and (ii) to the extent receiving Proceeds, Promised Options;
- Includes all Converting Securities, **other than** any Safes and other convertible securities (including without limitation shares of Preferred Stock) where the holders of such securities are receiving Cash-Out Amounts or similar liquidation preference payments in lieu of conversion amounts or similar "as-converted" payments; and
- Excludes the Unissued Option Pool.

"**Liquidity Event**" means a Change of Control, a Direct Listing or an Initial Public Offering.

"**Liquidity Price**" means the price per share equal to the Post-Money Valuation Cap divided by the Liquidity Capitalization.

"**Options**" includes options, restricted stock awards or purchases, RSUs, SARs, warrants or similar securities, vested or unvested.

"**Proceeds**" means cash and other assets (including without limitation stock consideration) that are proceeds from the Liquidity Event or the Dissolution Event, as applicable, and legally available for distribution.

"**Promised Options**" means promised but ungranted Options that are the greater of those (i) promised pursuant to agreements or understandings made prior to the execution of, or in connection with, the term sheet or letter of intent for the Equity Financing or Liquidity Event, as applicable (or the initial closing of the Equity Financing or consummation of the Liquidity Event, if there is no term sheet or letter of intent), (ii) in the case of an Equity Financing, treated as outstanding Options in the calculation of the Standard Preferred Stock's price per share, or (iii) in the case of a Liquidity Event, treated as outstanding Options in the calculation of the distribution of the Proceeds.

"**Safe**" means an instrument containing a future right to shares of Capital Stock, similar in form and content to this instrument, purchased by investors for the purpose of funding the Company's business operations. References to "this Safe" mean this specific instrument.

83

"**Safe Preferred Stock**" means the shares of the series of Preferred Stock issued to the Investor in an Equity Financing, having the identical rights, privileges, preferences and restrictions as the shares of Standard Preferred Stock, other than with respect to: (i) the per share liquidation preference and the initial conversion price for purposes of price-based anti-dilution protection, which will equal the Conversion Price; and (ii) the basis for any dividend rights, which will be based on the Conversion Price.

"**Safe Price**" means the price per share equal to the Post-Money Valuation Cap divided by the Company Capitalization.

"**Standard Preferred Stock**" means the shares of the series of Preferred Stock issued to the investors investing new money in the Company in connection with the initial closing of the Equity Financing.

"**Unissued Option Pool**" means all shares of Capital Stock that are reserved, available for future grant and not subject to any outstanding Options or Promised Options (but in the case of a Liquidity Event, only to the extent Proceeds are payable on such Promised Options) under any equity incentive or similar Company plan.

3. *Company Representations*

(a)  The Company is a corporation duly organized, validly existing and in good standing under the laws of its state of incorporation, and has the power and authority to own, lease and operate its properties and carry on its business as now conducted.

(b)  The execution, delivery and performance by the Company of this Safe is within the power of the Company and has been duly authorized by all necessary actions on the part of the Company (subject to section 3(d)). This Safe constitutes a legal, valid and binding obligation of the Company, enforceable against the Company in accordance with its terms, except as limited by bankruptcy, insolvency or other laws of general application relating to or affecting the enforcement of creditors' rights generally and general principles of equity.  To its knowledge, the Company is not in violation of (i) its current certificate of incorporation or bylaws, (ii) any material statute, rule or regulation applicable to the Company or (iii) any material debt or contract to which the Company is a party or by which it is bound, where, in each case, such violation or default, individually, or together with all such violations or defaults, could reasonably be expected to have a material adverse effect on the Company.

(c)  The performance and consummation of the transactions contemplated by this Safe do not and will not: (i) violate any material judgment, statute, rule or regulation applicable to the Company; (ii) result in the acceleration of any material debt or contract to which the Company is a party or by which it is bound; or (iii) result in the creation or imposition of any lien on any property, asset or revenue of the Company or the suspension, forfeiture, or nonrenewal of any material permit, license or authorization applicable to the Company, its business or operations.

(d)  No consents or approvals are required in connection with the performance of this Safe, other than: (i) the Company's corporate approvals; (ii) any qualifications or filings under applicable securities laws; and (iii) necessary corporate approvals for the authorization of Capital Stock issuable pursuant to Section 1.

(e)  To its knowledge, the Company owns or possesses (or can obtain on commercially reasonable terms) sufficient legal rights to all patents, trademarks, service marks, trade names, copyrights, trade secrets, licenses, information, processes and other intellectual property rights necessary for its business as now conducted and as currently proposed to be conducted, without any conflict with, or infringement of the rights of, others.

4. *Investor Representations*

(a)  The Investor has full legal capacity, power and authority to execute and deliver this Safe and to perform its obligations hereunder. This Safe constitutes valid and binding obligation of the Investor, enforceable in accordance with its terms, except as limited by bankruptcy, insolvency or other laws of general application relating to or affecting the enforcement of creditors' rights generally and general principles of equity.

DocuSign Envelope ID: D92C7764-A543-4851-B419-EA4E234255DE

(b)  The Investor is an accredited investor as such term is defined in Rule 501 of Regulation D under the Securities Act, and acknowledges and agrees that if not an accredited investor at the time of an Equity Financing, the Company may void this Safe and return the Purchase Amount. The Investor has been advised that this Safe and the underlying securities have not been registered under the Securities Act, or any state securities laws and, therefore, cannot be resold unless they are registered under the Securities Act and applicable state securities laws or unless an exemption from such registration requirements is available. The Investor is purchasing this Safe and the securities to be acquired by the Investor hereunder for its own account for investment, not as a nominee or agent, and not with a view to, or for resale in connection with, the distribution thereof, and the Investor has no present intention of selling, granting any participation in, or otherwise distributing the same. The Investor has such knowledge and experience in financial and business matters that the Investor is capable of evaluating the merits and risks of such investment, is able to incur a complete loss of such investment without impairing the Investor's financial condition and is able to bear the economic risk of such investment for an indefinite period of time.

5.  ***Miscellaneous***

(a)  Any provision of this Safe may be amended, waived or modified by written consent of the Company and either (i) the Investor or (ii) the majority-in-interest of all then-outstanding Safes with the same "Post-Money Valuation Cap" and "Discount Rate" as this Safe (and Safes lacking one or both of such terms will be considered to be the same with respect to such term(s)), *provided that* with respect to clause (ii): (A) the Purchase Amount may not be amended, waived or modified in this manner, (B) the consent of the Investor and each holder of such Safes must be solicited (even if not obtained), and (C) such amendment, waiver or modification treats all such holders in the same manner. "Majority-in-interest" refers to the holders of the applicable group of Safes whose Safes have a total Purchase Amount greater than 50% of the total Purchase Amount of all of such applicable group of Safes.

(b)  Any notice required or permitted by this Safe will be deemed sufficient when delivered personally or by overnight courier or sent by email to the relevant address listed on the signature page, or 48 hours after being deposited in the U.S. mail as certified or registered mail with postage prepaid, addressed to the party to be notified at such party's address listed on the signature page, as subsequently modified by written notice.

(c)  The Investor is not entitled, as a holder of this Safe, to vote or be deemed a holder of Capital Stock for any purpose other than tax purposes, nor will anything in this Safe be construed to confer on the Investor, as such, any rights of a Company stockholder or rights to vote for the election of directors or on any matter submitted to Company stockholders, or to give or withhold consent to any corporate action or to receive notice of meetings, until shares have been issued on the terms described in Section 1.  However, if the Company pays a dividend on outstanding shares of Common Stock (that is not payable in shares of Common Stock) while this Safe is outstanding, the Company will pay the Dividend Amount to the Investor at the same time.

(d)  Neither this Safe nor the rights in this Safe are transferable or assignable, by operation of law or otherwise, by either party without the prior written consent of the other; *provided, however*, that this Safe and/or its rights may be assigned without the Company's consent by the Investor (i) to the Investor's estate, heirs, executors, administrators, guardians and/or successors in the event of Investor's death or disability, or (ii) to any other entity who directly or indirectly, controls, is controlled by or is under common control with the Investor, including, without limitation, any general partner, managing member, officer or director of the Investor, or any venture capital fund now or hereafter existing which is controlled by one or more general partners or managing members of, or shares the same management company with, the Investor; and *provided, further*, that the Company may assign this Safe in whole, without the consent of the Investor, in connection with a reincorporation to change the Company's domicile.

(e)  In the event any one or more of the provisions of this Safe is for any reason held to be invalid, illegal or unenforceable, in whole or in part or in any respect, or in the event that any one or more of the provisions of this Safe operate or would prospectively operate to invalidate this Safe, then and in any such event, such provision(s) only will be deemed null and void and will not affect any other provision of this Safe and the remaining provisions of this Safe will remain operative and in full force and effect and will not be affected, prejudiced, or disturbed thereby.

(f)   All rights and obligations hereunder will be governed by the laws of the State of California, without regard to the conflicts of law provisions of such jurisdiction.

(g)   The parties acknowledge and agree that for United States federal and state income tax purposes this Safe is, and at all times has been, intended to be characterized as stock, and more particularly as common stock for purposes of Sections 304, 305, 306, 354, 368, 1036 and 1202 of the Internal Revenue Code of 1986, as amended.   Accordingly, the parties agree to treat this Safe consistent with the foregoing intent for all United States federal and state income tax purposes (including, without limitation, on their respective tax returns or other informational statements).

*(Signature page follows)*

IN WITNESS WHEREOF, the undersigned have caused this Safe to be duly executed and delivered.

**PALAMEDRIX, INC.**

By: _____
3E89D869DAC1479
Michael Shane Bowen
Chief Executive Officer

Address: 703 Passiflora Ave.
Encinitas, CA 92024

Email: sb@palamedrix.com

**INVESTOR:**

**Metaplanet Holdings OÜ**

By: _____
92731C782825476
Name: Karl-Rauno Miljand

Title: Portfolio Manager, acting under PoA

By: _____
6ACB64DDE7B0467...
Name: Keiu Heinpalu

Title: Lawyer, acting under PoA

Address:
Toompuiestee 33a, 10149, Tallinn, Estonia 0

Email: rauno@metaplanet.com

# EXHIBIT I

DocuSign Envelope ID: 649EC994-6BE5-4F7E-98F9-FEA337D84645

0HIS INSTRUMENT AND ANY SECURITIES ISSUABLE PURSUANT HERETO HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "**SECURITIES ACT**"), OR UNDER THE SECURITIES LAWS OF CERTAIN STATES.  THESE SECURITIES MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED, PLEDGED OR HYPOTHECATED EXCEPT AS PERMITTED IN THIS SAFE AND UNDER THE ACT AND APPLICABLE STATE SECURITIES LAWS PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT OR AN EXEMPTION THEREFROM.

## PALAMEDRIX, INC.

## SAFE
### (Simple Agreement for Future Equity)

THIS CERTIFIES THAT in exchange for the payment by **Beofund LLC** (the "**Investor**") of **$50,000** (the "**Purchase Amount**") on or about **June 22, 2021**, Palamedrix, Inc., a Delaware corporation (the "**Company**"), issues to the Investor the right to certain shares of the Company's Capital Stock, subject to the terms described below.

The "**Post-Money Valuation Cap**" is $165,000,000.

The "**Discount Rate**" is 80%.

See **Section 2** for certain additional defined terms.

1.  *Events*

(a)  **Equity Financing**. If there is an Equity Financing before the termination of this Safe, on the initial closing of such Equity Financing, this Safe will automatically convert into the number of shares of Safe Preferred Stock equal to the Purchase Amount divided by the Conversion Price.

In connection with the automatic conversion of this Safe into shares of Safe Preferred Stock, the Investor will execute and deliver to the Company all of the transaction documents related to the Equity Financing; *provided,* that such documents (i) are the same documents to be entered into with the purchasers of Standard Preferred Stock, with appropriate variations for the Safe Preferred Stock if applicable, and (ii) have customary exceptions to any drag-along applicable to the Investor, including (without limitation) limited representations, warranties, liability and indemnification obligations for the Investor.

(b)  **Liquidity Event**.  If there is a Liquidity Event before the termination of this Safe, this Safe will automatically be entitled (subject to the liquidation priority set forth in Section 1(d) below) to receive a portion of Proceeds, due and payable to the Investor immediately prior to, or concurrent with, the consummation of such Liquidity Event, in an amount that is equal to 1.4x the Purchase Amount (the "**Cash-Out Amount**").  If any of the Company's securityholders are given a choice as to the form and amount of Proceeds to be received in a Liquidity Event, the Investor will be given the same choice, *provided* that the Investor may not choose to receive a form of consideration that the Investor would be ineligible to receive as a result of the Investor's failure to satisfy any requirement or limitation generally applicable to the Company's securityholders, or under any applicable laws.

Notwithstanding the foregoing, in connection with a Change of Control intended to qualify as a tax-free reorganization, the Company may reduce the cash portion of Proceeds payable to the Investor by the amount determined by its board of directors in good faith for such Change of Control to qualify as a tax-free reorganization for U.S. federal income tax purposes, provided that such reduction (A) does not reduce the total Proceeds payable to such Investor and (B) is applied in the same manner and on a pro rata basis to all securityholders who have equal priority to the Investor under Section 1(d).

(c)  **Dissolution Event**.  If there is a Dissolution Event before the termination of this Safe, the Investor will automatically be entitled (subject to the liquidation priority set forth in Section 1(d) below) to receive a portion of Proceeds equal to the Cash-Out Amount due and payable to Investor should a Liquidity Event have been consummated as of the same date on which such Dissolution Event is consummated, due and payable to the Investor immediately prior to the consummation of the Dissolution Event.

(d) **Liquidation Priority**.  In a Liquidity Event or Dissolution Event, the Investor's right to receive its Cash-Out Amount is:

(i)     Junior to payment of outstanding indebtedness and creditor claims, including contractual claims for payment and convertible promissory notes (to the extent such convertible promissory notes are not actually or notionally converted into Capital Stock);

(ii)    On par with payments for other Safes and/or Preferred Stock, and if the applicable Proceeds are insufficient to permit full payments to the Investor and such other Safes and/or Preferred Stock, the applicable Proceeds will be distributed pro rata to the Investor and such other Safes and/or Preferred Stock in proportion to the full payments that would otherwise be due; and

(iii)   Senior to payments for Common Stock.

(e) **Termination**.  This Safe will automatically terminate (without relieving the Company of any obligations arising from a prior breach of or non-compliance with this Safe) immediately following the earliest to occur of: (i) the issuance of Capital Stock to the Investor pursuant to the automatic conversion of this Safe under Section 1(a); or (ii) the payment, or setting aside for payment, of amounts due the Investor pursuant to Section 1(b) or Section 1(c).

2.   *Definitions*

"**Capital Stock**" means the capital stock of the Company, including, without limitation, the "**Common Stock**" and the "**Preferred Stock**."

"**Change of Control**" means (i) a transaction or series of related transactions in which any "person" or "group" (within the meaning of Section 13(d) and 14(d) of the Securities Exchange Act of 1934, as amended), becomes the "beneficial owner" (as defined in Rule 13d-3 under the Securities Exchange Act of 1934, as amended), directly or indirectly, of more than 50% of the outstanding voting securities of the Company having the right to vote for the election of members of the Company's board of directors, (ii) any reorganization, merger or consolidation of the Company, other than a transaction or series of related transactions in which the holders of the voting securities of the Company outstanding immediately prior to such transaction or series of related transactions retain, immediately after such transaction or series of related transactions, at least a majority of the total voting power represented by the outstanding voting securities of the Company or such other surviving or resulting entity or (iii) a sale, lease or other disposition of all or substantially all of the assets of the Company.

"**Company Capitalization**" is calculated as of immediately prior to the Equity Financing and (without double-counting, in each case calculated on an as-converted to Common Stock basis):

- Includes all shares of Capital Stock issued and outstanding;
- Includes all Converting Securities;
- Includes all (i) issued and outstanding Options and (ii) Promised Options; and
- Includes the Unissued Option Pool, except that any increase to the Unissued Option Pool in connection with the Equity Financing shall only be included to the extent that the number of Promised Options exceeds the Unissued Option Pool prior to such increase.

"**Conversion Price**" means the either: (1) the Safe Price or (2) the Discount Price, whichever calculation results in a greater number of shares of Safe Preferred Stock.

"**Converting Securities**" includes this Safe and other convertible securities issued by the Company, including but not limited to: (i) other Safes; (ii) convertible promissory notes and other convertible debt instruments; and (iii) convertible securities that have the right to convert into shares of Capital Stock.

"**Direct Listing**" means the Company's initial listing of its Common Stock (other than shares of Common Stock not eligible for resale under Rule 144 under the Securities Act) on a national securities exchange by means of an effective registration statement on Form S-1 filed by the Company with the SEC that registers shares of existing capital stock of the

Company for resale, as approved by the Company's board of directors. For the avoidance of doubt, a Direct Listing shall not be deemed to be an underwritten offering and shall not involve any underwriting services.

"**Discount Price**" means the price per share of the Standard Preferred Stock sold in the Equity Financing multiplied by the Discount Rate.

"**Dissolution Event**" means (i) a voluntary termination of operations, (ii) a general assignment for the benefit of the Company's creditors or (iii) any other liquidation, dissolution or winding up of the Company (**excluding** a Liquidity Event), whether voluntary or involuntary.

"**Dividend Amount**" means, with respect to any date on which the Company pays a dividend on its outstanding Common Stock, the amount of such dividend that is paid per share of Common Stock multiplied by (x) the Purchase Amount divided by (y) the Liquidity Price (treating the dividend date as a Liquidity Event solely for purposes of calculating such Liquidity Price).

"**Equity Financing**" means a bona fide transaction or series of transactions with the principal purpose of raising capital, pursuant to which the Company issues and sells Preferred Stock at a fixed valuation, including but not limited to, a pre-money or post-money valuation.

"**Initial Public Offering**" means the closing of the Company's first firm commitment underwritten initial public offering of Common Stock pursuant to a registration statement filed under the Securities Act.

"**Liquidity Capitalization**" is calculated as of immediately prior to the Liquidity Event, and (without double-counting, in each case calculated on an as-converted to Common Stock basis):

- Includes all shares of Capital Stock issued and outstanding;
- Includes all (i) issued and outstanding Options and (ii) to the extent receiving Proceeds, Promised Options;
- Includes all Converting Securities, **other than** any Safes and other convertible securities (including without limitation shares of Preferred Stock) where the holders of such securities are receiving Cash-Out Amounts or similar liquidation preference payments in lieu of conversion amounts or similar "as-converted" payments; and
- Excludes the Unissued Option Pool.

"**Liquidity Event**" means a Change of Control, a Direct Listing or an Initial Public Offering.

"**Liquidity Price**" means the price per share equal to the Post-Money Valuation Cap divided by the Liquidity Capitalization.

"**Options**" includes options, restricted stock awards or purchases, RSUs, SARs, warrants or similar securities, vested or unvested.

"**Proceeds**" means cash and other assets (including without limitation stock consideration) that are proceeds from the Liquidity Event or the Dissolution Event, as applicable, and legally available for distribution.

"**Promised Options**" means promised but ungranted Options that are the greater of those (i) promised pursuant to agreements or understandings made prior to the execution of, or in connection with, the term sheet or letter of intent for the Equity Financing or Liquidity Event, as applicable (or the initial closing of the Equity Financing or consummation of the Liquidity Event, if there is no term sheet or letter of intent), (ii) in the case of an Equity Financing, treated as outstanding Options in the calculation of the Standard Preferred Stock's price per share, or (iii) in the case of a Liquidity Event, treated as outstanding Options in the calculation of the distribution of the Proceeds.

"**Safe**" means an instrument containing a future right to shares of Capital Stock, similar in form and content to this instrument, purchased by investors for the purpose of funding the Company's business operations.  References to "this Safe" mean this specific instrument.

"**Safe Preferred Stock**" means the shares of the series of Preferred Stock issued to the Investor in an Equity Financing, having the identical rights, privileges, preferences and restrictions as the shares of Standard Preferred Stock, other than with respect to: (i) the per share liquidation preference and the initial conversion price for purposes of price-based anti-dilution protection, which will equal the Conversion Price; and (ii) the basis for any dividend rights, which will be based on the Conversion Price.

"**Safe Price**" means the price per share equal to the Post-Money Valuation Cap divided by the Company Capitalization.

"**Standard Preferred Stock**" means the shares of the series of Preferred Stock issued to the investors investing new money in the Company in connection with the initial closing of the Equity Financing.

"**Unissued Option Pool**" means all shares of Capital Stock that are reserved, available for future grant and not subject to any outstanding Options or Promised Options (but in the case of a Liquidity Event, only to the extent Proceeds are payable on such Promised Options) under any equity incentive or similar Company plan.

3. *Company Representations*

(a)  The Company is a corporation duly organized, validly existing and in good standing under the laws of its state of incorporation, and has the power and authority to own, lease and operate its properties and carry on its business as now conducted.

(b)  The execution, delivery and performance by the Company of this Safe is within the power of the Company and has been duly authorized by all necessary actions on the part of the Company (subject to section 3(d)). This Safe constitutes a legal, valid and binding obligation of the Company, enforceable against the Company in accordance with its terms, except as limited by bankruptcy, insolvency or other laws of general application relating to or affecting the enforcement of creditors' rights generally and general principles of equity.  To its knowledge, the Company is not in violation of (i) its current certificate of incorporation or bylaws, (ii) any material statute, rule or regulation applicable to the Company or (iii) any material debt or contract to which the Company is a party or by which it is bound, where, in each case, such violation or default, individually, or together with all such violations or defaults, could reasonably be expected to have a material adverse effect on the Company.

(c)  The performance and consummation of the transactions contemplated by this Safe do not and will not: (i) violate any material judgment, statute, rule or regulation applicable to the Company; (ii) result in the acceleration of any material debt or contract to which the Company is a party or by which it is bound; or (iii) result in the creation or imposition of any lien on any property, asset or revenue of the Company or the suspension, forfeiture, or nonrenewal of any material permit, license or authorization applicable to the Company, its business or operations.

(d)  No consents or approvals are required in connection with the performance of this Safe, other than: (i) the Company's corporate approvals; (ii) any qualifications or filings under applicable securities laws; and (iii) necessary corporate approvals for the authorization of Capital Stock issuable pursuant to Section 1.

(e)  To its knowledge, the Company owns or possesses (or can obtain on commercially reasonable terms) sufficient legal rights to all patents, trademarks, service marks, trade names, copyrights, trade secrets, licenses, information, processes and other intellectual property rights necessary for its business as now conducted and as currently proposed to be conducted, without any conflict with, or infringement of the rights of, others.

4. *Investor Representations*

(a)  The Investor has full legal capacity, power and authority to execute and deliver this Safe and to perform its obligations hereunder. This Safe constitutes valid and binding obligation of the Investor, enforceable in accordance with its terms, except as limited by bankruptcy, insolvency or other laws of general application relating to or affecting the enforcement of creditors' rights generally and general principles of equity.

92

(b)  The Investor is an accredited investor as such term is defined in Rule 501 of Regulation D under the Securities Act, and acknowledges and agrees that if not an accredited investor at the time of an Equity Financing, the Company may void this Safe and return the Purchase Amount. The Investor has been advised that this Safe and the underlying securities have not been registered under the Securities Act, or any state securities laws and, therefore, cannot be resold unless they are registered under the Securities Act and applicable state securities laws or unless an exemption from such registration requirements is available. The Investor is purchasing this Safe and the securities to be acquired by the Investor hereunder for its own account for investment, not as a nominee or agent, and not with a view to, or for resale in connection with, the distribution thereof, and the Investor has no present intention of selling, granting any participation in, or otherwise distributing the same. The Investor has such knowledge and experience in financial and business matters that the Investor is capable of evaluating the merits and risks of such investment, is able to incur a complete loss of such investment without impairing the Investor's financial condition and is able to bear the economic risk of such investment for an indefinite period of time.

5.  ***Miscellaneous***

(a)  Any provision of this Safe may be amended, waived or modified by written consent of the Company and either (i) the Investor or (ii) the majority-in-interest of all then-outstanding Safes with the same "Post-Money Valuation Cap" and "Discount Rate" as this Safe (and Safes lacking one or both of such terms will be considered to be the same with respect to such term(s)), *provided that* with respect to clause (ii): (A) the Purchase Amount may not be amended, waived or modified in this manner, (B) the consent of the Investor and each holder of such Safes must be solicited (even if not obtained), and (C) such amendment, waiver or modification treats all such holders in the same manner. "Majority-in-interest" refers to the holders of the applicable group of Safes whose Safes have a total Purchase Amount greater than 50% of the total Purchase Amount of all of such applicable group of Safes.

(b)  Any notice required or permitted by this Safe will be deemed sufficient when delivered personally or by overnight courier or sent by email to the relevant address listed on the signature page, or 48 hours after being deposited in the U.S. mail as certified or registered mail with postage prepaid, addressed to the party to be notified at such party's address listed on the signature page, as subsequently modified by written notice.

(c)  The Investor is not entitled, as a holder of this Safe, to vote or be deemed a holder of Capital Stock for any purpose other than tax purposes, nor will anything in this Safe be construed to confer on the Investor, as such, any rights of a Company stockholder or rights to vote for the election of directors or on any matter submitted to Company stockholders, or to give or withhold consent to any corporate action or to receive notice of meetings, until shares have been issued on the terms described in Section 1.  However, if the Company pays a dividend on outstanding shares of Common Stock (that is not payable in shares of Common Stock) while this Safe is outstanding, the Company will pay the Dividend Amount to the Investor at the same time.

(d)  Neither this Safe nor the rights in this Safe are transferable or assignable, by operation of law or otherwise, by either party without the prior written consent of the other; *provided, however*, that this Safe and/or its rights may be assigned without the Company's consent by the Investor (i) to the Investor's estate, heirs, executors, administrators, guardians and/or successors in the event of Investor's death or disability, or (ii) to any other entity who directly or indirectly, controls, is controlled by or is under common control with the Investor, including, without limitation, any general partner, managing member, officer or director of the Investor, or any venture capital fund now or hereafter existing which is controlled by one or more general partners or managing members of, or shares the same management company with, the Investor; and *provided, further*, that the Company may assign this Safe in whole, without the consent of the Investor, in connection with a reincorporation to change the Company's domicile.

(e)  In the event any one or more of the provisions of this Safe is for any reason held to be invalid, illegal or unenforceable, in whole or in part or in any respect, or in the event that any one or more of the provisions of this Safe operate or would prospectively operate to invalidate this Safe, then and in any such event, such provision(s) only will be deemed null and void and will not affect any other provision of this Safe and the remaining provisions of this Safe will remain operative and in full force and effect and will not be affected, prejudiced, or disturbed thereby.

93

     (f)  All rights and obligations hereunder will be governed by the laws of the State of California, without regard to the conflicts of law provisions of such jurisdiction.

     (g)  The parties acknowledge and agree that for United States federal and state income tax purposes this Safe is, and at all times has been, intended to be characterized as stock, and more particularly as common stock for purposes of Sections 304, 305, 306, 354, 368, 1036 and 1202 of the Internal Revenue Code of 1986, as amended.  Accordingly, the parties agree to treat this Safe consistent with the foregoing intent for all United States federal and state income tax purposes (including, without limitation, on their respective tax returns or other informational statements).

*(Signature page follows)*

94

IN WITNESS WHEREOF, the undersigned have caused this Safe to be duly executed and delivered.

**PALAMEDRIX, INC.**

By: _____

Michael Shane Bowen

Chief Executive Officer

Address: 703 Passiflora Ave.

Encinitas, CA 92024

Email: sb@palamedrix.com

**INVESTOR:**

**Beofund LLC**

By: _____

Name: Matt Shlosberg

Title: Manager

Address:

462 Vanessa Way

Danville, CA 94506

Email: mshlos@beofund.com

# EXHIBIT J

DocuSign Envelope ID: 9A890D4C-06A3-4132-AA76-BA4B666AF69E

**PALAMEDRIX, INC.**
**652 Jocelyn Way**
**Encinitas, CA 92024**

January 4, 2021

**_VIA EMAIL_**

michael@formic.vc

Ladies and Gentlemen:

This letter agreement ("Agreement") is entered into in connection with the purchase by **Formic Ventures LLC** (the "**_Investor_**") of that certain simple agreement for future equity (the "**_Safe_**") issued by Palamedrix, Inc. (the "**_Company_**") on or about the date hereof.  As a material inducement to the Investor's investment, the Company agrees to the provisions set forth in this Agreement with Ant House Advisor, LLC, an affiliate of the Investor ("Ant House").  Capitalized terms used herein shall have the meanings set forth in the Safe, unless otherwise defined.

As long as Investor, Ant House or their affiliates do not have a right to appoint a member of the Company's Board of Directors (the "**_Board of Directors_**"), the Company shall invite one (1) representative from Ant House on behalf of the Investor (the "**_Investor's Representative_**") to attend all meetings of its Board of Directors in a nonvoting observer capacity; provided, however, that such Investor Representative shall agree to hold in confidence and trust and to act in a fiduciary manner with respect to all information provided at such meetings; and provided further, that the Company reserves the right to withhold any information and to exclude such Investor Representative from any meeting or portion thereof if access to such information or attendance at such meeting could adversely affect the attorney-client privilege between the Company and its counsel or result in disclosure of trade secrets or highly confidential information, or would constitute a conflict of interest, or if such Investor or the Investor Representative is a competitor of the Company (in each of the foregoing cases, as determined by the Board of Directors in its sole discretion).

The rights described herein are non-assignable and shall terminate and be of no further force or effect upon the earlier of the date of: (i) the closing of the Company's second Equity Financing (such as Series B Preferred Stock), or (ii) termination by the Board of Directors in its sole discretion, which ever event shall occur first. The confidentiality provision hereof will survive any such termination.

This Agreement shall be governed by and construed in accordance with the laws of the State of California, without reference to choice or conflict of laws provisions thereof.

This Agreement may not be amended or modified without the written consent of Investor and the Company.

4824-0593-0197 v.1

If any provision of this Agreement shall be declared void or unenforceable by any judicial or administrative authority, the validity of any other provision and of the entire Agreement shall not be affected thereby.

Sincerely,

**PALAMEDRIX, INC.**

By: _____
3E69D869DAC1479...

Michael Shane Bowen
President

**AGREED AND ACCEPTED:**

**By: Ant House Advisors LLC**

By: _____
B4D8C8F7913A4C4...

Name: Michael Antonov
Title: Manager

4824-0593-0197 v.1

# EXHIBIT K

Finance Home    Watchlists    My Portfolio    Crypto    Yahoo Finance Plus **yf**    News    Screeners    Markets    •••    **yahoo!** finance    Upgrade now

---

**SomaLogic, Inc. (SLGC)**
NasdaqGM - NasdaqGM Real Time Price. Currency in USD

Follow

Quote Lookup

**2.1999**  +0.0699 (+3.28%)
As of 12:57PM EDT. Market open.

Summary    Company Insights **yf**    Chart    Conversations    Statistics    **Historical Data**    Profile    Financials    Analysis    Options    Holders    Sustainability

---

Time Period: Jul 24, 2022 - Dec 20, 2022 ⌄          Show: Historical Prices ⌄          Frequency: Daily ⌄

Apply

Currency in USD                                                                                               ⬇ Download

| Date | Open | High | Low | Close* | Adj Close** | Volume |
|------|------|------|-----|--------|-------------|--------|
| Dec 20, 2022 | 2.1200 | 2.1850 | 2.0200 | 2.0500 | 2.0500 | 5,651,000 |
| Dec 19, 2022 | 2.2500 | 2.2800 | 2.0850 | 2.1400 | 2.1400 | 2,980,900 |
| Dec 16, 2022 | 2.3500 | 2.3600 | 2.2600 | 2.2600 | 2.2600 | 1,642,100 |
| Dec 15, 2022 | 2.3900 | 2.4100 | 2.3400 | 2.4000 | 2.4000 | 837,300 |
| Dec 14, 2022 | 2.4900 | 2.4900 | 2.3400 | 2.4200 | 2.4200 | 1,113,500 |
| Dec 13, 2022 | 2.6900 | 2.7500 | 2.4550 | 2.4700 | 2.4700 | 1,527,200 |
| Dec 12, 2022 | 2.6400 | 2.6600 | 2.5300 | 2.5500 | 2.5500 | 3,512,200 |
| Dec 09, 2022 | 2.7000 | 2.7700 | 2.6400 | 2.6500 | 2.6500 | 554,400 |
| Dec 08, 2022 | 2.6300 | 2.7700 | 2.5800 | 2.7200 | 2.7200 | 713,100 |
| Dec 07, 2022 | 2.5900 | 2.6800 | 2.5750 | 2.6200 | 2.6200 | 611,300 |
| Dec 06, 2022 | 2.6900 | 2.7430 | 2.5900 | 2.6300 | 2.6300 | 793,000 |
| Dec 05, 2022 | 2.8500 | 2.8800 | 2.6900 | 2.7000 | 2.7000 | 830,900 |
| Dec 02, 2022 | 2.7500 | 2.9400 | 2.6900 | 2.9000 | 2.9000 | 878,100 |
| Dec 01, 2022 | 2.8000 | 2.9400 | 2.8000 | 2.8200 | 2.8200 | 870,200 |
| Nov 30, 2022 | 2.7000 | 2.8000 | 2.6200 | 2.8000 | 2.8000 | 1,369,500 |
| Nov 29, 2022 | 2.6600 | 2.7250 | 2.6100 | 2.6500 | 2.6500 | 956,600 |
| Nov 28, 2022 | 2.8500 | 2.9200 | 2.6300 | 2.6400 | 2.6400 | 1,113,000 |
| Nov 25, 2022 | 2.7500 | 2.8700 | 2.7100 | 2.8500 | 2.8500 | 552,400 |
| Nov 23, 2022 | 2.8400 | 2.9100 | 2.7200 | 2.7400 | 2.7400 | 774,400 |
| Nov 22, 2022 | 3.3000 | 3.3000 | 2.7000 | 2.8100 | 2.8100 | 1,886,600 |
| Nov 21, 2022 | 3.1900 | 3.2250 | 2.8600 | 3.1700 | 3.1700 | 1,626,200 |
| Nov 18, 2022 | 2.8400 | 3.0300 | 2.7200 | 3.0100 | 3.0100 | 1,896,800 |
| Nov 17, 2022 | 2.6400 | 2.8000 | 2.6300 | 2.7600 | 2.7600 | 1,067,000 |

*Close price adjusted for splits.    **Adjusted close price adjusted for splits and dividend and/or capital gain distributions.



**COACH** OUTLET
SHOP NOW

**yahoo!** finance
**What's a strong buy today?**
Get expert stock picks built on data
Try 14 days free*

**yahoo!** finance
**NEW: EXPERIENCE OUR BEST CHARTS YET.**
Explore new charts

**People Also Watch**

| Symbol | Last Price | Change | % Change |
|--------|-----------|--------|----------|
| **ATAI** Atai Life Sciences N.V. | 1.2015 | +0.0315 | +2.69% |
| **QSI** Quantum-Si incorporated | 1.5900 | -0.0600 | -3.64% |
| **RXRX** Recursion Pharmaceuticals, Inc. | 6.84 | -0.14 | -2.08% |
| **MKFG** Markforged Holding Corporation | 0.9101 | +0.0049 | +0.54% |
| **VERV** Verve Therapeutics, Inc. | 14.84 | -0.38 | -2.50% |

**Similar to SLGC**

| Symbol | Last Price | Change | % Change |
|--------|-----------|--------|----------|
| **SLGCW** SomaLogic, Inc. | 0.2400 | -0.0004 | -0.17% |
| **WGS** | 0.3396 | -0.0440 | -11.4703% |

100

Finance Home  Watchlists  My Portfolio  Crypto  Yahoo Finance Plus  News  Screeners  Markets  ...

| Date | Open | High | Low | Close* | Adj Close** | Volume |
|------|------|------|-----|--------|-------------|--------|
| Nov 16, 2022 | 2.9100 | 2.9100 | 2.6700 | 2.6900 | 2.6900 | 1,414,300 |
| Nov 15, 2022 | 3.2200 | 3.2200 | 2.8400 | 2.9300 | 2.9300 | 2,388,800 |
| Nov 14, 2022 | 3.3000 | 3.3600 | 2.9300 | 3.1500 | 3.1500 | 1,718,700 |
| Nov 11, 2022 | 2.9600 | 3.3600 | 2.9100 | 3.2900 | 3.2900 | 2,600,400 |
| Nov 10, 2022 | 2.8700 | 3.1100 | 2.7300 | 2.9700 | 2.9700 | 3,206,300 |
| Nov 09, 2022 | 2.7300 | 2.7900 | 2.6900 | 2.6900 | 2.6900 | 664,700 |
| Nov 08, 2022 | 2.9100 | 2.9450 | 2.7400 | 2.7500 | 2.7500 | 1,192,400 |
| Nov 07, 2022 | 3.0000 | 3.0000 | 2.8850 | 2.9100 | 2.9100 | 730,100 |
| Nov 04, 2022 | 2.9500 | 3.0300 | 2.7900 | 3.0100 | 3.0100 | 1,050,800 |
| Nov 03, 2022 | 3.0000 | 3.1100 | 2.9500 | 2.9800 | 2.9800 | 511,200 |
| Nov 02, 2022 | 3.3800 | 3.3800 | 2.9900 | 3.1000 | 3.1000 | 1,193,100 |
| Nov 01, 2022 | 3.5200 | 3.5500 | 3.2200 | 3.3300 | 3.3300 | 810,900 |
| Oct 31, 2022 | 3.2500 | 3.4900 | 3.1500 | 3.4700 | 3.4700 | 1,869,600 |
| Oct 28, 2022 | 3.2000 | 3.3000 | 3.1000 | 3.3000 | 3.3000 | 716,100 |
| Oct 27, 2022 | 3.2700 | 3.2700 | 3.0600 | 3.1900 | 3.1900 | 1,018,100 |
| Oct 26, 2022 | 3.0800 | 3.2500 | 3.0200 | 3.2000 | 3.2000 | 737,500 |
| Oct 25, 2022 | 2.8500 | 3.1300 | 2.8000 | 3.0900 | 3.0900 | 1,346,300 |
| Oct 24, 2022 | 2.8200 | 2.8350 | 2.7000 | 2.8000 | 2.8000 | 586,900 |
| Oct 21, 2022 | 2.7900 | 2.8600 | 2.6550 | 2.8200 | 2.8200 | 987,700 |
| Oct 20, 2022 | 2.7200 | 2.9400 | 2.7150 | 2.7700 | 2.7700 | 921,100 |
| Oct 19, 2022 | 2.8000 | 2.8000 | 2.6250 | 2.7300 | 2.7300 | 1,399,300 |
| Oct 18, 2022 | 2.9500 | 3.0550 | 2.8200 | 2.8400 | 2.8400 | 1,346,400 |
| Oct 17, 2022 | 2.7500 | 2.8950 | 2.7450 | 2.8800 | 2.8800 | 963,400 |
| Oct 14, 2022 | 2.9400 | 2.9400 | 2.7100 | 2.7400 | 2.7400 | 774,500 |
| Oct 13, 2022 | 2.7500 | 2.9500 | 2.6650 | 2.8800 | 2.8800 | 1,178,200 |
| Oct 12, 2022 | 2.7300 | 2.8300 | 2.6850 | 2.8200 | 2.8200 | 757,000 |
| Oct 11, 2022 | 2.8200 | 2.8700 | 2.6700 | 2.7200 | 2.7200 | 1,164,400 |
| Oct 10, 2022 | 3.0100 | 3.0100 | 2.8370 | 2.8500 | 2.8500 | 571,200 |
| Oct 07, 2022 | 3.1000 | 3.1300 | 2.9500 | 3.0100 | 3.0100 | 1,017,900 |
| Oct 06, 2022 | 3.1800 | 3.2900 | 3.0600 | 3.1600 | 3.1600 | 665,300 |
| Oct 05, 2022 | 3.2000 | 3.2500 | 3.1200 | 3.2200 | 3.2200 | 1,207,900 |
| Oct 04, 2022 | 3.1500 | 3.3500 | 3.1100 | 3.2400 | 3.2400 | 1,669,900 |
| Oct 03, 2022 | 2.9800 | 3.1400 | 2.8400 | 3.0700 | 3.0700 | 1,701,200 |
| Sep 30, 2022 | 2.9500 | 3.0600 | 2.9000 | 2.9000 | 2.9000 | 1,440,000 |
| Sep 29, 2022 | 3.1000 | 3.1000 | 2.9000 | 2.9700 | 2.9700 | 1,890,400 |
| Sep 28, 2022 | 3.0900 | 3.1900 | 2.9600 | 3.1600 | 3.1600 | 2,399,700 |

*Close price adjusted for splits.  **Adjusted close price adjusted for splits and dividend and/or capital gain distributions.

**TXG** 50.20 +1.44 +2.95%
10x Genomics, Inc.

**SOPH** 4.4000 +0.2200 +5.26%
SOPHiA GENETICS SA

**ACCD** 12.91 +0.95 +7.94%
Accolade, Inc.

Data Disclaimer  Help  Suggestions
Terms and Privacy Policy
Your Privacy Choices
CA Privacy Notice
About Our Ads  Sitemap

© 2023 Yahoo. All rights reserved.

101

| Sep 27, 2022 | 2.9500 | 3.0200 | 2.8600 | 2.9700 | 2.9700 | 2,179,800 |
| Sep 26, 2022 | 2.9600 | 2.9700 | 2.8450 | 2.9000 | 2.9000 | 2,297,500 |
| Sep 23, 2022 | 3.0700 | 3.0800 | 2.9300 | 3.0000 | 3.0000 | 1,666,600 |
| Sep 22, 2022 | 3.2000 | 3.2300 | 3.0800 | 3.1100 | 3.1100 | 1,324,200 |
| Sep 21, 2022 | 3.3600 | 3.3650 | 3.2000 | 3.2200 | 3.2200 | 1,459,900 |
| Sep 20, 2022 | 3.3600 | 3.4200 | 3.3100 | 3.3500 | 3.3500 | 1,127,000 |
| Sep 19, 2022 | 3.4400 | 3.4500 | 3.3300 | 3.4100 | 3.4100 | 1,335,900 |
| Sep 16, 2022 | 3.7000 | 3.7000 | 3.4200 | 3.4900 | 3.4900 | 1,289,700 |
| Sep 15, 2022 | 3.7500 | 3.8690 | 3.7050 | 3.7300 | 3.7300 | 865,600 |
| Sep 14, 2022 | 3.7500 | 3.8300 | 3.6950 | 3.7800 | 3.7800 | 579,500 |
| Sep 13, 2022 | 3.8800 | 3.9450 | 3.7900 | 3.7900 | 3.7900 | 722,700 |
| Sep 12, 2022 | 3.9300 | 4.0600 | 3.9200 | 4.0400 | 4.0400 | 518,900 |
| Sep 09, 2022 | 3.9000 | 4.0800 | 3.8500 | 3.9800 | 3.9800 | 875,800 |
| Sep 08, 2022 | 3.6000 | 3.9200 | 3.5400 | 3.8800 | 3.8800 | 873,300 |
| Sep 07, 2022 | 3.4900 | 3.6700 | 3.4700 | 3.6500 | 3.6500 | 626,700 |
| Sep 06, 2022 | 3.5100 | 3.5650 | 3.4600 | 3.5100 | 3.5100 | 1,121,500 |
| Sep 02, 2022 | 3.7400 | 3.7400 | 3.4450 | 3.5100 | 3.5100 | 1,280,200 |
| Sep 01, 2022 | 3.6500 | 3.6900 | 3.5050 | 3.6800 | 3.6800 | 1,054,500 |
| Aug 31, 2022 | 3.7100 | 3.8100 | 3.6350 | 3.6800 | 3.6800 | 884,100 |
| Aug 30, 2022 | 3.8500 | 3.9000 | 3.6500 | 3.7000 | 3.7000 | 1,253,600 |
| Aug 29, 2022 | 3.8500 | 3.9100 | 3.8100 | 3.8300 | 3.8300 | 1,036,700 |
| Aug 26, 2022 | 4.0600 | 4.1200 | 3.8950 | 3.9100 | 3.9100 | 1,285,800 |
| Aug 25, 2022 | 3.8400 | 4.1000 | 3.8400 | 4.0900 | 4.0900 | 1,001,900 |
| Aug 24, 2022 | 3.7200 | 3.8850 | 3.7000 | 3.8200 | 3.8200 | 988,800 |
| Aug 23, 2022 | 3.7700 | 3.8250 | 3.7200 | 3.7200 | 3.7200 | 2,351,600 |
| Aug 22, 2022 | 3.8000 | 3.8500 | 3.7400 | 3.8200 | 3.8200 | 1,941,100 |
| Aug 19, 2022 | 4.0000 | 4.0300 | 3.8050 | 3.8500 | 3.8500 | 3,249,200 |
| Aug 18, 2022 | 4.0300 | 4.1350 | 3.9800 | 4.0900 | 4.0900 | 1,383,300 |
| Aug 17, 2022 | 4.3200 | 4.3200 | 4.0200 | 4.0600 | 4.0600 | 3,890,100 |
| Aug 16, 2022 | 3.7200 | 4.3800 | 3.6500 | 4.2500 | 4.2500 | 4,050,400 |
| Aug 15, 2022 | 4.3800 | 4.4600 | 4.1100 | 4.1300 | 4.1300 | 3,425,600 |
| Aug 12, 2022 | 4.4200 | 4.6100 | 4.2500 | 4.4300 | 4.4300 | 2,593,300 |
| Aug 11, 2022 | 4.3100 | 4.7300 | 4.3100 | 4.4100 | 4.4100 | 2,210,700 |
| Aug 10, 2022 | 4.1000 | 4.3100 | 4.0000 | 4.3000 | 4.3000 | 4,918,200 |
| Aug 09, 2022 | 4.6100 | 4.6850 | 3.9200 | 3.9700 | 3.9700 | 3,972,000 |
| Aug 08, 2022 | 5.1200 | 5.1500 | 4.6000 | 4.6100 | 4.6100 | 1,871,200 |

102

*Close price adjusted for splits.    **Adjusted close price adjusted for splits and dividend and/or capital gain distributions.

| Aug 05, 2022 | 4.8900 | 5.1500 | 4.8250 | 5.0900 | 5.0900 | 847,000 |
| Aug 04, 2022 | 4.9800 | 5.0400 | 4.9010 | 4.9800 | 4.9800 | 899,800 |
| Aug 03, 2022 | 4.9300 | 5.0800 | 4.8800 | 4.9700 | 4.9700 | 1,343,500 |
| Aug 02, 2022 | 4.8300 | 4.9800 | 4.7900 | 4.8200 | 4.8200 | 1,087,000 |
| Aug 01, 2022 | 4.9900 | 5.0800 | 4.7950 | 4.8500 | 4.8500 | 790,500 |
| Jul 29, 2022 | 5.1100 | 5.1400 | 4.9900 | 5.0500 | 5.0500 | 651,700 |
| Jul 28, 2022 | 5.1800 | 5.1900 | 5.0000 | 5.1500 | 5.1500 | 751,500 |
| Jul 27, 2022 | 5.0200 | 5.1850 | 4.9100 | 5.1500 | 5.1500 | 728,400 |
| Jul 26, 2022 | 4.7600 | 5.0900 | 4.7050 | 4.9600 | 4.9600 | 864,800 |
| Jul 25, 2022 | 4.7900 | 4.8200 | 4.6700 | 4.8100 | 4.8100 | 495,200 |

*Close price adjusted for splits.      **Adjusted close price adjusted for splits and dividend and/or capital gain distributions.

# EXHIBIT L

# ELLIS GEORGE CIPOLLONE

### ELLIS GEORGE CIPOLLONE O'BRIEN ANNAGUEY LLP

1155 F Street, NW
Suite 750
Washington, DC 20004

John V. Coghlan
202.269.6639
jcoghlan@egcfirm.com

February 21, 2023

**Via E-Mail**

Ruben Gutierrez
General Counsel
SomaLogic, Inc.

> Re:   Compensation for Palamedrix SAFE Note Holders Following SomaLogic
>        Acquisition

Dear Ruben:

I am writing on behalf of my clients, Formic Ventures LLC, Michael Antonov Charitable Foundation, Beofund LLC, and Metaplanet Holdings OU, in response to your February 3, 2023 e-mail, in which you provided a summary of SomaLogic's acquisition of Palamedrix ("Merger") and the consequences it had for holders of Palamedrix SAFE Notes ("Transaction Summary"). As you know, my clients are concerned that they have not been compensated following the Merger in accordance with the terms of their SAFE Notes.

Unfortunately, the Transaction Summary does not address my clients' concerns. In exchange for their investment in Palamedrix, each of my clients' SAFE Notes entitled them to guaranteed compensation. Specifically, each of their SAFE Notes entitled them "to receive a portion of Proceeds, due and payable to the Investor immediately prior to, or concurrent with, the consummation of [a] Liquidity Event." A Liquidity Event, as defined by the notes, includes a change of control of Palamedrix, as occurred in SomaLogic's acquisition here. Based on my clients' notes, they were entitled to receive compensation which, depending on each individual note, would either be (i) the purchase price of the note or (ii) 1.4 times the purchase price of the note.

The Transaction Summary you provided explains that the delay in releasing the stock was due to the form of compensation, namely the SomaLogic common stock component of the compensation that was "restricted" stock under the U.S. Securities Law. While we do not dispute that SomaLogic was able to choose the form of compensation to SAFE Note holders (including a combination of cash and stock), SomaLogic was still obligated to provide my clients with their compensation "immediately prior to, or concurrent with" the Merger. To the extent SomaLogic chose "restricted" stock, which by its nature could not be "payable to the Investor immediately prior to, or concurrent with" the Merger, SomaLogic has violated the clear terms of

ELLIS GEORGE CIPOLLONE
O'BRIEN ANNAGUEY LLP

Ruben Gutierrez
February 21, 2023
Page 2

the SAFE Notes.  Nothing in the July 25, 2022 Merger Agreement or any other document modified this operative language from my clients' SAFE Notes.

Unfortunately, my client's concerns following the Merger are not simply limited to SomaLogic's choice of restricted stock.  The Transaction Summary makes clear that, upon receipt of (i) a signed "letter of representations approved by the transfer agent," and (ii) transfer instructions for their brokerage account to the transfer agent, "the transfer agent usually removes the restrictive legend same-day or the following day, and  at that point shares can be transferred subject to the representations in the letter of representations."  My clients, however, have yet to have any stock restrictions lifted despite each of them providing both of these items and being in regular contact with SomaLogic.  While I do not suggest that my clients are entitled to anything less than the full compensation due under the terms of their SAFE Notes, that they have not been able to recover *any* stock to date despite diligently working with SomaLogic only further suggests that SomaLogic is not making Palamedrix Securityholders a priority.

I welcome the opportunity to discuss the matter further with you to hopefully reach a resolution that ensures my clients are compensated in accordance with the terms of their SAFE notes.  Please let me know when you would be available to chat in the next week.

Sincerely,

John V. Coghlan

JVC:JVC

# EXHIBIT B

| Attorney or Party without Attorney: | | For Court Use Only |
|---|---|---|
| Keith J. Wesley (SBN 229276)<br>ELLIS GEORGE CIPOLLONE O'BRIEN ANNAGUEY LLP<br>2121 Avenue of the Stars, Suite 2800<br>Los Angeles, California 90067<br>  *Telephone No:*  (310) 274-7100 | | **ELECTRONICALLY**<br>**F I L E D**<br>*Superior Court of California,*<br>*County of San Francisco* |
|   *Attorney For:*  Plaintiff | *Ref. No. or File No.:* | **04/03/2023**<br>**Clerk of the Court**<br>BY: YOLANDA TABO |

*Insert name of Court, and Judicial District and Branch Court:*
SUPERIOR COURT OF THE STATE OF CALIFORNIA
COUNTY OF SAN FRANCISCO

*Plaintiff:*  FORMIC VENTURES, LLC, et al.
*Defendant:*  SOMALOGIC, INC., PALAMEDRIX, INC., et al.

| **PROOF OF SERVICE**<br>**SUMMONS** | *Hearing Date:* | *Time:* | *Dept/Div:* | *Case Number:*<br>CGC-23-605398 |
|---|---|---|---|---|

1.  *At the time of service I was at least 18 years of age and not a party to this action.*

2.  I served copies of the Summons; Complaint; Civil Case Cover Sheet; Notice to Plaintiff; Alternative Dispute Resolution Information Package

3.  *a.*  *Party served:*      SOMALOGIC, INC.
    *b.*  *Person served:*   Robin Hutt-Banks, The Corporation Trust Company, Registered Agent

4.  *Address where the party was served:*   1209 Orange St, Wilmington, DE 19801

5.  *I served the party:*
    a. **by personal service.**   I personally delivered the documents listed in item 2 to the party or person authorized to receive service of process for the party (1) on *(date)*: Thu, Mar 30 2023 (2) at *(time)*: 09:11 AM

    (1)  [X]  **(business)**
    (2)  [ ]  **(home)**
    (3)  [ ]  **(other)** :

6.  The "Notice to the Person Served" (on the summons) was completed as follows:
    a.  [ ]   as an individual defendant.
    b.  [ ]   as the person sued under the fictitious name of *(specify)*:
    c.  [ ]   as occupant.
    d.  [X]   On behalf of *(specify)*:   SOMALOGIC, INC.
        under the following Code of Civil Procedure section:

| | |
|---|---|
| [X] 416.10 (corporation) | [ ] 415.95 (business organization, form unknown) |
| [ ] 416.20 (defunct corporation) | [ ] 416.60 (minor) |
| [ ] 416.30 (joint stock company/association) | [ ] 416.70 (ward or conservatee) |
| [ ] 416.40 (association or partnership) | [ ] 416.90 (authorized person) |
| [ ] 416.50 (public entity) | [ ] 415.46 (occupant) |
| [ ] other: | |

Judicial Council Form POS-010
Rule 2.150.(a)&(b) Rev January 1, 2007

PROOF OF
SERVICE
SUMMONS 108

8624825
(5272504)
Page 1 of 2

| Attorney or Party without Attorney:<br>Keith J. Wesley (SBN 229276)<br>ELLIS GEORGE CIPOLLONE O'BRIEN ANNAGUEY LLP<br>2121 Avenue of the Stars, Suite 2800<br>Los Angeles, California 90067<br>  Telephone No:  (310) 274-7100 | | For Court Use Only |
|---|---|---|
|   Attorney For:  Plaintiff | Ref. No. or File No.: | |
| Insert name of Court, and Judicial District and Branch Court:<br>SUPERIOR COURT OF THE STATE OF CALIFORNIA<br>COUNTY OF SAN FRANCISCO | | |
| Plaintiff:  FORMIC VENTURES, LLC, et al.<br>Defendant:  SOMALOGIC, INC., PALAMEDRIX, INC., et al. | | |

| PROOF OF SERVICE<br>SUMMONS | Hearing Date: | Time: | Dept/Div: | Case Number:<br>CGC-23-605398 |
|---|---|---|---|---|

Recoverable cost Per CCP 1033.5(a)(4)(B)

7.  **Person who served papers**
   a.  Name:         Robert Lougheed
   b.  Address:       **FIRST LEGAL**
               1517 W. Beverly Blvd.
               LOS ANGELES, CA 90026
   c.  Telephone number:   (213) 250-1111
   d.  **The fee** for service was:   $436.65
   e.  I am:
       (1)  [X]  not a registered California process server.
       (2)  [ ]  exempt from registration under Business and Professions Code section 22350(b).
       (3)  [ ]  a registered California process server:
           (i)  [ ] owner  [ ] employee  [ ] independent contractor
           (ii)  Registration No:
           (iii)  County:

8.  *I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.*

              03/30/2023                              Robert Lougheed
                (Date)

Judicial Council Form POS-010
Rule 2.150.(a)&(b) Rev January 1, 2007

PROOF OF
SERVICE 109
SUMMONS

8624825
(5272504)
Page 2 of 2

# EXHIBIT C

CIV-110

| | |
|---|---|
| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):*<br>George B. A. Laiolo (SBN 329850)<br>Ellis George Cipollone O'Brien Annaguey LLP<br>44 Montgomery Street, Suite 1280<br>San Francisco, CA 94104<br>TELEPHONE NO.: 415-391-7100   FAX NO. *(Optional):*<br>E-MAIL ADDRESS *(Optional):* glaiolo@egcfirm.com<br>ATTORNEY FOR *(Name):* Plaintiffs | FOR COURT USE ONLY |

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF San Francisco**
STREET ADDRESS: 400 McAllister Street
MAILING ADDRESS: 400 McAllister Street
CITY AND ZIP CODE: San Francisco, 94102
BRANCH NAME: Civic Center Courthouse

PLAINTIFF/PETITIONER: FORMIC VENTURES, LLC

DEFENDANT/RESPONDENT: SOMALOGIC, INC., et al.

| REQUEST FOR DISMISSAL | CASE NUMBER: CGC-23-605398 |
|---|---|

**A conformed copy will not be returned by the clerk unless a method of return is provided with the document.**

**This form may not be used for dismissal of a derivative action or a class action or of any party or cause of action in a class action. (Cal. Rules of Court, rules 3.760 and 3.770.)**

1. TO THE CLERK: Please **dismiss** this action as follows:
    a. (1) ☐ With prejudice   (2) ☒ Without prejudice
    b. (1) ☒ Complaint   (2) ☐ Petition
       (3) ☐ Cross-complaint filed by *(name):*   on *(date):*
       (4) ☐ Cross-complaint filed by *(name):*   on *(date):*
       (5) ☐ Entire action of all parties and all causes of action
       (6) ☒ Other *(specify):** As to Palamedrix, Inc., only, with each side to bear it's own fees and costs.
2. *(Complete in all cases except family law cases.)*
    The court ☐ did  ☒ did not waive court fees and costs for a party in this case. *(This information may be obtained from the clerk. If court fees and costs were waived, the declaration on the back of this form must be completed).*

Date: May 5, 2023

George B. A. Laiolo
_____
(TYPE OR PRINT NAME OF ☒ ATTORNEY ☐ PARTY WITHOUT ATTORNEY)
*If dismissal requested is of specified parties only of specified causes of action only, or of specified cross-complaints only, so state and identify the parties, causes of action, or cross-complaints to be dismissed.

▶ _____
(SIGNATURE)

Attorney or party without attorney for:
☒ Plaintiff/Petitioner   ☐ Defendant/Respondent
☐ Cross–Complainant

**TO THE CLERK:** Consent to the above dismissal is hereby given.**
Date:

_____
(TYPE OR PRINT NAME OF ☐ ATTORNEY ☐ PARTY WITHOUT ATTORNEY)
** If a cross-complaint – or Response (Family Law) seeking affirmative relief – is on file, the attorney for cross-complainant (respondent) must sign this consent if required by Code of Civil Procedure section 581 (i) or (j).

▶ _____
(SIGNATURE)

Attorney or party without attorney for:
☐ Plaintiff/Petitioner   ☐ Defendant/Respondent
☐ Cross–Complainant

*(To be completed by clerk)*
4. ☐ Dismissal entered as requested on *(date):*
5. ☐ Dismissal entered on *(date):*   as to only *(name):*
6. ☐ Dismissal **not entered** as requested for the following reasons *(specify):*

7. a. ☐ Attorney or party without attorney notified on *(date):*
    b. ☐ Attorney or party without attorney not notified. Filing party failed to provide
       ☐ a copy to be conformed   ☐ means to return conformed copy
    Date: _____   Clerk, by _____, Deputy

Page 1 of 2

Form Adopted for Mandatory Use
Judicial Council of California
CIV-110 [Rev. Jan. 1, 2013]

**REQUEST FOR DISMISSAL**

Code of Civil Procedure, § 581 et seq.;
Gov. Code, § 68637(c); Cal. Rules of Court, rule 3.1390
*www.courts.ca.gov*

CIV-110

| PLAINTIFF/PETITIONER: FORMIC VENTURES, LLC | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT: SOMALOGIC, INC., et al. | CGC-23-605398 |

**COURT'S RECOVERY OF WAIVED COURT FEES AND COSTS**

If a party whose court fees and costs were initially waived has recovered or will recover $10,000 or more in value by way of settlement, compromise, arbitration award, mediation settlement, or other means, the court has a statutory lien on that recovery. The court may refuse to dismiss the case until the lien is satisfied. (Gov. Code, § 68637.)

## Declaration Concerning Waived Court Fees

1. The court waived court fees and costs in this action for *(name):*

2. The person named in item 1 is (*check one below*):
   a. ☐  not recovering anything of value by this action.
   b. ☐  recovering less than $10,000 in value by this action.
   c. ☐  recovering $10,000 or more in value by this action. *(If item 2c is checked, item 3 must be completed.)*

3. ☐  All court fees and court costs that were waived in this action have been paid to the court *(check one):*  ☐ Yes  ☐ No

I declare under penalty of perjury under the laws of the State of California that the information above is true and correct.

Date: _____

_____

(TYPE OR PRINT NAME OF ☐ ATTORNEY ☐ PARTY MAKING DECLARATION)

▶ _____

(SIGNATURE)

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**PROOF OF SERVICE**

*Formic Ventures, LLC v. Somalogic, Inc., et al.*
**Case No. CGC-23-605398**

**STATE OF CALIFORNIA, COUNTY OF SAN FRANCISCO**

At the time of service, I was over 18 years of age and not a party to this action. I am employed in the County of San Francisco, State of California. My business address is 44 Montgomery Street, Suite 1280, San Francisco, CA 94104.

On May 5, 2023, I served a true copy of the documents described as **REQUEST FOR DISMISSAL** on the interested parties in this action as follows:

HUESTON HENNIGAN LLP
Moez M. Kaba (SBN 257456)
mkaba@hueston.com
Cassidy M. O'Sullivan (SBN 340492)
cosullivan@hueston.com
523 West 6th Street, Suite 400
Los Angeles, CA 90014
Phone: (213) 788-4340
Fax: (888) 775-0898

Counsel for Defendants
SomaLogic, Inc. and Palamedrix, Inc.

**BY E-MAIL OR ELECTRONIC TRANSMISSION:** On May 5, 2023, I caused a copy of the documents to be sent from e-mail address nward@egcfirm.com to the persons at the e-mail addresses listed below. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on May 5, 2023, at San Francisco, California.

*Nancie Ward*
Nancie Ward

# EXHIBIT D

CIV-110

| | |
|---|---|
| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):*<br>George B. A. Laiolo (SBN 329850)<br>Ellis George Cipollone O'Brien Annaguey LLP<br>44 Montgomery Street, Suite 1280<br>San Francisco, CA 94104<br>TELEPHONE NO.: 415-391-7100     FAX NO. *(Optional):*<br>E-MAIL ADDRESS *(Optional):* glaiolo@egcfirm.com<br>ATTORNEY FOR *(Name):* Plaintiffs | *FOR COURT USE ONLY*<br><br>**ELECTRONICALLY**<br>**F I L E D**<br>*Superior Court of California,*<br>*County of San Francisco*<br><br>**05/05/2023**<br>**Clerk of the Court**<br>**BY: VERA MU**<br>**Deputy Clerk** |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF **San Francisco**
STREET ADDRESS: 400 McAllister Street
MAILING ADDRESS: 400 McAllister Street
CITY AND ZIP CODE: San Francisco, 94102
BRANCH NAME: Civic Center Courthouse

PLAINTIFF/PETITIONER: FORMIC VENTURES, LLC

DEFENDANT/RESPONDENT: SOMALOGIC, INC., et al.

| | |
|---|---|
| **REQUEST FOR DISMISSAL** | CASE NUMBER: CGC-23-605398 |

**A conformed copy will not be returned by the clerk unless a method of return is provided with the document.**

**This form may not be used for dismissal of a derivative action or a class action or of any party or cause of action in a class action. (Cal. Rules of Court, rules 3.760 and 3.770.)**

1. TO THE CLERK: Please **dismiss** this action as follows:
   a. (1) ☐ With prejudice    (2) ☒ Without prejudice
   b. (1) ☒ Complaint    (2) ☐ Petition
      (3) ☐ Cross-complaint filed by *(name):*             on *(date):*
      (4) ☐ Cross-complaint filed by *(name):*             on *(date):*
      (5) ☐ Entire action of all parties and all causes of action
      (6) ☒ Other *(specify):** As to Palamedrix, Inc., only, with each side to bear it's own fees and costs.
2. *(Complete in all cases except family law cases.)*
   The court ☐ did ☒ did not waive court fees and costs for a party in this case. *(This information may be obtained from the clerk. If court fees and costs were waived, the declaration on the back of this form must be completed).*

Date: May 5, 2023

George B. A. Laiolo
(TYPE OR PRINT NAME OF ☒ ATTORNEY ☐ PARTY WITHOUT ATTORNEY)

▶ *(signature)*

(SIGNATURE)

*If dismissal requested is of specified parties only of specified causes of action only, or of specified cross-complaints only, so state and identify the parties, causes of action, or cross-complaints to be dismissed.

Attorney or party without attorney for:
☒ Plaintiff/Petitioner    ☐ Defendant/Respondent
☐ Cross–Complainant

**TO THE CLERK:** Consent to the above dismissal is hereby given.**
Date:

(TYPE OR PRINT NAME OF ☐ ATTORNEY ☐ PARTY WITHOUT ATTORNEY)

▶

(SIGNATURE)

** If a cross-complaint – or Response (Family Law) seeking affirmative relief – is on file, the attorney for cross-complainant (respondent) must sign this consent if required by Code of Civil Procedure section 581 (i) or (j).

Attorney or party without attorney for:
☐ Plaintiff/Petitioner    ☐ Defendant/Respondent
☐ Cross–Complainant

*(To be completed by clerk)*
4. ☐ Dismissal entered as requested on *(date):*
5. ☐ Dismissal entered on *(date):*       as to only *(name):*
6. ☐ Dismissal **not entered** as requested for the following reasons *(specify):*

**DISMISSAL ENTERED**
**05/05/2023**
**By: VERA MU**
**Deputy Clerk**

7. a. ☐ Attorney or party without attorney notified on *(date):*
   b. ☐ Attorney or party without attorney not notified. Filing party failed to provide
      ☐ a copy to be conformed ☐ means to return conformed copy
   Date:         Clerk, by _____, Deputy

| | | |
|---|---|---|
| Form Adopted for Mandatory Use<br>Judicial Council of California<br>CIV-110 [Rev. Jan. 1, 2013] | **REQUEST FOR DISMISSAL** | Page 1 of 2<br>Code of Civil Procedure, § 581 et seq.;<br>Gov. Code, § 68637(c); Cal. Rules of Court, rule 3.1390<br>*www.courts.ca.gov* |

CIV-110

| PLAINTIFF/PETITIONER: FORMIC VENTURES, LLC | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT: SOMALOGIC, INC., et al. | CGC-23-605398 |

---

**COURT'S RECOVERY OF WAIVED COURT FEES AND COSTS**

If a party whose court fees and costs were initially waived has recovered or will recover $10,000 or more in value by way of settlement, compromise, arbitration award, mediation settlement, or other means, the court has a statutory lien on that recovery. The court may refuse to dismiss the case until the lien is satisfied. (Gov. Code, § 68637.)

---

## Declaration Concerning Waived Court Fees

1. The court waived court fees and costs in this action for *(name):*

2. The person named in item 1 is (*check one below):*
   a. ☐  not recovering anything of value by this action.
   b. ☐  recovering less than $10,000 in value by this action.
   c. ☐  recovering $10,000 or more in value by this action. *(If item 2c is checked, item 3 must be completed.)*

3. ☐  All court fees and court costs that were waived in this action have been paid to the court *(check one):* ☐ Yes   ☐ No

I declare under penalty of perjury under the laws of the State of California that the information above is true and correct.

Date: _____

_____          ▶  _____
(TYPE OR PRINT NAME OF ☐ ATTORNEY ☐ PARTY MAKING DECLARATION)                    (SIGNATURE)

**PROOF OF SERVICE**

*Formic Ventures, LLC v. Somalogic, Inc., et al.*
Case No. CGC-23-605398

**STATE OF CALIFORNIA, COUNTY OF SAN FRANCISCO**

At the time of service, I was over 18 years of age and not a party to this action. I am employed in the County of San Francisco, State of California. My business address is 44 Montgomery Street, Suite 1280, San Francisco, CA 94104.

On May 5, 2023, I served a true copy of the documents described as **REQUEST FOR DISMISSAL** on the interested parties in this action as follows:

HUESTON HENNIGAN LLP
Moez M. Kaba (SBN 257456)
mkaba@hueston.com
Cassidy M. O'Sullivan (SBN 340492)
cosullivan@hueston.com
523 West 6th Street, Suite 400
Los Angeles, CA 90014
Phone: (213) 788-4340
Fax: (888) 775-0898

Counsel for Defendants
SomaLogic, Inc. and Palamedrix, Inc.

**BY E-MAIL OR ELECTRONIC TRANSMISSION:** On May 5, 2023, I caused a copy of the documents to be sent from e-mail address nward@egcfirm.com to the persons at the e-mail addresses listed below. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on May 5, 2023, at San Francisco, California.

Nancie Ward

THE SUPERIOR COURT OF CALIFORNIA
COUNTY OF SAN FRANCISCO

Case Number: CGC23605398
Title: FORMIC VENTURES, LLC ET AL VS. SOMALOGIC, INC. ET AL
Cause of Action: CONTRACT/WARRANTY
Generated: 2023-05-25 10:16 pm

Register of Actions    Parties    Attorneys    Calendar    Payments    Documents

**Please Note: The "View" document links on this web page are valid until 10:26:23 pm**
After that, please refresh your web browser. (by pressing Command +R for Mac, pressing F5 for Windows or clicking the refresh button on your web browser)

# Register of Actions

Show [ All ⌄ ] entries                                                      Search: [                    ]

| Date | Proceedings | Document | Fee |
|---|---|---|---|
| 2023-03-24 | CONTRACT/WARRANTY, COMPLAINT (TRANSACTION ID # 210032119) FILED BY PLAINTIFF FORMIC VENTURES, LLC THE MICHAEL ANTONOV CHARITABLE FOUNDATION, INC. BEOFUND LLC METAPLANET HOLDINGS OU AS TO DEFENDANT SOMALOGIC, INC. PALAMEDRIX, INC. DOES 1-10 NO SUMMONS ISSUED, JUDICIAL COUNCIL CIVIL CASE COVER SHEET NOT FILED CASE MANAGEMENT CONFERENCE SCHEDULED FOR AUG-23-2023 PROOF OF SERVICE DUE ON MAY-23-2023 CASE MANAGEMENT STATEMENT DUE ON JUL-31-2023 | View | $435.00 |
| 2023-03-24 | CIVIL CASE COVERSHEET FILED (TRANSACTION ID # 210032119) FILED BY PLAINTIFF FORMIC VENTURES, LLC THE MICHAEL ANTONOV CHARITABLE FOUNDATION, INC. BEOFUND LLC METAPLANET HOLDINGS OU | View | |
| 2023-03-24 | NOTICE TO PLAINTIFF | View | |
| 2023-03-24 | SUMMONS ISSUED (TRANSACTION ID # 210032119) TO PLAINTIFF FORMIC VENTURES, LLC THE MICHAEL ANTONOV CHARITABLE FOUNDATION, INC. BEOFUND LLC METAPLANET HOLDINGS OU | View | |
| 2023-04-03 | SUMMONS ON COMPLAINT (TRANSACTION ID # 210032796), PROOF OF SERVICE ONLY, FILED BY PLAINTIFF FORMIC VENTURES, LLC THE MICHAEL ANTONOV CHARITABLE FOUNDATION, INC. BEOFUND LLC METAPLANET HOLDINGS OU SERVED MAR-30-2023, PERSONAL SERVICE AS TO DEFENDANT SOMALOGIC, INC. | View | |
| 2023-04-03 | SUMMONS ON COMPLAINT (TRANSACTION ID # 210032797), PROOF OF SERVICE ONLY, FILED BY PLAINTIFF FORMIC VENTURES, LLC THE MICHAEL ANTONOV CHARITABLE FOUNDATION, INC. BEOFUND LLC METAPLANET HOLDINGS OU SERVED MAR-30-2023, PERSONAL SERVICE AS TO DEFENDANT PALAMEDRIX, INC. | View | |
| 2023-04-10 | MOTION TO ADMIT COUNSEL PRO HAC VICE, DECLARATION ATTY. JOHN V. COGHLAN (TRANSACTION ID # 210033554) FILED BY PLAINTIFF FORMIC VENTURES, LLC THE MICHAEL ANTONOV CHARITABLE FOUNDATION, INC. BEOFUND LLC METAPLANET HOLDINGS OU HEARING SET FOR MAY-04-2023 AT 09:30 AM IN DEPT 302 | View | $500.00 |
| 2023-04-10 | DECLARATION OF GEORGE B. A. LAIOLO IN SUPPORT OF THE APPLICATION OF JOHN V. COGHLAN TO APPEAR PRO HAC VICE (TRANSACTION ID # 210033554) FILED BY PLAINTIFF FORMIC VENTURES, LLC THE MICHAEL ANTONOV CHARITABLE FOUNDATION, INC. BEOFUND LLC METAPLANET HOLDINGS OU | View | |
| 2023-04-10 | PROOF OF SERVICE BY ELECTRONIC MAIL (TRANSACTION ID # 210033554) FILED BY PLAINTIFF FORMIC VENTURES, LLC THE MICHAEL ANTONOV CHARITABLE FOUNDATION, INC. BEOFUND LLC METAPLANET HOLDINGS OU | View | |
| 2023-04-11 | FEE PAID ON: JOINT STIPULATION AND [PROPOSED] ORDER EXTENDING TIME FOR A RESPONSIVE PLEADING (TRANSACTION ID # 100196528) FILED BY DEFENDANT SOMALOGIC, INC. PALAMEDRIX, INC. | | $870.00 |
| 2023-04-20 | ORDER - JOINT STIPULATION AND ORDER EXTENDING TIME FOR A RESPONSIVE PLEADING TO 5-31-23 | View | |
| 2023-05-04 | MINI MINUTES FOR MAY-04-2023 09:30 AM FOR DEPT 302 | | |
| 2023-05-04 | ORDER GRANTING APPLICATION TO APPEAR AS COUNSEL PRO HAC VICE FOR ATTORNEY JOHN V. COGHLAN FILED BY COUNSEL FOR PLAINTIFF FORMIC VENTURES, LLC THE MICHAEL ANTONOV CHARITABLE FOUNDATION, INC. BEOFUND LLC METAPLANET HOLDINGS OU | View | |
| 2023-05-04 | LAW & MOTION, DEPT. 302, AS TO THE MAY-04-2023 HEARING RE: PLAINTIFFS FORMIC VENTURES, LLC, THE MICHAEL ANTONOV CHARITABLE FOUNDATION, INC., BEOFUND LLC, AND METAPLANET HOLDINGS OU'S MOTION TO ADMIT COUNSEL PRO HAC VICE, THE COURT ADOPTS ITS TENTATIVE RULING. JOHN COUGHLIN'S UNOPPOSED PRO HAC VICE APPLICATION IS GRANTED. ORDER SIGNED. JUDGE: RICHARD B. ULMER JR.; CLERK. SEAN KANE; NOT REPORTED. (302/RBU) | | |
| 2023-05-05 | DISMISSAL WITHOUT PREJUDICE ONLY. EACH SIDE TO BEAR ITS OWN FEES AND COSTS. (TRANSACTION ID # 210036096) AS TO DEFENDANT PALAMEDRIX, INC. | View | |

Showing 1 to 15 of 15 entries                                    Previous   [ 1 ]   Next

118

Document title: Case Information
Capture URL: https://webapps.sftc.org/ci/CaseInfo.dll?CaseNum=CGC23605398&amp;SessionID=196405F6772DDACB52B2A29CA62E6FB41D597A83
Capture timestamp (UTC): Thu, 25 May 2023 22:17:07 GMT

# EXHIBIT E

Page Vault

| | |
|---|---|
| Document title: | Case Information |
| Capture URL: | https://webapps.sftc.org/ci/CaseInfo.dll?CaseNum=CGC23605398&SessionID=196405F6772DDACB52B2A29CA62E6FB41D597A83 |
| Page loaded at (UTC): | Thu, 25 May 2023 22:16:23 GMT |
| Capture timestamp (UTC): | Thu, 25 May 2023 22:17:07 GMT |
| Capture tool: | 10.21.0 |
| Collection server IP: | 54.157.181.49 |
| Browser engine: | Mozilla/5.0 (Windows NT 10.0; Win64; x64) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/108.0.5359.215 Safari/537.36 |
| Operating system: | Windows_NT (Node 16.17.1) |
| PDF length: | 2 |
| Capture ID: | mePReWDBYa1CiexN2rHguU |
| User: | hh-bbrownlee |

THE SUPERIOR COURT OF CALIFORNIA
COUNTY OF SAN FRANCISCO

Case Number: CGC23605398
Title: FORMIC VENTURES, LLC ET AL VS. SOMALOGIC, INC. ET AL
Cause of Action: CONTRACT/WARRANTY
Generated: 2023-05-25 10:16 pm

Register of Actions     Parties     Attorneys     Calendar     Payments     Documents

**Please Note: The "View" document links on this web page are valid until 10:26:23 pm
After that, please refresh your web browser. (by pressing Command +R for Mac, pressing F5 for Windows or clicking the refresh button on your web browser)**

## Register of Actions

Show [All ▾] entries                                     Search: [          ]

| Date | Proceedings | Document | Fee |
|------|-------------|----------|-----|
| 2023-03-24 | CONTRACT/WARRANTY, COMPLAINT (TRANSACTION ID # 210032119) FILED BY PLAINTIFF FORMIC VENTURES, LLC THE MICHAEL ANTONOV CHARITABLE FOUNDATION, INC. BEOFUND LLC METAPLANET HOLDINGS OU AS TO DEFENDANT SOMALOGIC, INC. PALAMEDRIX, INC. DOES 1-10 NO SUMMONS ISSUED, JUDICIAL COUNCIL CIVIL CASE COVER SHEET NOT FILED CASE MANAGEMENT CONFERENCE SCHEDULED FOR AUG-23-2023 PROOF OF SERVICE DUE ON MAY-23-2023 CASE MANAGEMENT STATEMENT DUE ON JUL-31-2023 | View | $435.00 |
| 2023-03-24 | CIVIL CASE COVERSHEET FILED (TRANSACTION ID # 210032119) FILED BY PLAINTIFF FORMIC VENTURES, LLC THE MICHAEL ANTONOV CHARITABLE FOUNDATION, INC. BEOFUND LLC METAPLANET HOLDINGS OU | View | |
| 2023-03-24 | NOTICE TO PLAINTIFF | View | |
| 2023-03-24 | SUMMONS ISSUED (TRANSACTION ID # 210032119) TO PLAINTIFF FORMIC VENTURES, LLC THE MICHAEL ANTONOV CHARITABLE FOUNDATION, INC. BEOFUND LLC METAPLANET HOLDINGS OU | View | |
| 2023-04-03 | SUMMONS ON COMPLAINT (TRANSACTION ID # 210032796), PROOF OF SERVICE ONLY, FILED BY PLAINTIFF FORMIC VENTURES, LLC THE MICHAEL ANTONOV CHARITABLE FOUNDATION, INC. BEOFUND LLC METAPLANET HOLDINGS OU SERVED MAR-30-2023, PERSONAL SERVICE AS TO DEFENDANT SOMALOGIC, INC. | View | |
| 2023-04-03 | SUMMONS ON COMPLAINT (TRANSACTION ID # 210032797), PROOF OF SERVICE ONLY, FILED BY PLAINTIFF FORMIC VENTURES, LLC THE MICHAEL ANTONOV CHARITABLE FOUNDATION, INC. BEOFUND LLC METAPLANET HOLDINGS OU SERVED MAR-30-2023, PERSONAL SERVICE AS TO DEFENDANT PALAMEDRIX, INC. | View | |
| 2023-04-10 | MOTION TO ADMIT COUNSEL PRO HAC VICE, DECLARATION ATTY. JOHN V. COGHLAN (TRANSACTION ID # 210033554) FILED BY PLAINTIFF FORMIC VENTURES, LLC THE MICHAEL ANTONOV CHARITABLE FOUNDATION, INC. BEOFUND LLC METAPLANET HOLDINGS OU HEARING SET FOR MAY-04-2023 AT 09:30 AM IN DEPT 302 | View | $500.00 |
| 2023-04-10 | DECLARATION OF GEORGE B. A. LAIOLO IN SUPPORT OF THE APPLICATION OF JOHN V. COGHLAN TO APPEAR PRO HAC VICE (TRANSACTION ID # 210033554) FILED BY PLAINTIFF FORMIC VENTURES, LLC THE MICHAEL ANTONOV CHARITABLE FOUNDATION, INC. BEOFUND LLC METAPLANET HOLDINGS OU | View | |
| 2023-04-10 | PROOF OF SERVICE BY ELECTRONIC MAIL (TRANSACTION ID # 210033554) FILED BY PLAINTIFF FORMIC VENTURES, LLC THE MICHAEL ANTONOV CHARITABLE FOUNDATION, INC. BEOFUND LLC METAPLANET HOLDINGS OU | View | |
| 2023-04-11 | FEE PAID ON: JOINT STIPULATION AND [PROPOSED] ORDER EXTENDING TIME FOR A RESPONSIVE PLEADING (TRANSACTION ID # 100196528) FILED BY DEFENDANT SOMALOGIC, INC. PALAMEDRIX, INC. | | $870.00 |
| 2023-04-20 | ORDER - JOINT STIPULATION AND ORDER EXTENDING TIME FOR A RESPONSIVE PLEADING TO 5-31-23 | View | |
| 2023-05-04 | MINI MINUTES FOR MAY-04-2023 09:30 AM FOR DEPT 302 | | |
| 2023-05-04 | ORDER GRANTING APPLICATION TO APPEAR AS COUNSEL PRO HAC VICE FOR ATTORNEY JOHN V. COGHLAN FILED BY COUNSEL FOR PLAINTIFF FORMIC VENTURES, LLC THE MICHAEL ANTONOV CHARITABLE FOUNDATION, INC. BEOFUND LLC METAPLANET HOLDINGS OU | View | |
| 2023-05-04 | LAW & MOTION, DEPT. 302, AS TO THE MAY-04-2023 HEARING RE: PLAINTIFFS FORMIC VENTURES, LLC, THE MICHAEL ANTONOV CHARITABLE FOUNDATION, INC., BEOFUND LLC, AND METAPLANET HOLDINGS OU'S MOTION TO ADMIT COUNSEL PRO HAC VICE, THE COURT ADOPTS ITS TENTATIVE RULING. JOHN COUGHLIN'S UNOPPOSED PRO HAC VICE APPLICATION IS GRANTED. ORDER SIGNED. JUDGE: RICHARD B. ULMER JR.; CLERK: SEAN KANE; NOT REPORTED. (302/RBU) | | |
| 2023-05-05 | DISMISSAL WITHOUT PREJUDICE ONLY. EACH SIDE TO BEAR ITS OWN FEES AND COSTS. (TRANSACTION ID # 210036096) AS TO DEFENDANT PALAMEDRIX, INC. | View | |

Showing 1 to 15 of 15 entries                    Previous   [1]   Next

Document title: Case Information
Capture URL: https://webapps.sftc.org/ci/CaseInfo.dll?CaseNum=CGC23605398&amp;SessionID=196405F6772DDACB52B2A29CA62E6FB41D597A83
Capture timestamp (UTC): Thu, 25 May 2023 22:17:07 GMT

1

**PROOF OF SERVICE**

2

*Formic Ventures, LLC v. SomaLogic, Inc., et. al.*
*San Francisco Superior Court, Case No. CGC-23-605398*

3

I am employed in the County of Los Angeles, State of California.  I am over the age of 18

4

and not a party to the within action.  My business address is 523 West 6th Street, Suite 400, Los

5

Angeles, CA 90014.

6

On May 30, 2023, I served the foregoing document(s) described as:

7

**DEFENDANT SOMALOGIC, INC.'S NOTICE OF REMOVAL OF CIVIL ACTION**

8

on all of the interested parties in this action listed on the attached Service List by electronic mail by

9

transmitting a true copy of the foregoing document(s) to the e-mail addresses set forth on the

10

Service List. I declare under penalty of perjury under the laws of the State of California that the

11

foregoing is true and correct.

12

Executed on May 30, 2023, at Los Angeles, California.

13

14

15

*/s/ Susan Segovia*
Susan Segovia

16

17

18

19

20

21

22

23

24

25

26

27

28

122

6411960

1

**SERVICE LIST**

2

*Formic Ventures, LLC v. SomaLogic, Inc., et. al.,*
*San Francisco Superior Court, Case No. CGC-23-605398*

3

4

ELLIS GEORGE CIPOLLONE O'BRIEN
ANNAGUEY LLP

5

Keith J. Wesley

6

kwesley@egcfirm.com
John V. Coghlan (Pro Hac Vice)

7

jcoghlan@egcfirm.com
2121 Avenue of the Stars, 30th Floor

8

Los Angeles California 90067
Telephone: (310) 274-7100

9

Facsimile: (310) 275-5697

10

George B. A. Laiolo

11

glaiolo@egcfirm.com
44 Montgomery Street, Suite 1280

12

San Francisco, CA 94104
Telephone: (415) 391-7100

13

Facsimile: (415) 391-7198

14

*Attorneys for Plaintiffs Formic Ventures, LLC,*

15

*The Michael Antonov Charitable Foundation,*
*Inc., Beofund LLC, and Metaplanet Holdings*

16

*OU*

17

Honorable Judge Anne-Christine Massullo

18

Courtroom Room 610                              [Served by Mail Only]
San Francisco Superior Court

19

400 McAllister Street
San Francisco, CA 94102

20

21

22

23

24

25

26

27

28

SOMALOGIC, INC'S NOTICE OF REMOVAL

6411960